COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West-Plaza One
250 Pehle Avenue | Suite 401
Saddle Brook, NJ 07663
Telephone:  201/845-9600
201/845-9423  (fax)
psp@njlawfirm.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173  (fax)

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf Himself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>HERTZ GLOBAL HOLDINGS, INC., MARK P. FRISSORA and ELYSE DOUGLAS,<br><br>                              Defendants. | Civil Action No.:<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Pedro Ramirez, Jr. ("Plaintiff"), residing at 18 Silver Beech Road, Riverside, Connecticut 06878, alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by the Hertz Global Holdings, Inc. ("Hertz" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common stock of Hertz between February 25, 2013 and November 4, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b), as Hertz is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Pedro Ramirez, Jr., as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Hertz during the Class Period and has been damaged thereby.

7.     Defendant Hertz is one of the nation's largest automobile and equipment rental companies.  Headquartered in Park Ridge, New Jersey, the Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HTZ."  As of July 31, 2013, the Company had more than 401.5 million shares issued and outstanding.

8.     Defendant Mark P. Frissora ("Frissora") is, and was throughout the Class Period, the Chief Executive Officer ("CEO"), a director of Hertz and Chairman of its Board of Directors (the "Board").

9.     Defendant Elyse Douglas ("Douglas") served as Senior Executive Vice President and Chief Financial Officer ("CFO") of Hertz from the beginning of the Class Period through and including October 1, 2013, when she resigned.  Defendant Douglas made the following sales of Hertz stock during the Class Period at times and amounts that were unusual in light of her having made *no* open market sales of Hertz stock during fiscal 2012:

| DATE | NO. OF SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|
| April 15, 2013 | 36,758 | $23.09 | $848,742 |
| May 8, 2013 | 53,300 | $25.01 | $1,308,023 |
| May 15, 2013 | 57,700 | $25.04 | $1,444,808 |
| | *147,758* | | *$3,601,573* |

10.    The defendants identified above in ¶¶8-9 are sometimes referred to herein as the "Individual Defendants."   Defendant Hertz and the Individual Defendants are referred to herein as "Defendants."

11.    Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Hertz common stock was a success, as it: (i) deceived the investing public regarding Hertz's prospects and business; (ii) artificially inflated the price of Hertz common stock; (iii) enabled Defendant Douglas to sell more than *$3.6 million* of her personally-held Hertz common stock, and Hertz's former private equity owners to sell another *$4.44 billion* of their Hertz stock – (cashing them out completely) to the unsuspecting public; and (iv) caused

- 3 -

Plaintiff and other members of the Class to purchase Hertz common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

12.   Defendant Hertz, through its subsidiaries, engages in the car and equipment rental businesses worldwide.  As of November 2012, Hertz was the second-largest U.S. car rental company by sales.  The Company operates in two segments, Car Rental and Equipment Rental.  Hertz also offers claims administration services, such as investigating, evaluating, negotiating, and disposing of various claims, including third-party, first-party, bodily injury, property damage, general liability, and product liability.

13.   The Car Rental segment rents and leases various car models on an hourly, daily, weekend, weekly, monthly, or multi-month basis.  This segment operates car rental locations at or near airports, as well as in central business districts and suburban areas of cities in the United States, Canada, France, Germany, Italy, the United Kingdom, Spain, the Netherlands, Switzerland, Belgium, Luxembourg, the Czech Republic, Slovakia, Australia, New Zealand, China, and Brazil.  The Car Rental segment also operates retail used car sales locations in the United States, France, and Australia, as well as provides car-sharing services, and fleet leasing and management services.

14.     The Equipment Rental segment rents earthmoving equipment, material handling equipment, aerial and electrical equipment, air compressors, generators, pumps, small tools, compaction equipment, and construction-related trucks.  This segment also sells new equipment, and consumables, such as gloves and hardhats.

15.     In the Car Rental Segment, Hertz, which primarily appeals to a corporate clientele amenable to paying higher prices, has increasingly relied upon increased sales in the "opaque" market following its December 2012 divestiture of the U.S. operations of Advantage Rent A Car ("Advantage"), the division that had appealed more to lower-budget leisure travelers.  An opaque rental is a reservation that permits online customers to bid the price they want to pay for a specific travel-related product or service and location without knowing the brand.  The brand is revealed after the customer makes the online purchase.  While such opaque sales through travel discounting websites permit airlines, hotels and car rental firms to increase their market share and, importantly, their utilization, they do so at the expense of pricing, margins and profits.  Although the number of discount travel websites offering opaque car rental bookings has mushroomed, the most popular opaque travel websites have traditionally been Priceline.com and Hotwire.com.

16.     Prior to its divestiture, Hertz owned and operated Advantage, a car rental company headquartered in San Antonio, Texas which at its peak operated more than 150 U.S. locations and 130 locations in 33 countries internationally.

Advantage primarily serviced the leisure segment of the rental car market and predominantly operated in key domestic leisure destinations, including California, Florida, Texas, Colorado, Hawaii and Arizona.

17.    In order to facilitate Hertz's acquisition of Dollar Thrifty – a mid-market car rental purveyor – in late 2012, on November 19, 2012, Hertz entered into an agreement with the Federal Trade Commission to divest the Advantage brand and select Dollar Thrifty airport concessions.  Specifically, on August 26, 2012, Hertz announced that it agreed to sell the U.S. Advantage business to Franchise Services of North America ("FSNA") and Macquarie Capital.   As explained in the Company's third quarter 2012 financial report filed with the SEC on Form 10-Q on November 2, 2012, as part of the spin-off transaction, Hertz purportedly evaluated the Advantage fleet assets held on its books for impairment and represented that no impairment charge was necessary.   The Form 10-Q stated, in pertinent part, as follows:

**Advantage Divestiture**

On August 26, 2012, Hertz Holdings entered into a Merger Agreement with HDTMS, Inc., a Delaware corporation and an indirect wholly owned subsidiary of Hertz Holdings, and Dollar Thrifty pursuant to which Hertz Holdings has agreed to acquire Dollar Thrifty.  The Merger Agreement provides that, with respect to obtaining antitrust approval of the acquisition, Hertz Holdings is required to, among other actions, divest its Advantage Rent A Car, or "Advantage," business, together with certain additional assets and airport concessions, pursuant to a proposed consent agreement currently under discussion between Hertz Holdings and the United States Federal Trade Commission, or the

"FTC;" provided, however, that any such divestitures shall be conditioned upon the consummation of the Merger.  To that end, Hertz Holdings has reached a definitive agreement with Adreca Holdings Corp., a subsidiary of Macquarie Capital which is expected to be operated by Franchise Services of North America Inc., providing for the divestiture of its Advantage business, or the "Advantage Divestiture," selected Dollar Thrifty airport concessions and certain other assets, contingent on a successful acquisition of Dollar Thrifty.

As of September 30, 2012, the Advantage business was classified as held and used as the sale transaction was not probable and was contingent upon acquisition of Dollar Thrifty as of such date.  ***Hertz's agreement to divest its Advantage business, which if consummated would result in a loss, triggered an interim impairment analysis.  The assets were evaluated for impairment under a probability-weighted approach for developing estimates of future cash flows used to test a long-lived asset for recoverability.  The sum of future undiscounted cash flows of the Advantage business exceeds the carrying value as of September 30, 2012.  Accordingly, no impairment has been recognized at September 30, 2012.***[1]

Hertz estimates that the occurrence of the Advantage Divestiture would cause Hertz to realize a loss (before income taxes) in the range of approximately $30 million to $35 million.  This estimated loss associated with the Advantage Divestiture is preliminary and subject to further adjustments.  We can offer no assurance that the Merger Agreement will be consummated.

18.    On December 12, 2012, Hertz completed the sale of Simply Wheelz LLC ("Simply Wheelz"), a wholly-owned subsidiary of Hertz that operated its Advantage  business, to FSNA.

---

[1]    All emphasis in bold and italics is added, unless otherwise noted.

## HERTZ'S PRIVATE EQUITY OWNERS' EFFORTS TO CASH OUT

19.    In the late 1980s, Hertz, which had previously been owned by General Motors, was sold to an entity owned by the Ford Motor Company, Volvo and Hertz management.  In June 2005, Ford announced it would spin off Hertz in an initial public stock offering ("IPO").  However, on September 13, 2005, it was announced that instead, Hertz was to be sold to a private equity group comprised of Clayton, Dubilier & Rice, Inc. ("CD&R"), The Carlyle Group ("Carlyle") and Merrill Lynch Global Private Equity ("Merrill") (collectively, the "Private Equity Group") for $5.6 billion in cash and debt acquisition.  The sale to the Private Equity Group was completed on December 22, 2005.  The Private Equity Group then took Hertz public on November 16, 2006.

20.    In the November 2006 IPO, Hertz issued and sold more than 88 million shares and the Private Equity Group sold another 13.2 million shares at $15 per share, receiving $198 million in proceeds.  The Private Equity Group sold another 51.75 million shares of Hertz at $22.25 per share in an underwritten secondary stock offering June 2007, receiving more than $1.15 billion in proceeds.  Following the IPO, the Private Equity Group still held approximately 255 million shares of Hertz, or more than 79% of the Company's equity.

21.    In early 2011, the Private Equity Group, which still owned more than 70% of the Company's stock, began cashing out.  On March 30, 2011, the Private

Equity Group sold 50 million shares of Hertz to Goldman, Sachs & Co. ("Goldman Sachs") at $15.63 per share, receiving $781.5 million in proceeds, with Hertz registering those shares for resale by Goldman Sachs "from time to time for sale in one or more transactions on the [NYSE], in the over the counter market, through negotiated transactions or otherwise at market prices prevailing at the time of sale or at negotiated prices." Of those shares, CD&R sold approximately 38 million, Carlyle sold approximately 34 million, Merrill sold approximately 23.2 million, and an entity jointly-owned by the Private Equity Group sold the remaining 4.6 million.

22. Then, during the Class Period, on or about March 8, 2013, the Private Equity Group sold more than 60 million shares to Citigroup Global Markets Inc. ("Citigroup") and Barclays Capital Inc. ("Barclays") at $20.14 per share, receiving more than $1.2 billion in proceeds, with Hertz again registering the shares for resale by Citigroup and Barclays "from time to time for sale in one or more transactions on the [NYSE], in the over the counter market, through negotiated transactions or otherwise at market prices prevailing at the time of sale or at negotiated prices." Of those shares, CD&R sold approximately 38 million, Carlyle sold approximately 34 million, Merrill sold 43.3 million, and an entity jointly-owned by the Private Equity Group sold the remaining 4.6 million.

23. Finally, on or about May 8, 2013, also during the Class Period, the Private Equity Group sold nearly all of its more than 49.8 million remaining shares

to Goldman Sachs and J.P. Morgan Securities LLC ("J.P. Morgan") at $24.715 per share, receiving $1.24 billion in proceeds, with Hertz again registering the shares for resale by Goldman Sachs and J.P. Morgan "from time to time for sale in one or more transactions on the [NYSE], in the over the counter market, through negotiated transactions or otherwise at market prices prevailing at the time of sale or at negotiated prices."  Of these remaining shares, CD&R sold approximately 45.5 million, Carlyle sold approximately 40.6 million, Merrill sold approximately 7.7 million, and an entity jointly-owned by the Private Equity Group sold the remaining 5.5 million.

24.     Through these sales via Goldman Sachs, Citigroup, Barclays and J.P. Morgan, which were registered by Hertz during the Class Period, CD&R and Carlyle completely cashed out of their investments in Hertz and Merrill retained only a few hundred thousand shares, or less than 1% of Hertz's common stock.  These sales were also made as Hertz stock was trading at its highest levels in five years.

25.     Pursuant to a stockholder agreement between Hertz and the Private Equity Group, so long as Hertz qualified as a "controlled company" within the meaning of the NYSE rules, the Private Equity Group was entitled to nominate all members of the Hertz Board.  Early on (prior to many of the stock sales), those director nominees were to include three nominees by CD&R (one of whom was entitled to serve as Chairman of the Board or, if the CEO was Chairman, the Lead

Director), two nominees by Carlyle, two nominees by Merrill, and up to six independent directors (subject to unanimous consent of the Private Equity Group). As the Private Equity Group began selling its Hertz stock, the stockholders' agreement was amended and restated so that by March 2013, CD&R was only entitled to nominate two directors (one of whom was entitled to serve as Chair of the Executive Committee and as either Chairman of the Board or as Lead Director), and Carlyle was entitled to nominate one director.  During the Class Period, Hertz director Angel L. Morales, a Merrill designee and a founding member of Merrill Lynch Global Private Equity, the private equity arm of Merrill prior to its merger with Bank of America ("Bank of America"), also served as a managing partner of North Cove Partners, LLC, a registered investment adviser under the Investment Advisers Act of 1940 that acts as an adviser to the Global Principal Investments group of Bank of America.  Hertz director George W. Tamke, who has served as Lead Director of Hertz since July 2006 (and served as its Chairman from 2005 to 2006), also served as an operating analyst with CD&R during the Class Period. Hertz director David Wasserman, another CD&R designee, also served as a financial officer of CD&R, which he joined in 1998.  And Brian Bernasek, a Carlyle designee, also served as a managing director of Carlyle, which he joined in 2000.  The Private Equity Group's nomination rights were subject to continuing ownership requirements.  As result, all of the members of the Hertz Board served at the favor

of the Private Equity Group, and the Private Equity Group members had access to confidential, non-public information about the Advantage spin-off and the adverse effects it would have on Hertz.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

26.    The Class Period commences on February 25, 2013.  On that date, before the opening of trading, Hertz issued a press release announcing its financial results for fourth quarter and fiscal 2012, the quarter ended December 31, 2012 and during which the Advantage sale had closed, and Hertz's fiscal 2013 guidance.  The press release, entitled "Hertz Sets Financial Records for Fourth Quarter and Full Year," emphasized the Company's purportedly "record" results in its title and stated, in pertinent part, as follows:

> *Company provides earnings guidance and outlook for 2013*
>
> - *Record worldwide revenues for the fourth quarter and full year 2012, up 15.1%* (15.5% excluding currency effects), *and 8.7%* (10.5% excluding currency effects), *respectively, year-over-year ("YOY").*
>
> - *Record fourth quarter adjusted pre-tax margin of 9.2%,* and record adjusted pre-tax income of $213.5 million, 29.3% higher YOY.  On a GAAP basis, pre-tax loss was $40.3 million, attributable primarily to Dollar Thrifty Automotive Group, Inc., or "Dollar Thrifty," related acquisition costs and charges.
>
> - *Car rental adjusted pre-tax income for the fourth quarter up 29.5% YOY*, on an improved margin of 11.5%; worldwide equipment rental adjusted pre-tax income up 32.7% for the quarter, on an improved margin of 21.4%.

- ***Adjusted diluted earnings per share for the quarter of $0.33 increased 37.5%*** compared to $0.24 in the fourth quarter of 2011. GAAP diluted loss per share of $0.09 decreased from earnings per share of $0.11 for the prior year period. The GAAP loss in the fourth quarter of 2012 includes $0.24 per diluted share of costs and charges related to the Dollar Thrifty acquisition.

- ***FY 2012 net cash flow from operations of $2.72 billion, an increase of $484.7 million YOY.***

- ***Record Corporate EBITDA of $1.63 billion for the full year, up $246.1 million, or 17.7% YOY.***

- ***Record adjusted pre-tax income for FY 2012 of $901.5 million, up 32.5% YOY, on a margin of 10%, up 180 bps.  GAAP pre-tax income for FY 2012 of $450.6 million increased 38.9% compared to $324.3 million in 2011.***

27.    The release also quoted Defendant Frissora stating, in pertinent part, as

follows about the Company's purportedly then-present business metrics:

I'm pleased that Hertz once again delivered record fourth quarter and full year financial performance ***due to sustained operational excellence, improving pricing during the fourth quarter and the positive impact of strategic investments, including the acquisition of Dollar Thrifty Automotive Group.***  We also continue to realize best-in-class efficiency improvements with over $480 million of incremental cost savings in 2012, bringing total savings to over $2.6 billion since 2007.  Net cash flows from operations topped $2.7 billion last year, a $484.7 million year-over-year increase, and accelerating cash flow generation will be a critical financial objective going forward.  Finally, 2012 marked our third consecutive year of significant double-digit percentage improvements in adjusted pre-tax income, EBITDA, and adjusted earnings per share, as well as margin expansion[.]

28.    Purporting to detail the "Worldwide Car Rental" segment, the release

stated, in pertinent part, as follows:

Worldwide car rental revenues were $1,932.5 million for the fourth quarter of 2012, *an increase of 14.0%* (a 14.6% increase excluding the effects of foreign currency) *from the prior year period*. Transaction days for the quarter increased 17.3% over the fourth quarter of 2011 [25.4% U.S.; (0.9)% International]. U.S. off-airport total revenues for the fourth quarter increased 12.2% year-over-year, and transaction days increased 12.4% from the prior year period. Worldwide rental rate revenue per transaction day ("RPD") for the quarter decreased 2.8% [(1.7)% U.S.; (4.3)% International] from the prior year period. *The Company noted that U.S. pricing improved during the latter portion of the fourth quarter, culminating in December airport RPD increasing 1.6% for Hertz and 4.6% for Dollar Thrifty* (consistent with historical Dollar Thrifty calculation methodology). Growth in off-airport rentals, and specifically growth in replacement rentals, which have longer rental lengths, has a negative impact on RPD. However, it is important to note that off-airport's highly contributory profit is growing significantly.

Worldwide car rental adjusted pre-tax income for the fourth quarter of 2012 was $222.0 million, *an increase of $50.6 million from $171.4 million in the prior year period. The result was driven by increased volume, strong residual values and strong cost management performance*, partially offset by negative RPD. As a result, worldwide car rental achieved an adjusted pre-tax margin of 11.5% for the quarter, versus 10.1% in the prior year period.

*The worldwide average number of Company-operated cars, largely as a result of the Dollar Thrifty acquisition, for the fourth quarter of 2012 was 705,800, an increase of 17.8% over the prior year period, and 9.8% year-over-year excluding the Dollar Thrifty fleet.*

29.    As to "Outlook" for fiscal 2013, the release continued:

For the full year 2013, the Company forecasts the following:

|  | **Full Year 2013 Guidance** | **% Variance YOY** |
|---|---|---|
| Revenues | $10,850M - $10,950M | 20.3% - 21.4% |

| | | |
|---|---|---|
| Corporate EBITDA | $2,210M - $2,270M | 35.1% - 38.8% |
| Adjusted Pre-Tax Income | $1,270M - $1,340M | 40.9% - 48.6% |
| Adjusted Net Income | $830M - $875M | 39.5% - 47.1% |
| Adjusted Diluted Earnings Per Share | $1.82 - $1.92 | 37.4% - 44.9% |

***The Company forecasts full year 2013 revenues in the range of $10,850.0 million to $10,950.0 million. The range is based on the projection of modest economic growth, a strong U.S. Dollar and incremental franchising of certain rental operations.*** The adjusted diluted number of shares outstanding is estimated to fluctuate within a range of 440 million to 455 million through the year. The estimate for Q1 is 455 million shares outstanding. For example, based on 455 million adjusted diluted shares outstanding, the Company's full year 2013 guidance for adjusted diluted earnings per share is $1.92 at the upper end of the guidance range. The Company will provide an estimate of forecasted adjusted diluted shares outstanding on a quarterly basis.

***Additionally, Hertz forecasts lower monthly depreciation per vehicle in the U.S. of no less than 4% to 5% in 2013, with only modest deterioration in residual values due to the Company's increasingly diversified re-marketing channels. Dollar Thrifty synergies are expected to exceed previous forecasts, now estimated at $300 million of cost synergies from 2013 through 2015, and $300 million of revenue synergies over the same period.*** Also, the Company expects full year 2013 cash flow after fleet growth of between $500 million and $600 million due to higher earnings, lower fleet investments and the absence of significant, additional acquisitions.

Mark Frissora, commenting on the Company's outlook, said, ***"Our operating strengths and strategic investments are expected to help yield breakout results from 2013 through 2015 in the forms of further margin expansion and accelerated cash flow generation. We continue to make significant progress reducing fleet expenses, our largest operating cost, and we are encouraged that Dollar Thrifty synergies are likely to exceed our earlier forecasts. Additionally, we are off to a fast start this year with January 2013 car rental RPD at***

*U.S. airports up 6.0% for Hertz and 2.6% for Dollar Thrifty* (consistent with historical Dollar Thrifty calculation methodology). *We are also generating double-digit revenue growth from four of our $500 million-plus businesses: U.S. airport leisure, U.S. off-airport, HERC and Donlen, and we expect these businesses to maintain their pace of strong growth throughout 2013."*

30.     That same day, Hertz held a conference call for analysts and investors to discuss the Company's earnings release and operations – and in particular its strong fiscal 2013 guidance.  During the call, Defendants spoke positively about the Company's businesses and prospects.

31.     In its report entitled "Hertz Gains as 2013 Forecasts Exceed Analysts' Estimates" published that day, *Bloomberg* emphasized, quoting Defendants, that Hertz's "[a]djusted earnings per share for 2013 [would] rise to $1.82 to $1.92, on sales of as much as $10.95 billion," whereas "[a]nalysts [had only] projected $1.73 a share on revenue of $10.6 billion," citing "the averages of estimates compiled by *Bloomberg*."

32.     On this news, the price of Hertz stock closed up from its close of $18.73 on February 22, 2013 to close at $19.04 per share on February 25, 2013, on unusually high trading volume of more than 18 million shares traded.

33.     On March 4, 2013, Hertz filed its annual financial report on Form 10-K with the SEC, which was signed by Defendants Frissora and Douglas, among others.  According to the Form 10-K, Hertz reported "a loss on the Advantage

divestiture of $31.4 million." The Form 10-K also stated, as to the Advantage divestiture, in pertinent part, as follows:

> On December 12, 2012, Hertz completed the sale of Simply Wheelz LLC, or the "Advantage divestiture," a wholly owned subsidiary of Hertz that operated our Advantage Rent A Car business, or "Advantage," *for approximately $16.0 million, plus the value of current assets as of the closing date, which was approximately $3.6 million*. As part of the agreement to sell Advantage, Hertz agreed to provide financial support to the buyer of Advantage in the amount of $17.0 million over a period of three years from the closing date (with the present value of $15.6 million as of December 31, 2012). As a result of the Advantage divestiture, Hertz realized a loss (before income taxes) of approximately $31.4 million as of December 31, 2012.
>
> *To assist the buyer of Advantage in securing alternative fleet financing arrangements, Hertz entered into a senior note credit agreement, pursuant to which Hertz agreed, subject to certain conditions, to loan Simply Wheelz, on a senior unsecured basis, up to $45.0 million over 5 years (2.5 years weighted average life) at varied interest rates up to 13% over the life of the loan.*
>
> *Further, Hertz agreed to sublease vehicles to the buyer of Advantage for use in continuing the operations of Advantage, for a period no longer than two years from the closing date. As such, Hertz will have significant continuing involvement in the operations of the disposed Advantage business.* Therefore, the operating results associated with the Advantage business will continue to be classified as part of our continuing operations in the consolidated statements of operations for all periods presented.

34.     As detailed above, on or about March 8, 2013, the Private Equity Group sold more than 60 million shares of its Hertz stock to Citigroup and Barclays at $20.14 per share, receiving more than $1.2 billion in proceeds, with Hertz registering those shares for resale at market prices by Citigroup and Barclays. The prospectus

filed with the SEC that day and used by those underwriters to sell that stock was materially false and misleading as it failed to disclose material adverse information, as detailed herein, and was not prepared in accordance with the rules and regulations governing its preparation.

35.     As disclosed in the prospectus Hertz filed with the SEC in connection with that secondary stock offering, Hertz was actually "repurchasing from the underwriters 23,200,000 of the 60,050,777 shares of [its] common stock . . . at a price of $20.14 per share." As disclosed by Hertz in a press release issued on March 14, 2013, Hertz would then privately place $250 million of senior notes (the "Notes") in a private offering exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), the proceeds of which Hertz said it would use to "replenish a portion of its liquidity after having dividended approximately $467.2 million in available liquidity to the Company, which the Company used to repurchase approximately 23 million of the approximately 60 million shares of the Company's common stock sold in an offering by certain of the Company's stockholders on March 12, 2013."

36.     On April 2, 2013, Hertz, through Defendants Frissora and Douglas and other members of senior management, presented a purported overview of Hertz's "strategies, operations and financial results to financial investors in connection with

an investor meeting."  During the presentation, Defendants provided very positive additional statements about the Company's business, finances and prospects.

37.    The price of Hertz common stock further increased on these positive statements, increasing $1.50 per share, or approximately 8%, from its close of $21.91 per share on April 1, 2013 to close at $23.41 per share on April 2, 2013, on unusually high trading volume of more than 17 million shares traded.

38.    Defendant Douglas immediately acted to take advantage of these rises in the price of Hertz stock, selling 147,758 shares of Hertz stock and receiving more than $3.6 million in proceeds between April 15 and May 15, 2013.

39.    On April 29, 2013, Hertz issued a press release announcing its first quarter 2013 financial results for the period ended March 31, 2013, entitled "Hertz Sets Financial Records for First Quarter 2013."  As the February 25, 2013 release had, the release again emphasized the Company's purportedly ongoing "record" results in its title, stating, in pertinent part, as follows:

- ***Record first quarter worldwide revenues of $2,436.5 million, up 24.3% year-over-year ("YOY").***

- ***Record first quarter worldwide car rental revenues of $2,084.8 million, on record transaction days***; worldwide equipment rental revenues increased 16.2% YOY, with an 18.6% rental revenue increase in North America.

- U.S. car rental first quarter total RPD increased 4.8% YOY.

- Record first quarter adjusted pre-tax income of $144.5 million, compared with a $29.4 million adjusted pre-tax income in the

prior year period.  GAAP pre-tax income for the first quarter of $72.2 million, versus a loss of $36.8 million in the first quarter of 2012.

- *U.S. car rental adjusted pre-tax income for the first quarter up 19.7% YOY*, on adjusted pre-tax margin improvement of 160 bps.  U.S. car rental GAAP pre-tax income for the first quarter up 23.4% on pre-tax margin improvement of 180 bps.

- *Worldwide equipment rental adjusted pre-tax income up 76.8% for the quarter*, on an adjusted pre-tax margin improvement of 440 bps.  Worldwide equipment rental GAAP pre-tax income for the first quarter up 215.7% on pre-tax margin improvement of 580 bps.

- *Record first quarter adjusted diluted earnings per share of $0.21 versus adjusted diluted earnings per share of $0.05 in the first quarter of 2012.  Record first quarter GAAP diluted earnings per share of $0.04 versus a diluted earnings per share loss of $0.13 in the first quarter of 2012.*

- *Record first quarter Corporate EBITDA of $367.1 million, up $156.4 million, or 74.2% YOY.*

40.    Concerning the Company's purportedly then-present business metrics and glowing financial guidance, the release further stated, in pertinent part, as follows:

Mark P. Frissora, the Company's Chairman and Chief Executive Officer, said, *"We've now achieved record year-over-year adjusted pre-tax income seven consecutive quarters and increased employee productivity twenty six consecutive quarters.  Our record first quarter 2013 results were driven by year-over-year, double-digit revenue and pre-tax margin growth in the car and equipment rental and leasing businesses, especially in North America.  Dollar Thrifty is performing better than anticipated, with integration and synergy progress exceeding our targets,"* he added.

\*      \*      \*

***The Company reaffirms its full year 2013 guidance, provided on February 25, 2013, for revenues, Corporate EBITDA, adjusted pre-tax income, adjusted net income and adjusted diluted earnings per share.*** In 2013, the Company expects to generate worldwide revenues in the range of $10,850 million - $10,950 million, Corporate EBITDA in the range of $2,210 million - $2,270 million, adjusted pre-tax income in the range of $1,270 million - $1,340 million, adjusted net income in the range of $830 million - $875 million and adjusted diluted earnings per share in the range of $1.82 - $1.92.

41.     That same day, Hertz held a conference call for analysts and investors to discuss the Company's earnings release and operations – and in particular its strong fiscal 2013 guidance.  During the call, Defendants spoke positively about the Company's businesses and prospects.

42.     On May 2, 2013, Hertz filed its quarterly financial report on Form 10-Q with the SEC, which was signed by Defendants Frissora and Douglas.  The Form 10-Q now stated, as to the Advantage divestiture, in pertinent part, as follows:

On December 12, 2012, Hertz completed the sale of Simply Wheelz LLC, or the "Advantage divestiture," a wholly owned subsidiary of Hertz that operated our Advantage Rent A Car business, or "Advantage."  As part of the sale agreement, Hertz agreed to sublease vehicles to the buyer of Advantage for use in continuing the operations of Advantage, for a period no longer than two years from the closing date. ***As such, Hertz will have significant continuing involvement in the operations of the disposed Advantage business.***  Therefore, the operating results associated with the Advantage business will continue to be classified as part of our continuing operations in the consolidated statements of operations for all periods presented.

43.     As detailed above, on or about May 8, 2013, the Private Equity Group sold nearly all of its more than 49.8 million remaining shares of Hertz to Goldman Sachs and J.P. Morgan at $24.715 per share, receiving $1.24 billion in proceeds, with Hertz again registering those shares for resale by Goldman Sachs and J.P. Morgan at market prices.  The prospectus filed with the SEC that day and used by those underwriters to sell that stock was materially false and misleading as it failed to disclose material adverse information, as detailed herein, and was not prepared in accordance with the rules and regulations governing its preparation.

44.     Soon after this second offering, with the Private Equity Group having lost the right to appoint directors to the Company's Board, Hertz directors Angel L. Morales (a Bank of America/Merrill designee), David Wasserman (a CD&R designee) and Brian Bernasek (a Carlyle designee) would notify the Board that they were resigning as directors of the Company effective immediately.

45.     On July 29, 2013, Hertz issued a press release announcing its second quarter 2013 financial results for the period ended June 30, 2013, entitled "Hertz Sets Financial Records for Second Quarter 2013," once again emphasizing the Company's purportedly ongoing "record" results in the title and stating, in pertinent part, as follows:

- ***Record second quarter worldwide revenues of $2,714.6 million, up 22.0% year-over-year ("YOY").***

- ***Record second quarter worldwide car rental revenues of $2,329.5 million, on record transaction days; worldwide equipment rental revenues increased 14.7% YOY, with a 17.4% rental revenue increase in North America.***

- ***U.S. car rental second quarter total RPD increased 3.1% YOY, driven by U.S. airport leisure RPD up 4.4%.***

- ***Record second quarter adjusted pre-tax income of $314.5 million***, compared with a $233.9 million adjusted pre-tax income in the prior year period.  Record GAAP pre-tax income for the second quarter of $211.9 million, versus $158.7 million in the second quarter of 2012.

- ***Worldwide car rental adjusted pre-tax income for the second quarter up 30.9% YOY, and worldwide car rental GAAP pre-tax income for the second quarter up 30.7%.***

- ***Worldwide equipment rental adjusted pre-tax income for the second quarter up 74.4% for the quarter,*** on an adjusted pre-tax margin improvement of 660 bps.  ***Worldwide equipment rental GAAP pre-tax income for the second quarter up 123.5%*** on pre-tax margin improvement of 790 bps.

- ***Record second quarter adjusted diluted earnings per share of $0.45 versus adjusted diluted earnings per share of $0.35 in the second quarter of 2012.  Record second quarter GAAP diluted earnings per share of $0.27 versus diluted earnings per share of $0.21 in the second quarter of 2012.***

- ***Record second quarter Corporate EBITDA of $540.4 million, up $132.7 million, or 32.5% YOY.***

46.    As to the Company's purportedly then-present business metrics and

financial guidance, the release stated, in pertinent part, as follows:

Mark P. Frissora, the Company's Chairman and Chief Executive Officer, said, ***"Our eighth consecutive quarter of record adjusted pre-tax income, which increased 34.5% year-over-year in the second***

- 23 -

*quarter, was driven in part by double-digit revenue growth in four businesses: U.S. off-airport car rental, leisure car rental, HERC and Donlen. Hertz also achieved several other financial records this past quarter, the result of solid execution of balanced revenue, cost initiatives, and Dollar Thrifty synergies which are running ahead of plan," he added.*

*       *       *

*The Company reaffirms its full year 2013 guidance, provided on February 25, 2013, for revenues, Corporate EBITDA, adjusted pre-tax income, adjusted net income and adjusted diluted earnings per share.* In 2013, the Company expects to generate worldwide revenues in the range of $10,850 million - $10,950 million, Corporate EBITDA in the range of $2,210 million - $2,270 million, adjusted pre-tax income in the range of $1,270 million - $1,340 million, adjusted net income in the range of $830 million - $875 million and adjusted diluted earnings per share in the range of $1.82 - $1.92.

47.   That same day, Hertz held a conference call for analysts and investors to discuss the Company's earnings release and operations – and in particular its strong fiscal 2013 guidance. During the call, Defendants spoke positively about the Company's businesses and prospects.

48.   On August 2, 2013, Hertz filed its quarterly financial report on Form 10-Q with the SEC, which was signed by Defendants Frissora and Douglas. The Form 10-Q again stated, as to the Advantage divestiture, in pertinent part, as follows:

On December 12, 2012, Hertz completed the sale of Simply Wheelz LLC, or the "Advantage divestiture," a wholly owned subsidiary of Hertz that operated our Advantage Rent A Car business, or "Advantage." As part of the sale agreement, Hertz agreed to sublease vehicles to the buyer of Advantage for use in continuing the operations of Advantage, for a period no longer than two years from the closing date. *As such, Hertz will have significant continuing involvement in*

*the operations of the disposed Advantage business.*  Therefore, the operating results associated with the Advantage business will continue to be classified as part of our continuing operations in the consolidated statements of operations for all periods presented.

49.     On September 23, 2013, Hertz announced that Defendant Douglas had resigned from her position as Senior Executive Vice President and CFO effective October 1, 2013.  Though this was reported to be a resignation by Defendant Douglas "for personal reasons," Hertz announced on September 27, 2013 that Defendant Douglas was receiving a very lucrative severance package and payment in lieu of "outplacement services," including:

> Accrued Obligations and Vested Benefits: All accrued but unpaid obligations **through December 31, 2013, including salary**, reimbursement of business expenses and payment for earned but unused vacation days; Ms. Douglas will also receive payments under the Companies' plans in which Ms. Douglas is vested in accordance with the terms of such plans.
>
> **Cash Payment: Cash payments in the aggregate amount of $1,965,165,** which is equal to one and a half times the sum of Ms. Douglas's base salary plus her average bonus for the three prior years.
>
> **Options: Vesting of all options that would have vested on or before March 31, 2014 if Ms. Douglas had remained employed by the Company through March 31, 2014.**  All of Ms. Douglas's vested options shall be exercisable through July 31, 2014.
>
> **Performance Stock Units: Vesting of performance stock units that would have vested on or before March 31, 2014 if Ms. Douglas had remained employed by the Company through March 31, 2014** on the date the Compensation Committees of the Companies certify the applicable 2013 performance criteria with respect to the performance stock units.

*Bonus: Eligibility for 100% of the 2013 bonus to which Ms. Douglas otherwise would have been entitled (multiplied by the Companies' strategic performance modifier determined in respect of 2013), payable in accordance with the bonus plan but no later than March 15, 2014.*

*Outplacement: A lump sum payment of $25,000 in lieu of outplacement services.*

Car Privileges: Car privileges until December 31, 2014.

Health Coverage: Reimbursement of certain medical and health care coverage costs for a period of eighteen months.

50.    The statements in ¶¶26-31, 33-34, 36, 39-43 and 45-48 were each materially false and misleading because they failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that Hertz was losing sales in the all-important airport market which offers higher rental prices and margins than off-airport, longer-term "replacement car" locations;

(b)    that Hertz had significant undisclosed exposure to Advantage subsidiary Simply Wheelz's insolvency resulting from its having transferred much of its older, less valuable fleet to Advantage in the divestiture and valuing the fleet transferred to Advantage at improperly high prices;

(c)    that Hertz and Advantage were engaged in a disagreement over the value of the Advantage fleet assets;

(d)     that Hertz was carrying the value of its fleet transferred to Advantage and its subsidiary Simply Wheelz on its books at an artificially-inflated level; and

(e)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about Hertz and its business, earnings and prospects.

51.    After reporting quarter after quarter of purportedly "record" financial results during the Class Period, which Defendants claimed supported the Company's strong fiscal 2013 guidance that was also emphasized throughout the Class Period, suddenly, on September 26, 2013, before the opening of trading, Hertz shocked the market by issuing a press release at 5:45 a.m. entitled "Hertz Revises Full Year 2013 Guidance."  The release made the following substantial revisions to the guidance the Company had consistently maintained it was on track to reach since February 2013:

| ($ in Millions) | February 2013 Guidance | September 2013 Guidance |
|---|---|---|
| *Revenues* | *10,850.0 – 10,950.0* | *10,800.0 – 10,900.0* |
| Adj. Pre-Tax Income | 1,270.0 – 1,340.0 | 1,200.0 – 1,270.0 |
| *Corporate EBITDA* | *2,210.0 – 2,270.0* | *2,120.0 – 2,190.0* |
| *Adj. Net Income* | *830.0 – 875.0* | *780.0 – 830.0* |
| *Adj. EPS* | *1.78 – 1.88* | *1.68 – 1.78** |

52.    The press release quoted Defendant Frissora explaining, in pertinent part, as follows:

*We are revising full year 2013 guidance primarily because of weaker than anticipated volume generated by the Hertz brand in the U.S.*

- 27 -

*airport car rental market, our largest business. . . . Weaker volume impacts not only revenues, but also generates related fleet issues, including lower utilization and the inability of the used car market to absorb our excess vehicles at current market prices. . . .*

53.    In response to the unexpected guidance slashing, the price of Hertz stock plummeted by *more than $4 per share*, or approximately *16%*, to close at $21.63 per share, down from its prior night's close of $25.78, on extremely heavy trading volume of more than 74 million shares traded, or more than 11 times the average daily trading volume over the preceding 10 trading days.

54.    As Fred Lowrance, a senior research analyst with Avondale Partners LLC in Nashville Tennessee, told *Bloomberg* in an e-mail that day: "Investors 'didn't get any clues' from management the lower forecast was coming . . ."

55.    Then, on November 4, 2013, after the close of trading, Hertz issued a press release announcing its third quarter 2013 financial results for the quarter ended September 30, 2013.  The release disclosed that on a GAAP basis, *Hertz's net income fell to $214.7 million, or $0.47 per share, from $242.9 million, or $0.55 per share, in the third quarter of 2012,* disclosing for the first time the disastrous condition of Simply Wheelz's and Hertz's exposure to its insolvency, stating, in pertinent part, that:

> *As of September 30, 2013, Simply Wheelz, LLC, or "Simply Wheelz," the owner and operator of Hertz's divested Advantage brand, had not made payments due under concession and joint use agreements due to Hertz.  Simply Wheelz also did not make the sublease payments due to Hertz on October 1, 2013 or November 1, 2013.  Simply Wheelz's*

*parent Franchise Services of North America, Inc., or "FSNA," called us in early October to inform us that they were having liquidity issues and requested that Hertz delay seeking collection of all outstanding amounts owed to Hertz and agree to renegotiate certain aspects of existing commercial arrangements between the parties, including the financial terms on which Hertz is subleasing vehicles to them.*

We evaluated their request and suggested a number of changes that would be acceptable to Hertz. However, after extensive discussions with respect to a potential restructuring of those commercial arrangements, we determined that it was not in Hertz's best interests to make the requested changes and were unable to agree on a suitable alternative. On November 2, 2013, we terminated the applicable sublease contracts, and we continue evaluating our alternatives in light of the sublease termination.

*We currently estimate our total exposure to FSNA's liquidity issues to be between $50 and $70 million. We recorded a reserve in the third quarter of $4 million covering those amounts due but not paid as of September 30, 2013 and an aggregate impairment charge of $40 million to cover our expected loss on the sale, including transportation and auction fees, of the vehicles subleased to Simply Wheelz. The remaining $6-$26 million of exposure relates to professional fees, non-payment by FSNA of interest, sublease and other payments due Hertz which may fluctuate depending on when the vehicles are returned and sold.*

56.    That same day, Simply Wheelz issued its own press release announcing

that it was filing for protection under the federal bankruptcy statutes, with *Reuters*

reporting the following day on Hertz's significant undisclosed exposure to Simply

Wheelz, stating, in pertinent part, as follows:

> Advantage Rent A Car, which Hertz Corp hived off last year as part of its deal to buy Dollar Thrifty, would be placed under Chapter 11 bankruptcy on Tuesday, as its new owners question the book value of the fleet that was causing losses.

Hertz sold its Advantage brand, which competes with Dollar Thrifty in the low-cost segment of the market, to Franchise Services of North America and Macquarie Capital.

*Simply Wheelz LLC, a unit of Franchise Services of North America (FSNA) that does business as Advantage Rent A Car, bought 24,000 vehicles from Hertz as part of the deal.*

*The master lease agreement required Simply Wheelz to bear the residual value risk of the leased fleet.* Residual value shows how much an equipment is worth at the end of its lease, or at the end of its useful life.

*Simply Wheelz, as part of its fleet management operations, began to sell Hertz vehicles in June and booked losses on these sales, FSNA said.*

As of Oct. 25, Simply Wheelz had sold 5,295 vehicles through auctions for an average loss of about $1,633 per vehicle, and a total loss of about $8.6 million, according to FSNA.

*Given the "significant difference" between the book value of the Hertz vehicles and the fair market value realized at the auction, FSNA said it requested Hertz to provide information to determine the calculation of the net book value of the leased fleet.*

"Despite repeated requests, Hertz has not yet provided the company with such information notwithstanding the view of the company that Hertz is contractually obligated to do so," FSNA said in a statement.

Without access to this information, FSNA said it was unable to accurately quantify the potential loss it would experience as a result of its disposition of the Hertz leased fleet.

FSNA said that it has been in talks with three other parties, besides Hertz, for the sale of the Advantage car rental business and to obtain additional financing.

*Hertz offered to provide interim financing to Advantage, a move rejected by FSNA as the company said the terms offered by Hertz*

*would not lead to a broader auction that could fetch a higher sale price.*

*FSNA also ruled out a potential sale of the Advantage brand back to Hertz, saying the Federal Trade Commission may not approve it.*

57.     On this news, the price of Hertz stock further plummeted, falling *$2.50 per share*, or *10.50%*, on extremely high trading volume of more than 74 million shares traded, or more than eight times the average daily trading volume over the preceding 10 trading days.

58.     The market for Hertz common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Hertz common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Hertz common stock relying upon the integrity of the market price of Hertz common stock and market information relating to Hertz, and have been damaged thereby.

59.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hertz common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.   Said statements and omissions were materially false and misleading in that they failed to

disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

60.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Hertz's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Hertz and its business, prospects and operations, thus causing the price of Hertz common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Hertz common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Hertz stock was removed and the price of Hertz stock declined dramatically, causing loss to Plaintiff and the other members of the Class.

61.     The true facts, which were known by Defendants but concealed from the investing public during the Class Period, were that the Company was grossly

overstating demand for its U.S. airport rentals and the value of its fleet (and the fleet leased to Advantage) on its books.

62.    As a result of Defendants' false statements, Hertz common stock traded at artificially inflated levels during the Class Period.  After the above revelations seeped into the market, the price of Hertz common stock was hammered by massive sales.

## ADDITIONAL SCIENTER ALLEGATIONS

63.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Hertz, their control over, and/or receipt and/or modification of Hertz's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hertz, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

64.     At all relevant times, the market for Hertz common stock was an efficient market for the following reasons, among others:

(a)     Hertz stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     The Company had more than 401.5 million shares issued and outstanding during the Class Period.   During the Class Period, on average, approximately 8 million shares of Hertz stock were traded on a daily basis, demonstrating a very active and broad market for Hertz stock and permitting a very strong presumption of an efficient market;

(c)     Hertz purported that it was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)     As a regulated issuer, Hertz filed periodic public reports with the SEC and the NYSE;

(e)     Hertz regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 34 -

(f)    Hertz was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.    As a result of the foregoing, the market for Hertz common stock promptly digested current information regarding Hertz from all publicly available sources and reflected such information in the price of Hertz common stock.  Under these circumstances, all purchasers of Hertz common stock during the Class Period suffered similar injury through their purchase of Hertz common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at

the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hertz who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Hertz during the Class Period and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hertz shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hertz or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Hertz; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

73.     Plaintiff incorporates ¶¶1-72 by reference.

74.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Hertz common stock during the Class Period.

76.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hertz common stock. Plaintiff and the Class would not have purchased Hertz common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

77.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Hertz common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

78.    Plaintiff incorporates ¶¶1-77 by reference.

79.    The Individual Defendants acted as controlling persons of Hertz within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Hertz, and their ownership of Hertz stock, the Individual Defendants had the power and authority to cause Hertz to engage in the wrongful conduct complained of herein.  Hertz controlled each of the Individual Defendants

and all of its employees.  By reason of such conduct, the Individual Defendants and Hertz are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  November 20, 2013

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN


*/s/ Peter S. Pearlman*
PETER S. PEARLMAN

Park 80 West-Plaza One
250 Pehle Avenue | Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423  (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173  (fax)

ABRAHAM FRUCHTER &
  TWERSKY, LLP
JEFFREY ABRAHAM
One Penn Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655  (fax)

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that to the best of my knowledge, the matter in controversy is not currently the subject of one other action pending in this court.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of November, 2013.

*s/ Peter S. Pearlman*
PETER S. PEARLMAN


## CERTIFICATION OF NON-ARBITRABILITY PURSUANT TO L. CIV. R. 201.1

Peter S. Pearlman, of full age, certifies that pursuant to L. Civ. R. 201.1 the within matter is not arbitrable, being that the Complaint seeks damages that are in an excess of $150,000.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of November, 2013.

*s/ Peter S. Pearlman*
PETER S. PEARLMAN