NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

:
:
:          **Civil Action No. 13-7050**
**In re HERTZ GLOBAL HOLDINGS,**          :
**INC. SECURITIES LITIGATION**          :          **OPINION**
:
:          **July 22, 2015**
_____          :

**ARLEO**, **UNITED STATES DISTRICT JUDGE.**

Before the Court is the motion of Defendants Hertz Global Holdings, Inc. ("Hertz"), Mark

P. Frissora, and Elyse Douglas (collectively, "Defendants") to dismiss the Second Amended

Complaint (the "SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) [Dkt. No. 52].  Lead

Plaintiff Sheet Metal Workers' Local No. 80 Pension Trust Fund ("Plaintiff") opposes the motion.

No oral argument was heard pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule

78.1.  For the reasons set forth herein, Defendants' motion is **GRANTED**.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Introduction

Plaintiff brings this putative securities class action on behalf of purchasers of Hertz

common stock between May 8, 2013, and September 25, 2013 (the "Class Period"), alleging

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") as a result of various claimed misrepresentations and omissions by Defendants during that

time period.  Dkt. No. 45, SAC ¶¶ 1-2.  Plaintiff is a pension fund that purchased Hertz common

stock during the Class Period.  Id. ¶ 6.  Hertz is a publicly traded company engaged in the car and

equipment rental businesses, with the car rental business comprising the bulk (85%) of the

company's revenue.  Id. ¶¶ 7, 29.  Hertz became a publicly traded company on November 16, 2006, after it was purchased by a group of private equity entities (the "Private Equity Group").  Id. ¶ 30.  The Private Equity Group sold most of its 12.5% stake to Goldman, Sachs & Co. and J.P. Morgan Securities LLC on May 8, 2013, the first day of the Class Period.  Id. ¶¶ 31-32.  During the Class Period, Defendant Mark P. Frissora served as Hertz's CEO and Chairman and Defendant Elyse Douglas served as Hertz's Senior Executive Vice President and CFO.  Id. ¶¶ 8-9.

Plaintiff's case is based on three interrelated developments that occurred during the Class Period: overvaluation, overfleeting, and government sequestration.  Hertz allegedly overvalued a set of cars (the "Advantage Fleet") that were leased to a former Hertz subsidiary and failed to timely correct that overvaluation.  See id. ¶¶ 33-45, 73-96.  Hertz also allegedly failed to disclose the potential negative financial impact associated with maintaining excess rental car inventory (i.e., "overfleeting") in the face of a weakened market for used cars (the "Residual Market").  See id. ¶¶ 56-72.  Finally, Hertz allegedly failed to incorporate into its 2013 earnings guidance (the "2013 Earnings Guidance") the expected and continuing impact of the federal government budget sequestration (the "Sequester") that was signed into law on March 1, 2013.  See id. ¶¶ 46-55.  Plaintiff's allegations are based upon Hertz's public filings with the Securities and Exchange Commission ("SEC") and the Federal Trade Commission ("FTC"), various other publicly available documents, and interviews with eight confidential witnesses ("CWs").  Id. ¶¶ 18-28.

In connection with the above developments, Plaintiff alleges that Defendants made the following misstatements during the Class Period.  First, Ms. Douglas and Hertz misled investors by reaffirming the 2013 Earnings Guidance (originally issued on February 25, 2013) on May 21, 2013, and July 29, 2013, respectively.  See id. ¶¶ 105-06, 109-10.  Second, Mr. Frissora misled investors in his May 8, 2013, comments regarding the strength of the Residual Market and his July

29, 2013, comments regarding Hertz's efforts to reduce the size of its rental car fleet.  Id. ¶¶ 103-04, 112-13.  Third, Hertz's July 29, 2013, press release and its August 2, 2013, Form 10-Q filing for second quarter 2013 financial results (the "2Q13 Form 10-Q") both materially overstated Hertz's profits.  See id. ¶¶ 107-08, 114-15.  Fourth, Hertz's 2Q13 Form 10-Q also allegedly contained false statements concerning the strength of the Residual Market.[1]  Id. ¶¶ 116-17.  Finally, Plaintiff claims that Hertz's statement in its 2Q13 Form 10-Q that the risk factors identified in its 2012 Form 10-K did not require any update was materially misleading.  Id. ¶¶ 129-30.

These misstatements allegedly inflated the price of Hertz's stock, which then declined by approximately 16% after a September 26, 2013, press release (the "September 26 Press Release") in which Hertz revised its 2013 earnings guidance downward.  See id. ¶¶ 132-36.  The reduction in earnings guidance resulted from a $40 million impairment of the Advantage Fleet, issues with overfleeting, and softness in Hertz's airport rental business due in part to the impact of the Sequester.  Id. ¶ 133.  The reasons cited for the reduction in earnings guidance track the three developments discussed above, and Plaintiff claims that the misrepresentations associated with those developments hid risks from investors during the Class Period.  See id. ¶ 136.  The eventual disclosure of these risks in the September 26 Press Release resulted in the drop in Hertz's share price on that date.  Id.

In order to provide greater context, the Court will discuss the Class Period allegations in detail with respect to each of the three developments: overvaluation, overfleeting, and government sequestration.

### B.  Overvaluation of the Advantage Fleet

---

[1] Mr. Frissora and Ms. Douglas also certified the truthfulness of the 2Q13 Form 10-Q statements. See id. ¶¶ 121-23.

### 1. Background

The alleged overvaluation has its roots in Hertz's introduction of "Simply Wheelz by Hertz" ("Simply Wheelz") in 2007. Id. ¶ 33. Simply Wheelz was a Hertz subsidiary that sought to serve the "value-seeking" segment of the rental car market. Id. In furtherance of that goal, Hertz caused Simply Wheelz to purchase one of its competitors, Advantage Rent-A-Car ("Advantage"), out of bankruptcy for $33 million on or around April 1, 2009. Id. This purchase included Advantage's 24,000-vehicle fleet, which Simply Wheelz then used in its operations. See id. ¶ 36.

In 2012, Hertz entered into negotiations to acquire Dollar Thrifty Automotive Group ("Dollar Thrifty"), another Hertz competitor, for $2.3 billion. Id. ¶¶ 34-35. The acquisition could not be completed, however, without the approval of the Federal Trade Commission regarding compliance with federal antitrust laws. Id. ¶ 34. The FTC conditioned its approval of the deal on Hertz's fulfillment of a number of obligations, including divesting Simply Wheelz and the Advantage business (the "Divestiture"). Id. Hertz satisfied that obligation on July 13, 2012, when it sold Simply Wheelz to Adreca Holdings Corp. Id. Hertz then acquired Dollar Thrifty on November 19, 2012. Id. ¶ 35. The Divestiture was completed on December 12 of that year. Id.

Although Hertz no longer formally owned Simply Wheelz, Hertz was significantly involved in Simply Wheelz's operations under the terms of the Divestiture. See id. ¶¶ 36-38. Hertz retained ownership of the Advantage Fleet, which it then leased to Simply Wheelz in its entirety. Id. ¶ 36. Hertz also helped Simply Wheelz secure alternative fleet financing and agreed to lend Simply Wheelz up to $45 million over five years under a senior note credit agreement. Id. The sale agreement further required Simply Wheelz to sell the entire Advantage Fleet by December

31, 2014, through the use of Manheim, Inc. ("Manheim"), a major auctioneer for wholesale car buyers and sellers.  Id. ¶ 38.

Hertz's ownership of the Advantage Fleet meant control over the valuation of the cars within it.  The Divestiture also obligated Simply Wheelz to cover any "loss" on the sale of an Advantage Fleet vehicle, namely, the difference between Hertz's valuation of the car and the sale price.  Id. ¶ 42.  Plaintiff claims that Hertz overvalued the Advantage Fleet from the outset.  Id. ¶ 39.  Plaintiff alleges that Simply Wheelz began incurring "significant losses" on the sales of Advantage Fleet vehicles in June 2013.  Id. ¶ 40.  In support of that claim, Plaintiff relies on Confidential Witness 5 ("CW5"), who worked as an accounting consultant to Simply Wheelz between approximately March 2013 and early 2014.  See id. ¶¶ 25, 42-43.  CW5 claims that Simply Wheelz never profited on sales of the Advantage Fleet and, in fact, the company's largest losses came from those sales.  Id. ¶ 41.  CW5 also claims that Hertz received sales proceeds directly from Manheim, so "Hertz promptly learned when an Advantage Fleet vehicle was sold."  Id. ¶ 42.  Based on Hertz's continued involvement in Simply Wheelz's business and CW5's statements, Plaintiff concludes that "Defendants knew, or recklessly disregarded, that the Advantage Fleet vehicles were consistently being sold for a loss."  Id.

As a result, Plaintiff argues, Hertz should have recognized and disclosed a $40 million impairment in the Advantage Fleet's value no later than the quarter ended June 30, 2013.  Id. ¶ 45.  Hertz failed to do so.  Id. ¶ 73.  Allegedly, both Generally Accepted Accounting Principles ("GAAP")—a set of accounting guidelines with which Hertz represented that it complied—and Hertz's publicly disclosed method of determining the value and depreciation rate of particular assets required Hertz to recognize such an impairment.  Id. ¶¶ 73-74, 77.  Hertz's 2012 Form 10-K filed with the SEC stated that Hertz reviewed its depreciation rates on a quarterly basis.  Id. ¶

5

77.   GAAP requires review and impairment of an asset's valuation whenever facts or circumstances indicate that the asset's value exceeds the sum of the undiscounted cash flows a company expects to receive from use and disposal of the asset.  Id. ¶¶ 82-83.  Plaintiff argues that such facts or circumstances existed before Hertz filed its financial statements for the second quarter of 2013 based on the consistent losses on sales of Advantage Fleet vehicles in the late spring and early summer of 2013 and Hertz's alleged knowledge or reckless disregard of those losses.  See id. ¶¶ 86-96.  According to Plaintiff, Hertz was required to impair the value of the Advantage Fleet by $40 million or at least disclose the "reasonable possibility" of such an impairment in its financial statements.  Id. ¶¶ 95-96.

### 2.   Allegedly Actionable Statements

Plaintiff claims that Hertz's July 29, 2013, press release (the "2Q13 Press Release") was materially misleading.  In the 2Q13 Press Release, Hertz provided its overall revenue and income figures and represented that it had achieved record results for the second quarter of 2013.  Id. ¶ 107.  Plaintiff alleges that Hertz's failure to include a $40 million impairment in the Advantage Fleet in its second quarter financial results falsely inflated Hertz's actual operating results.  Id. ¶ 108.  Also, the 2Q13 Press Release reaffirmed the 2013 Earnings Guidance (originally issued on February 25, 2013) rather than adjusting that guidance to reflect an actual—or at least potential— impairment of the Advantage Fleet.  Id. ¶¶ 109-10.  Thus, Plaintiff claims, the 2Q13 Press Release was misleading.  Plaintiff also alleges that Hertz repeated the misstatements of the 2Q13 Press Release when it officially released the 2Q13 Form 10-Q on August 2, 2013, formally disclosing Hertz's financial results.  Id. ¶¶ 114-15.[2]

---

[2] Plaintiff also attributes these alleged misstatements to Defendants Douglas and Frissora because they certified that the 2Q13 Form 10-Q did not contain any untrue statement or omission of material fact.  Id. ¶¶ 121-22.  Defendant Douglas also signed the 2Q13 Form 10-Q.  Id. ¶ 114.

### C. Overfleeting and Weakness in the Residual Market

#### 1. Background

At times, fluctuations in the rental car market can cause an oversupply of rental cars relative to demand—known in the rental car industry as "overfleeting"—which can negatively impact a company's financial results.  Id. ¶ 57.  In order to correct such an imbalance, Hertz will typically reduce its fleet size by selling cars in the Residual Market through various channels.  Id. ¶ 56. Plaintiff alleges that Hertz was simultaneously overfleeted and limited in its ability to reduce fleet size by selling excess cars due to a weak Residual Market during the Class Period.  See id. ¶¶ 56- 72.  Hertz was therefore left with a dilemma: either sell cars at a loss or retain the cars and continue to incur the associated costs of ownership.  Id. ¶¶ 63-64.  Plaintiff claims that Defendants concealed this problem and knowingly misrepresented the strength of the Residual Market and Hertz's ability to reduce its fleet size.  Id. ¶¶ 64-68, 103-06, 109-13, 116-17, 120-21, 123.

#### 2. Overfleeting

Hertz allegedly became overfleeted after the acquisition of Dollar Thrifty.  Id. ¶ 59.  In addition, Plaintiff claims that Defendants were aware of the situation at that time and throughout the Class Period, but only disclosed the problem after the Class Period on September 26, 2013, when Mr. Frissora stated that Hertz "had too much fleet" after the Dollar Thrifty Acquisition.  Id. ¶¶ 59-60.

Plaintiff relies on Confidential Witnesses 1, 2, and 4 ("CW1," "CW2," and "CW4,"), who claim, directly or indirectly, that overfleeting was a known problem.  See id. ¶¶ 60-62.  CW1 was a Contribution Manager and Senior Revenue Manager for Hertz in the Denver, Colorado, region during the Class Period.  Id. ¶ 20.  CW1 claims that the overfleeting problem negatively impacted the profit and loss statements for which he was responsible and he spoke almost daily about the

problem with his "director," who allegedly told CW1 to "'push cars' as much as possible." Id. ¶ 60.   CW2 was also a Hertz employee during the Class Period, serving as a Revenue Manager/Contribution Strategist. Id. ¶ 22.  In that capacity, "CW2 was responsible for developing competitive pricing strategies for Hertz's rental vehicles in locations in Tallahassee, Jacksonville, and Savannah." Id.  CW2 claims that overfleeting in that region "became apparent by the end of March 2013 and April 2013." Id. ¶ 61.  CW2 further alleges that Hertz's overfleeting problem was widely known because "fleet utilization figures" were available to employees via Hertz's "VAW" system. Id.  Plaintiff avers that Mr. Frissora and Ms. Douglas would have had access to this system. Id.  Finally, CW4 was a Location Manager for Hertz at Newark Airport during the Class Period. Id. ¶ 24.  CW4 claims that during the summer of 2013, Newark Airport "had so many vehicles that CW4 felt like they were virtually being given away in order to rent them off the lot." Id. ¶ 62.

### 3. The Weak Residual Market

At the same time that Hertz was faced with overfleeting, a weak Residual Market allegedly hindered the company's ability to alleviate the problem.  Plaintiff alleges that Defendants were aware of the weakness in the Residual Market during the Class Period. Id. ¶ 65.  To support that allegation, Mr. Frissora's September 2013 statement that "he and others at Hertz thought the weak residual market in April and May 2013 was an 'aberration but weren't sure.'" Id.

To further illustrate the weakness in the Residual Market and Defendants' knowledge of that weakness, Plaintiff relies on Confidential Witnesses 6, 7, and 8 ("CW6," "CW7," and "CW8"). See id. ¶¶ 66-68.  As a Hertz Remarketing Manager at John Wayne Airport in Santa Ana, California, during the Class Period, CW6 was responsible for selling Hertz and Advantage Fleet cars. Id. ¶ 26.  CW6 claims that beginning in April or May 2013, Hertz's cars were

overpriced in the used car market.  Id. ¶ 66.  Hertz assigned more employees to sales efforts in June or July of 2013, as it was unable to sell cars at desired prices.  Id.  This strategy did not remedy Hertz's overfleeting problem, and Hertz ultimately sold fewer cars than it budgeted to sell in 2013.  Id.  CW7 served as a Remarketing Representative for Hertz in the Central Florida region beginning in June 2013.  Id. ¶ 27.  In that capacity, CW7 sold Hertz, Advantage, and Dollar Thrifty cars.  Id.  CW7 claims that he immediately recognized in June 2013 that Hertz's cars were overpriced, estimating that the cars were overvalued by between $800 and $1,300 per car.  Id. ¶ 67.  Finally, CW8 worked as a Fleet Remarketing Manager in Southern California for Dollar Thrifty prior to its acquisition by Hertz and continued to work for Hertz in that capacity after the acquisition.  Id. ¶ 28.  CW8 was tasked with selling Hertz and Dollar Thrifty cars at auctions held by Manheim and other auctioneers.  Id.  CW8 claims that Hertz did not allow cars to be sold at a loss during the summer of 2013, which resulted in many cars remaining unsold.  Id. ¶ 68.  CW8 provides as an example thousands of Infiniti Q-Series SUV's that CW8 was unable to sell.[3]  Id.

### 4.  Allegedly Actionable Statements During the Class Period

The first alleged misstatement concerning the Residual Market and Hertz's overfleeting was made by Mr. Frissora on a conference call with analysts on May 8, 2013 (the "May 8 Conference Call"), the first day of the Class Period.  Id. ¶ 103.  On the May 8 Conference Call, Mr. Frissora was asked a question about the Residual Market and stated repeatedly his belief that the Residual Market was strong at that time.  Id.  Plaintiff quotes snippets of Mr. Frissora's response, generally reflecting optimism about the Residual Market, although he also twice acknowledged that there had been some recent weakening in the Residual Market that he attributed

---

[3] Plaintiff provides additional allegations regarding "opaque pricing."  See Compl. ¶¶ 69-72. Viewing the SAC in its entirety, it is unclear where these allegations fit within the case.

to seasonal variation.  Id.  When Mr. Frissora's statements are read in context, it appears that he

was discussing the strength of the Residual Market in relation to its condition in 2007.  Mr.

Frissora's entire statement on the issue reads as follows:

> You know, I think residual values are right now way higher than what they've been
> historically.  The [Manheim Index] back to [2007], we're probably close to 20
> points higher than we were at pre-recessionary periods, on an index basis.  So we
> think residuals are strong.  I mean, we sit here and people are worrying about this,
> and I'm – it's a strong market.  I can sell more used cars in this market, it's a positive
> thing.  In terms of them weakening, yes, there's been some weakening, but again
> we always get weakening of residuals in this seasonal time period.  And everyone's
> talking about it, but it's like every year this happens. … Yes, there's some softening
> but I think the market overreacts to that.  So my opinion is still a strong market; we
> still feel good about it.

Dkt. No. 53-6, Cert. of Kevin H. Marino Ex. F at 4-5 (emphasis added).[4]  Mr. Frissora's first two

sentences indicate that he was comparing the Residual Market of 2007 with the Residual Market

as of May 8, 2013.  Plaintiff nonetheless claims that Mr. Frissora's statements were false and

misleading because he "was emphatically stating that the residual market was strong and that it

was a good time for Hertz to be selling used cars when the opposite was true."  Id. ¶ 104.

Plaintiff next claims that Ms. Douglas's and Hertz's reaffirmations of the 2013 Earnings

Guidance misled investors because the guidance should have been adjusted downward to reflect

the impact of the overfleeting/weak Residual Market issue.  Id. ¶¶ 105-06, 109-10.  Ms. Douglas

reaffirmed the 2013 Earnings Guidance during a May 21, 2013, conference call (the "May 21

---

[4] The Certification of Kevin H. Marino was submitted in support of Defendants' motion to dismiss.
The exhibits attached thereto are comprised mainly of public documents that Hertz has filed with
the SEC, as well as documents on which the SAC explicitly relies.  On a motion to dismiss, the
Court properly considers "document[s] integral to or explicitly relied upon in the" SAC.  See In re
Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations and
citations omitted).  Moreover, the Court may take judicial notice of public filings with the SEC.
Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).  The Court considers these documents not for
the purpose of establishing the truth of the statements made therein, but rather only for the purpose
of establishing that the statements were made so as to place the allegedly actionable statements in
proper context.

Conference Call"), while Hertz reaffirmed the guidance in the 2Q13 press release on July 29, 2013. Id. ¶¶ 105, 109.

Plaintiff also points to Mr. Frissora's response to an analyst's question on the July 29 Conference Call concerning whether Hertz planned to reduce the size of its fleet in light of the softness in the market. Id. ¶¶ 111-12. Mr. Frissora responded that Hertz was "definitely tightening" its fleet and always looked to do so whenever it saw "any kind of a volume softening in the environment." Id. This was false, Plaintiff claims, because Hertz "was unable to obtain desired prices for its excessive vehicles" due to the weak Residual Market and chose to retain those cars rather than sell them at a loss. Id. ¶ 113. Thus, Hertz could not have been "definitely tightening" its fleet because it was unable to sell as many cars as it wanted to. Id.

Finally, Plaintiff claims that Hertz's statements in the 2Q13 Form 10-Q regarding the strength of the Residual Market—and Mr. Frissora's and Ms. Douglas's certification that the 2Q13 Form 10-Q did not contain any untrue statement of material fact—were materially false and misleading. Id. ¶¶ 116-17, 121-23. Plaintiff focuses specifically on Hertz's statement in the 2Q13 Form 10-Q that "residuals have remained relatively strong during the [second quarter of 2013]." Id. ¶ 116. Immediately following that statement, however, the 2Q13 Form 10-Q reads: "For the six months ended June 30, 2013 and 2012, our worldwide car rental operations sold approximately 146,800 and 90,400 non-program cars, respectively, a 62.4% year over year increase." Dkt. No. 53-7, Marino Cert. Ex. G at 38. Notwithstanding that language, Plaintiff concludes that Hertz's characterization of the Residual Market was false because Advantage Fleet vehicles were being sold at a loss and Hertz could not sell excess cars at desired prices. SAC ¶ 117.

**D.  The Sequester**

**1.  Background**

11

On March 1, 2013, President Obama signed a law commonly known as the "Sequester," which required $1.2 trillion in budget cuts over nine years, including $85 billion in cuts for 2013. Id. ¶ 46. Plaintiff claims that although Hertz expected the Sequester to have an impact on its business, it failed to account for this impact when it issued reaffirmations of its 2013 earnings guidance. See id. ¶¶ 47, 105-06, 109-10. Hertz also allegedly failed to update its 2012 Form 10-K risk factors in accordance with Item 503 of Regulation S-K to reflect the impact of the Sequester and warn investors of Hertz's sensitivity to the Sequester relative to its competitors. Id. ¶¶ 128-30(b)-(c).

### 2.  The "Sequester Analysis"

Plaintiff's allegations concerning the impact of the Sequester and Hertz's knowledge thereof center on an internal analysis that assessed the potential and actual impact of the Sequester on Hertz's business (the "Sequester Analysis"). Id. ¶ 47. Hertz prepared two analyses: one predicting the impact of the Sequester prior to its implementation and another analyzing the Sequester's actual impact after implementation. Id. Senior Hertz executives allegedly ordered the Sequester Analysis, which evaluated the impact on the governmental businesses of both Hertz and the newly acquired Dollar Thrifty. Id. ¶ 48. The Sequester Analysis was circulated among a number of Hertz employees. Id. ¶ 49. Plaintiff further alleges on information and belief that the Sequester Analysis projected a 20-30% reduction and a 50-60% reduction in the Hertz and Dollar Thrifty governmental businesses, respectively. Id. Hertz employees also frequently discussed the impact of the Sequester during the Class Period. Id. ¶ 50. Because the Sequester Analysis assumed that the Sequester would remain in effect at least for the remainder of 2013, Hertz directed its employees in its Global Government & Strategic Programs department to ramp up efforts to obtain state government business. Id. ¶ 51.

Despite this harm, Plaintiff claims Hertz did not incorporate the impact of the Sequester into its 2013 Earnings Guidance, even though 6% of Hertz's total revenue was tied to the government and that portion of revenue was down 30-40% during the Class Period.  Id. ¶ 52. Plaintiff acknowledges that Hertz did acknowledge the impact of the Sequester at various points during the Class Period, but Plaintiff claims that "Defendants downplayed the severity of its impact on [Hertz's] operations."  Id. ¶ 53.  As an example, Plaintiff points to Mr. Frissora's comments on the July 29 Conference Call regarding the effect of the Sequester on airport demand.  Id.  There, Mr. Frissora said:

> Anything that is related to the government, as well as the Government business itself has been weaker.  Those accounts that are tied to the government are traveling a lot less and so overall, those are the primary drivers.  It is more of an economy. It has nothing to do with Hertz.  We're not losing share or anything.  So it is an overall economic environment that we're seeing right now.

Marino Cert. Ex. D at 8.  Thus, Mr. Frissora did acknowledge the negative impact of the Sequester. Plaintiff complains, however, that Mr. Frissora "failed to reveal the extent of the Sequester's impact by reaffirming [Hertz's] previously issued financial guidance."  SAC ¶ 53.

Plaintiff alleges that Hertz was more sensitive to the Sequester than its competitors, knew it was, and failed to disclose that fact.  Id. ¶ 54.  Hertz's awareness of this sensitivity is allegedly shown by a statement by Mr. Frissora on November 5, 2013: "Hertz has a fairly high share in customers that serve the government so there was some impact on that business that might have been greater than our competitors."  Id.  It was not until the September 26 Conference Call that Mr. Frissora revealed that Hertz's government-related business was down 40% through August 2013.  Id. ¶ 55.

### 3.  Allegedly Actionable Statements During the Class Period

The alleged actionable statements here are twofold.  First, Plaintiff argues that Hertz should have adjusted its guidance downward in light of the actual and anticipated impact of the Sequester, so Hertz's and Ms. Douglas's reaffirmations of Hertz's 2013 earnings guidance in the July 29 Press Release and on the May 21 Conference Call were materially misleading.  See id. ¶¶ 105-06(a), 109-10(a).  Second, Plaintiff argues that Hertz should have updated the 10-K Risk Factors to reflect the past and continuing impact of the Sequester and Hertz's sensitivity to the Sequester, so Hertz's 2Q13 Form 10-Q materially misled investors by representing that there was "no material change" in the risk factors that were identified in Item 1A of the 2012 Form 10-K (the "10-K Risk Factors").  Id. ¶ 129-30.

### E.  Procedural History

This action was filed on November 20, 2013.  Dkt. No. 1, Compl.  Plaintiff was appointed lead plaintiff on February 20, 2014, and Plaintiff filed the First Amended Complaint ("FAC") on May 7, 2014.  Dkt. No. 7, Order Granting Mot. to Appoint Lead Pl.; Dkt. No. 19, FAC.  Defendants then moved to dismiss the FAC on June 23, 2014.  Dkt. No. 33, Mot. to Dismiss FAC.  At a hearing on October 1, 2014, the Honorable Stanley R. Chesler dismissed the FAC "without prejudice for failure to adequately plead the statements which are fraudulent and to comply with the PSLRA requirement that [Plaintiff] plead with specificity the manner in which those statements are fraudulent."  Dkt. No. 43, Hr'g Tr. at 28:15-19.  Judge Chesler gave Plaintiff the opportunity to file an amended complaint, but warned Plaintiff that the Court would not give any additional opportunities.  Id. at 29:1-21.  Plaintiff then filed the SAC on November 7, 2014.  Dkt. No. 45, SAC.  This motion followed.

## II.   STANDARD OF REVIEW UNDER RULE 12(B)(6)

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief" and provides the defendant with "fair notice of what the . . . the claim is and the grounds upon which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal quotations omitted).  In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  Id.

However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.  That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.  Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In order to determine whether a complaint is sufficient under these standards, the Third Circuit requires a three-part inquiry: the court must (1) recite the elements that must be pled in order to state a claim; (2) determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) assume the veracity of well-pleaded factual allegations and ascertain whether they plausibly give rise to a right to relief. Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

## III.   COUNT I: SECTION 10(B) CLAIM

### A.  Elements of the Claim and Additional Pleading Requirements Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe …."  15 U.S.C. § 78j(b).  Pursuant to its authority under § 10(b), the SEC promulgated Rule 10b-5, which renders it "unlawful for any person … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Investors have an implied private cause of action under § 10(b) to remedy any harm resulting from materially false or misleading statements.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011).

In order to state a claim under § 10(b), a plaintiff must allege the following elements: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  City of Edinburgh Council v. Pfizer, Inc., 745 F.3d 159, 167 (3d Cir. 2014).

In addition to the customary pleading requirements under Federal Rule of Civil Procedure 8, Congress imposed stringent requirements for § 10(b) claims under the PSLRA.  The PSLRA requires a would-be § 10(b) plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  In addition, plaintiff must plead scienter with particularity.  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006).  In order to satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2)(A) (emphasis added).  A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 324 (2007).

As claims under § 10(b) sound in fraud, the plaintiff must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 236 (3d Cir. 2004).  Accordingly, the plaintiff must, at the very least, plead "the 'who, what, when, where and how' of the events at issue."  <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 217 (3d Cir. 2002) (internal citation omitted).  With these principles in mind, the Court now turns to the substance of Plaintiff's § 10(b) claim.

## B.  Analysis

Defendants make four arguments for dismissal of Plaintiff's § 10(b) claim: (1) the SAC does not comply with the PSLRA's pleading requirements;[5] (2) Plaintiff fails to plead any actionable statements; (3) Plaintiff does not adequately plead scienter; and (4) Plaintiffs fail to plead loss causation.[6]

### 1.  Alleged Misrepresentations

#### a.  Statements of Fact Regarding the Strength of the Residual Market

---

[5] As an initial matter, the Court is satisfied that the SAC complies with the PSLRA's threshold requirement that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1). The SAC specifically identifies each alleged misstatement and summarizes the reasons why it is misleading.  The Court therefore declines Defendants' invitation to dismiss the SAC on specificity grounds.

[6] Given the fact-intensive inquiry that loss causation requires, it is generally inappropriate to decide that issue on a Rule 12(b)(6) motion to dismiss.  <u>McCabe v. Ernst & Young, LLP</u>, 494 F.3d 418, 427 n.4 (3d Cir. 2007).  Moreover, the plaintiff's burden in adequately pleading loss causation is not great—the plaintiff need only give "some indication of the loss and the causal connection that the plaintiff has in mind."  <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005).  The Court is satisfied that the allegations in the SAC meet that standard.  <u>See</u> SAC ¶¶ 189-95.

Plaintiff identifies three alleged misrepresentations relating to the Residual Market: (1) Mr. Frissora's statements on the May 8 Conference Call, SAC ¶¶ 103-04; (2) Hertz's statement in the 2Q13 Form 10-Q that "residuals have remained relatively strong," id. ¶¶ 116-17; and (3) Mr. Frissora's and Ms. Douglas's certification of the truth of statements in the 2Q13 Form 10-Q due to the allegedly false statement quoted above, id. ¶¶ 121, 123.  For each of these statements, however, Plaintiff fails adequately to allege objective falsity.[7]  These statements are therefore not actionable.

On the May 8 Conference Call, Mr. Frissora stated that he believed that "residuals are strong," "[t]he overall residual market is very strong," and that the Residual Market was "still a strong market."  SAC ¶ 103-04.  Plaintiff argues these statements were false and misleading because the Residual Market was experiencing weakness at the time the statements were made. Id. ¶ 104.  A fair reading of Mr. Frissora's statement in its entirety demonstrates otherwise.

Plaintiff ignores Mr. Frissora's multiple references to the prevailing "softness" in the Residual Market.  These references include his acknowledgements that "yes, there's been some weakening [in the Residual Market]" and "[y]es, there's some softening … ."  See id. ¶¶ 103-04. Though Plaintiff claims that Mr. Frissora did not disclose his knowledge of weakness in the Residual Market until September 2013, the statements cited in the Complaint show otherwise.

---

[7] The parties dispute whether Mr. Frissora's comments on the May 8 Conference Call are statements of opinion or statements of fact.  In the context of a claim under § 11 of the Securities Act of 1933, the Supreme Court recently determined that an opinion may be actionable: (1) as an untrue statement of material fact if the opinion is both incorrect (i.e., objectively false) and not genuinely believed; or (2) as misleading if the speaker omits material facts underlying the basis for the opinion "if those facts conflict with what a reasonable investor would take from the statement itself."  Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1326, 1329 (2015).  Given that Omnicare concerned a claim under a statute not at issue here, it is unclear whether the holding in the case would extend to § 10(b) claims.  Whether Omnicare's holding does apply here is immaterial because Plaintiff neither establishes that the statements are objectively false nor pleads that Mr. Frissora omitted any material facts.

Furthermore, Mr. Frissora's statements, when considered in context, can only plausibly be read to say that the Residual Market was strong in relation to historical benchmarks. Prior to stating his belief regarding the strength of the Residual Market, Mr. Frissora opined, "You know, I think residual values are right now way higher than what they've been historically. The [Manheim Index] back to [2007], we're probably close to 20 points higher than we were at pre-recessionary periods, on an index basis." Marino Cert. Ex. F at 4. Only after those statements does Mr. Frissora state that "residuals are strong." Id. Plaintiff does not plead that the Residual Market was not strong in relation to the historical benchmarks Mr. Frissora referenced.[8] Therefore, Plaintiff has failed to plead that Mr. Frissora's statements on the May 8 Conference Call were objectively false.

Mr. Frissora's and Ms. Douglas's certification that the 2Q13 10-Q was accurate is not false for the same reason: read in context, the 2Q13 10-Q was discussing a year-to-year comparison of non-program car sales. Plaintiff identifies the following 2Q13 10-Q statement as false: "residuals remained relatively strong during the period." SAC ¶ 123. But immediately following that allegedly false statement, the 2Q13 10-Q continues: "For the six months ended June 30, 2013 and 2012, our worldwide car rental operations sold approximately 146,800 and 90,400 non-program cars, respectively, a 62.4% year over year increase." Dkt. No. 53-7, Marino Cert. Ex. G at 38. Read in context, Hertz's characterization of the Residual Market as "relatively strong" was based on a year-to-year comparison of non-program car sales. Plaintiff levels no allegation that Hertz

---

[8] Plaintiff argues that whether Mr. Frissora's statement was discussing the condition of the prevailing Residual Market in relation to its pre-recession condition is an issue of fact inappropriately addressed on a Rule 12(b)(6) motion to dismiss. The Court disagrees. Plaintiff must plausibly plead an objectively false statement, not cherry-pick snippets to create "questions of fact" about context. The only plausible construction of Mr. Frissora's statement, when considered as a whole, is that he believed there was a strong Residual Market in relation to historical benchmarks.

did not have such a year-to-year increase.  The SAC accordingly fails to plead objective falsity with respect to this statement, as well.  Cf. In re Lululemon Sec. Litig., 14. F. Supp. 3d 553, 577-79 (S.D.N.Y. 2014) (plaintiff failed to plead falsity as to seven statements when the statements were read in the context of the language surrounding them).

**b.  Mr. Frissora's Statements Regarding Hertz's Efforts to Reduce Fleet Size**

Plaintiff alleges that Mr. Frissora's comments on the July 29 Conference Call regarding Hertz's efforts to "tighten" its fleet were false and misleading because Hertz could not sell as many cars as it budgeted to sell due to the weak residual market.  Compl. ¶¶ 65-69, 112-13.  But Plaintiff admits that Hertz was selling cars during the Class Period and was even ramping up its efforts to sell cars.  See id. ¶ 66.  Hertz may not have sold as many cars as it hoped, but that does not mean Hertz was not "tightening" its fleet.  Therefore, Plaintiff fails to plead falsity as to these statements.

**c.  Forward-Looking Statements: Reaffirmations of the 2013 Earnings Guidance**

Plaintiff claims that Ms. Douglas's and Hertz's respective reaffirmations of Hertz's 2013 Earnings Guidance on May 21, 2013, and July 29, 2013, were false and misleading.  The May 21 Conference Call's reaffirmation was allegedly misleading in light of the expected and continuing impact of the Sequester and Hertz's overfleeting/weak Residual Market problem.  Id. ¶¶ 105-06. Plaintiff's allegations with respect to the July 29, 2013, reaffirmation are substantially the same, except that Plaintiff also claims that Hertz should have adjusted the guidance to reflect an actual or possible impairment in the value of the Advantage Fleet.  Id. ¶¶ 109-10.  These allegations fail on a number of grounds.

Because they are projections of financial results, the reaffirmations of the 2013 Earnings Guidance plainly are forward-looking statements under the PSLRA.[9]   See 15 U.S.C. § 78u-5(i)(1)(A); see also Abuhamdan v. Blyth, Inc., 9 F. Supp. 3d 175, 191-92 (D. Conn. 2014); In re PDI Sec. Litig., No. 02-0211, 2005 WL 2009892, at *10 (D.N.J. Aug. 17, 2005).   The PSLRA renders a forward-looking statement non-actionable where: (1) it is identified as forward-looking and is accompanied by meaningful cautionary language; (2) it is immaterial; or (3) it is made without actual knowledge that it is false or misleading.   In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 278-79 (3d Cir. 2010) (citing 15 U.S.C. § 78u-5(c)(1)).   Here, the reaffirmations are protected by the PSLRA's safe harbor for two reasons: (1) they were accompanied by meaningful cautionary language and (2) Plaintiff's allegations fail to give rise to a reasonable inference that Hertz and Ms. Douglas reaffirmed the guidance with actual knowledge of its falsity.

### i.   Safe Harbor Protection Under the "Cautionary Language" Prong

Plaintiff alleges that Ms. Douglas's and Hertz's reaffirmations of the 2013 Earnings Guidance are not entitled to safe harbor protection because any accompanying cautionary language was insufficiently specific as to the risks associated with: (1) the Sequester; (2) Hertz's ability to manage its fleet size; and (3) the Advantage Divestiture.   See SAC ¶¶ 158-77.   The Court disagrees.

The PSLRA's safe harbor is applicable where a forward-looking statement is identified as such and is accompanied by meaningful, cautionary language.   15 U.S.C. § 78u-5(c)(1)(A)(i).   The

---

[9] Plaintiff argues that although the reaffirmations have forward-looking elements, they do not fall within the PSLRA's safe harbor because the Earnings Guidance focuses not only on future events, but also on then-existing facts and circumstances that Defendants allegedly failed to disclose.   The Court disagrees.   Following Plaintiff's logic, essentially all financial projections would be unprotected by the PSLRA's safe harbor, since all financial projections are, at some level, based on present or past facts.   The PSLRA's safe harbor focuses on the statements themselves, not on the assumptions or existing facts underlying them.   Where the statements in question speak only to events expected to occur in the future, they are forward-looking statements entitled to protection under the safe harbor.

PSLRA's focus on cautionary language tracks the judge-made "bespeaks caution" doctrine, which provides that sufficient cautionary language "renders the alleged omissions or misrepresentations immaterial as a matter of law." EP MedSystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 873 (3d Cir. 2000). Cautionary language is sufficiently meaningful where it is extensive and specific and directly touches upon the subject matter of the alleged misrepresentation. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir. 2004). Thus, boilerplate language that merely warns readers of the risks associated with investing is generally insufficient. Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir. 2009) (internal quotations and citations omitted). The cautionary language need not be contained within the same document as the forward-looking statement itself; instead, cautionary language in SEC filings "may be incorporated by reference" into the document containing the forward-looking statement. Aetna, 617 F.3d at 282 (quoting In re Merck & Co. Sec. Litig., 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

Here, Hertz incorporated by reference the risk factors identified in Item 1A of the 2012 Form 10-K into every statement Defendants made during the class period. See, e.g., Marino Cert. Ex. B at 1-2, Ex. C at 5-6, Ex. D at 2, Ex. G at 35-36; SAC ¶ 164. Plaintiff claims that these risk factors were not sufficiently specific.

### (1) Cautionary Language Regarding the Sequester

With respect to the Sequester, Hertz's 2012 Form 10-K warns of "the impact of pending and future U.S. governmental action to address budget deficits through reductions in spending and similar austerity measures, which could materially adversely affect unemployment rates and consumer spending levels." Marino Cert. Ex. B at 1. Plaintiff alleges that this language was not meaningful because "Defendants failed to disclose that the Sequester had already, and was expected to continue, to materially impact Hertz's business." SAC ¶ 169. This Court disagrees.

The above language meaningfully warned investors that deficit-cutting measures implemented by the federal government could impact future financial results. The cautionary language need not use the word "sequester" or provide a precise characterization of Hertz's government business as of either May 21, 2013, or July 29, 2013, in order to be meaningful. It clearly warned investors that government cost-cutting measures—such as the Sequester—posed a risk to Hertz's business, a risk which Hertz still faced as of July 29, 2013. The Court is therefore satisfied that Hertz's cautionary language here was adequate.[10]

### (2) Cautionary Language Regarding Overfleeting and the Residual Market

The Court is similarly convinced that Hertz provided specific and extensive cautionary language addressing the potential risks associated with overfleeting and fluctuations in the Residual Market. Hertz specifically warned in its 2012 Form 10-K of the potential difficulties that the company faced with respect to: (1) the risks associated with the Dollar Thrifty Acquisition and (2) increased exposure to declining residual values and a concomitant decrease in Hertz's ability to manage fleet size. Marino Cert. Ex. B at 1-2, 22.

Plaintiff alleges that Hertz knowingly or recklessly disregarded its overfleeting following the Dollar Thrifty Acquisition and failed sufficiently to warn investors of potential complications the company faced in managing its fleet size after the acquisition. See SAC ¶¶ 59, 164-65. This is belied by the warnings contained in Hertz's 2012 Form 10-K. First, the 2012 Form 10-K warns

---

[10] In any event, Mr. Frissora specifically disclosed the negative impact of the Sequester both before and during the Class Period. For example, on an April 30, 2013, conference call, Mr. Frissora stated that Hertz had "experienced some softness" due in part to "the initial impact of the sequester" and further acknowledged that "[v]olumes in [Hertz's] government business were down double-digits [in April]." Marino Cert. Ex. I at 6. On the July 29 Conference Call, Mr. Frissora again acknowledged the "significant" impact of the Sequester on Hertz's and stated that all of Hertz's government-related business was "weaker." Marino Cert. Ex. D at 8.

that Hertz's results could be affected by its "ability to integrate the car rental operations of Dollar Thrifty and realize operational efficiencies from the acquisition."  SAC ¶ 164; Marino Cert. Ex. B at 1.  Hertz also stated that integration could take longer or be more costly than expected and identified a number of issues that Hertz would have to address.  Marino Cert. Ex. B at 30.  Specifically, the company needed to address "integrating and optimizing the utilization of the rental vehicle fleets" and "consolidating the automotive purchasing, maintenance and resale operations."  Id.  Moreover, Hertz acknowledged that the company had incurred, and would continue to incur, significant costs with respect to, inter alia, "fleet and systems consolidation costs" in connection with the acquisition.  Id.  These statements sufficiently placed investors on notice of the risks associated with integrating the Dollar Thrifty fleet.

Plaintiff also claims that Hertz's warnings regarding the company's increased exposure to risk in the Residual Market did not meaningfully address Hertz's problem of overfleeting in a weak Residual Market.  SAC ¶¶ 164-65.  But Hertz clearly warned at multiple points in the 2012 Form 10-K of these risks.  It cautioned that expected financial results could be negatively impacted by "an increase in our fleet costs as a result of … a decrease in the price at which we dispose of used vehicles either in the used vehicle market or under repurchase or guaranteed depreciation programs."  Marino Cert. Ex. B at 1.  Hertz also warned of potential impacts to the company's "ability to accurately estimate future levels of rental activity and adjust the size and mix of our fleet accordingly." [11]  Id. at 2.  Hertz specifically addressed the risks associated with the increased percentage of "non-program" cars in its fleet versus "program" cars.  See id. at 22; SAC ¶ 164.

---

[11] The Court recognizes Plaintiff's allegation that Hertz used identical language in its 2010 and 2011 Forms 10-K.  SAC ¶ 166.  Of course, the repeated use of the same cautionary language casts doubt upon its meaningfulness.  But considering all of Hertz's warnings regarding the overfleeting/weak Residual Market issue together, the Court is satisfied that Hertz's cautionary language is sufficiently meaningful.

Hertz warned that this development exposed it to "an increased risk that the market value of a car will be less than its estimated value," since "program" cars were insulated from the risks associated with a downturn in the Residual Market.  SAC ¶ 164.  Hertz therefore concluded that its ability to reduce the size of its fleet by selling cars "without the risk of loss in the event of an economic downturn or to respond to changes in rental demand has been reduced."  Id.

These warnings precisely address the possibility that Hertz's 2013 Earnings Guidance could later turn out to be incorrect due to changes in the Residual Market that might impact Hertz's ability to reduce fleet size.  They also address a then-current trend that Hertz unequivocally acknowledged had negatively impacted the company's ability to reduce fleet size without incurring losses.  Because these warnings directly addressed the risks attendant to overfleeting and the weak Residual Market, the Court is satisfied that Hertz's cautionary language on this point was sufficiently meaningful.  Cf. Aetna, 617 F.3d at 282 (cautionary language addressing risks associated with medical cost projections was sufficiently meaningful even though it did not specifically mention the defendants' alleged practice of underpricing premiums).

### (3) Cautionary Language Regarding the Advantage Divestiture

Finally, Plaintiff contends that Hertz failed to meaningfully warn of the risks associated with the Advantage Divestiture because it did not specifically address the valuation issues surrounding the Advantage Fleet.  See SAC ¶ 163.  The Court disagrees.

Hertz specifically warned that future financial results could be affected by "the operational and profitability impact of the Advantage [D]ivestiture."  Marino Cert. Ex. B at 1.  Hertz also provided a general warning that financial results could be impacted by "the effect of tangible and intangible asset impairment charges."  Id. at 2.  Taken together, this language provides sufficient warning that Hertz's financial results could be adversely impacted by the Advantage Divestiture

and future impairment charges.  Because Hertz placed investors on notice of the possibility that the Advantage Divestiture in particular and asset impairments in general could negatively impact Hertz's business in the future, the Court is satisfied that Hertz's cautionary language was meaningful.[12]

In light of the foregoing, Ms. Douglas's and Hertz's reaffirmations of the 2013 Earnings Guidance are forward-looking statements that were accompanied by meaningful cautionary language.  As such, they are protected by the PSLRA's safe harbor and are therefore not actionable.[13]

### ii.  Safe Harbor Protection Under the "Actual Knowledge" Prong

Plaintiff must also plausibly plead that Ms. Douglas and Hertz had actual knowledge of the falsity of their statements.  The inference of actual knowledge must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).[14]  Plaintiff does not meet this requirement.

### (1) Ms. Douglas's Reaffirmation of the 2013 Earnings Guidance on the May 21 Conference Call

---

[12] Finally, the Court rejects Plaintiff's claim that the 2Q13 Form 10-Q was misleading because it stated that there were not material changes to the risk factors outlined in the 2012 Form 10-K. SAC ¶¶ 128-30.  This claim is essentially another way of stating that Hertz's cautionary language was not meaningful.

[13] Plaintiff erroneously argues that safe harbor protection is automatically unavailable where there is actual knowledge of the forward-looking statement's falsity.  That argument is based on an incorrect reading of the statute.  The three prongs of the safe harbor are disjunctive—that is, a forward-looking statement is protected where it is accompanied by meaningful cautionary language **or** where the statement is immaterial **or** where the plaintiff cannot prove that the statement was made with actual knowledge that it was false or misleading.  Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010) (quoting Southland Secs. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 371-72 (5th Cir. 2004)).  While the Third Circuit has previously declined to squarely address the issue, the weight of authority is in accord with this Court's position.  See Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 258-59 (3d Cir. 2009).  Accordingly, the safe harbor's protection attaches if any one of those three prongs is satisfied.

[14] The Court addresses scienter more generally at Part B.2 infra.

Plaintiff claims that Ms. Douglas's reaffirmation on the May 21 Conference Call was known to be false because the 2013 Earnings Guidance should have been downwardly adjusted to account for the impact of the Sequester and the overfleeting/weak Residual Market issue.  SAC ¶ 105-06.  This claim fails for a number of reasons.

For one, the SAC provides no indication that Ms. Douglas actually knew that the weak Residual Market—which had allegedly developed, at the earliest, only in April 2013, see id. ¶¶ 65-66—was going to persist well into the future such that the 2013 Earnings Guidance should have been downwardly adjusted on the May 21 Conference Call.  The SAC is entirely devoid of any allegations indicating that Ms. Douglas was aware of permanent weakness in the Residual Market as of the May 21 Conference Call.

There is also no proof of actual knowledge of falsity pertaining to the Sequester.  Plaintiff claims that the reaffirmation of the earnings guidance on May 21 was done with actual knowledge of falsity because the 2013 Earnings Guidance did not incorporate the impact of the Sequester. However, Hertz conducted a Sequester Analysis which was disseminated among Hertz executives and employees.  See SAC ¶¶ 47-52.  Plaintiff does not allege that this Sequester Analysis was not incorporated into the initial guidance on February 25, 2013.  And the Sequester Analysis accurately predicted the impact of the Sequester.  Id. ¶ 52 ("The actual decline in Hertz's government business due to the Sequester was very similar to what Hertz predicted in the Sequester Analysis.").  Therefore, Plaintiff has not adequately alleged that reaffirmation of the earnings guidance was false, much less that it was made with actual knowledge of falsity; Ms. Douglas's reaffirmation of the earnings guidance may have simply reflected her belief that the guidance already accounted for the impact of the Sequester.  Plaintiff's allegations "fail to give rise to a strong inference that"

Ms. Douglas actually knew that her reaffirmation of the 2013 Earnings Guidance was false.
Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 259 (3d Cir. 2009).

### (2) Hertz's Reaffirmation of the 2013 Earnings Guidance in the July 29 Press Release

Plaintiff's allegations concerning Hertz's reaffirmation of the 2013 Earnings Guidance in
the July 29 Press Release suffer from the same defects as Plaintiff's allegations against Ms.
Douglas.  The SAC contains no allegations suggesting that Hertz was aware by July 29, 2013, that
the weakness in the Residual Market had transitioned from a seasonal problem to a more
permanent one.  Moreover, as discussed above, the SAC may have incorporated the Sequester
Analysis; Plaintiff alleges nothing to the contrary.  The SAC also contains no allegations that
Hertz's reaffirmation of the earnings guidance in its July 29 Press Release was baseless.  Because
many other bases may have existed—e.g., Hertz's revenue growth in other aspects of its business,
see Dkt. No. 53-4, Marino Cert. Ex. D at 8—Plaintiff does not make an inference of actual
knowledge that reaffirmation of the 2013 Earnings Guidance was false at least as likely as
competing inferences.

In addition to the impact of the Sequester and the problems surrounding overfleeting and
the Residual Market, Plaintiff claims that the 2013 Earnings Guidance should have been adjusted
downward to account for an actual or possible impairment of the Advantage Fleet in the amount
of $40 million.  Id. ¶ 110(c).  Again, Plaintiff does not provide evidence that Hertz knew that it
needed to impair its valuation of the Advantage Fleet.  Plaintiff principally relies on CW5—an
outside accounting consultant to Simply Wheelz—and regional, low-level Hertz employees, who
provide their anecdotal experience concerning sales during spring and early summer of 2013.  But

no allegations connect these confidential witnesses' knowledge and beliefs to Hertz's. These are insufficient to plead actual knowledge of falsity.[15]

Furthermore, it would have been ill-advised and illogical for Hertz to have recognized an impairment on the Advantage Fleet in the second quarter of 2013. The terms of the Advantage Divestiture provided that Hertz retained ownership of the Advantage Fleet and required Simply Wheelz to sell off the entire Advantage Fleet solely through Manheim by July 31, 2014. Id. ¶¶ 36, 38. The terms of the Advantage Divestiture further provided that whenever Simply Wheelz sold an Advantage Fleet vehicle for less than the book value (as determined by Hertz) of the vehicle, Simply Wheelz would be responsible for payment of the difference to Hertz. Id. ¶ 42. Hertz thus would always be made whole on the sale of any Advantage Fleet vehicle so long as Simply Wheelz remained solvent and capable of making the payments. Plaintiff does not plead either (1) that Simply Wheelz was not paying Hertz for losses on Advantage Fleet vehicles as of July 29, 2013, or (2) that Defendants knew that Simply Wheelz was insolvent or incapable of making payments. There is therefore no basis to conclude that Hertz should have written down the value of the Advantage Fleet when it was receiving full book value for every Advantage Fleet vehicle. Hertz would have potentially left $40 million on the table had it done so. Only after Simply Wheelz stopped making payments did Hertz impair the Advantage Fleet on November 4, 2013. SAC ¶ 142. In the absence of allegations that Hertz knew Simply Wheelz could not cover losses on sales

---

[15] Plaintiff also references a meeting that Simply Wheelz allegedly requested in July 2013 to discuss the losses on Advantage Fleet vehicles and Hertz's valuation methods. There is, however, no allegation that this meeting took place or that Simply Wheelz actually told Hertz about the relevant valuation defects. The request alone is insufficient, without more, to prove actual knowledge of falsity.

of Advantage Fleet vehicles as of July 29, 2013, there is no basis to conclude that Hertz had actual knowledge of falsity when it reaffirmed the guidance in the July 29 Press Release.[16]

Plaintiff's allegations therefore do not give rise to a strong inference that Ms. Douglas and Hertz actually knew that the 2013 Earnings Guidance was false. The reaffirmations are protected under the PSLRA on this separate basis, as well.

### d. Announcements of 2Q13 Earnings in the July 29 Press Release and the 2Q13 Form 10-Q

Hertz announced its second quarter earnings in the July 29 Press Release and in the 2Q13 Form 10-Q released on August 2, 2013. SAC ¶¶ 107, 114. Plaintiff claims that Hertz's earnings figures were falsely inflated because they did not include a $40 million impairment in the value of the Advantage Fleet. Id. ¶¶ 108, 115. Plaintiff alleges Defendants knowingly or recklessly violated GAAP and Hertz's own publicly disclosed accounting policy for long-lived assets by failing to timely record the impairment (or at least the possibility of one) in Hertz's second quarter financial results. Id. ¶¶ 73-96, 108, 115.

As the SAC points out, Rule 4-01(a) of SEC Regulation S-X provides that "financial statements filed with the SEC which are not prepared in accordance with GAAP will be presumed to be misleading or inaccurate." Id. ¶ 74. GAAP "provides that long-lived assets … must be reviewed for an impairment in value when facts and/or circumstances indicate that the … book value of the asset … may be greater than the sum of undiscounted cash flows expected from the asset's (or group of assets) use and disposal." Id. ¶ 82 (emphasis added). Furthermore, Hertz represented in its 2012 Form 10-K that it reviewed depreciation rates on a quarterly basis and made adjustments based on market conditions. Id. ¶ 77. Based on documents filed in connection with

---

[16] This leaves aside Plaintiff's claim that Hertz's failure to record an impairment was a violation of GAAP.

Simply Wheelz's bankruptcy petition and information provided by CWs, Plaintiff alleges "that the carrying value of the Advantage Fleet was greater than the sum of the undiscounted cash flows Simply Wheelz expected from the Advantage Fleet's use and disposal." Id. ¶ 86 (emphasis added); see also id. ¶¶ 87-96.

Plaintiff's claim here fails because it relies on Simply Wheelz's expectations regarding future cash flows, not Hertz's. As Hertz retained ownership of the Advantage Fleet, see id. ¶ 36, expectations regarding cash flow from the fleet should be analyzed from Hertz's perspective. As discussed above, the terms of the Advantage Divestiture ensured that Hertz would always receive book value upon the sale of any vehicle in the Advantage Fleet.[17] Hertz therefore had no obligation to record an impairment as of August 2, 2013. Thus, the SAC does not demonstrate that Hertz's announced financial results for the second quarter of 2013 were false.[18]

The foregoing demonstrates that Plaintiff has failed to plead any actionable statements or omissions. Dismissal on that basis alone is appropriate.

### 2. Scienter

Separately, the SAC fails to meet the PSLRA's stringent pleading requirements for the scienter element of a Rule 10b-5 claim. Under the PSLRA, scienter is adequately pled only where the complaint "state[s] with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In a Rule 10b-5 case, the "required state of mind" is scienter, which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Rahman v. Kid Brands, Inc., 736 F.3d 237, 242-43 (3d Cir. 2013)

---

[17] Hertz would have been prevented from receiving full book value only if Simply Wheelz had become insolvent or otherwise unable to pay under the terms of the Advantage Divestiture. Plaintiff pleads neither.

[18] As a necessary consequence of this finding, Plaintiff's also fails to establish falsity with respect to Mr. Douglas's and Ms. Frissora's certification of the 2Q13 Form 10-Q. See id. ¶¶ 121-22.

(internal quotations and citations omitted).  Such a mental state can be proven by either knowing or reckless behavior.  Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009).  Recklessness, in turn, is "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id. at 267 n.42.

The inference of scienter is sufficiently strong to survive a Rule 12(b)(6) motion to dismiss only if, in light of all of the allegations in the complaint, it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).   Under this standard, therefore, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  Id. at 324.  The plaintiff may establish this "strong inference" either by demonstrating motive and opportunity on the part of the defendants, or by coming forward with "circumstantial evidence of conscious misbehavior or recklessness."  In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006).  The inference of scienter "need not be irrefutable," but the inference must be more than "reasonable" or "permissible."  Tellabs, 551 U.S. at 324.  Moreover, allegations that merely suggest corporate mismanagement are insufficient to establish even recklessness.  Avaya, 564 F.3d at 267 n.42.

Here, Plaintiff's scienter allegations rest on: (1) several statements by Hertz and Mr. Frissora at the end of, and following, the Class Period; (2) the Private Equity Group's sale of its 12.5% stake in Hertz; (3) information provided by the eight CWs, seven of whom were low-level Hertz employees in various regions of the country; (4) the Sequester Analysis; (5) stock sales made in May by a number of Hertz executives, including Ms. Douglas; and (6) Ms. Douglas's resignation

at the end of the Class Period and Mr. Frissora's resignation approximately one year later. Taken together, these allegations fail to give rise to even a reasonable inference of scienter, let alone an inference "as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The Court addresses each category of allegations in turn.

### a.   Statements Made Near or Shortly After the End of the Class Period

In support of Plaintiff's allegations regarding Mr. Frissora's awareness of the weak Residual Market in the spring of 2013, Plaintiff relies upon Mr. Frissora's statement in September 2013 that he thought the weakness in the Residual Market was an "aberration but [wasn't] sure." SAC ¶¶ 65, 181. Plaintiff also uses this statement to establish that Mr. Frissora knew that losses were incurred on sales of Advantage Fleet vehicles.

Mr. Frissora was aware that the Residual Market was experiencing some weakness in the spring of 2013; he acknowledged the Residual Market was experiencing "softness" during the May 8 Conference Call. But his statements fail to reveal any fraudulent intent. Mr. Frissora was forthcoming regarding the difficulties in the Residual Market during the spring, although he appeared to remain upbeat about the market's overall condition going forward. Mr. Frissora's September 2013 statement is not at all inconsistent with that sentiment.

Plaintiff also points to Mr. Frissora's statements on a September 26, 2013, conference call in which he stated that Hertz "had too much fleet" immediately after the Dollar Thrifty Acquisition and "should have taken fleet out," but was not doing so because of an anticipated increase in business during the summer months. Id. ¶ 138. As with Mr. Frissora's comments on the May 8 Conference Call, these statements are not inconsistent with anything Mr. Frissora said beforehand. On the July 29 Conference Call, for example, Mr. Frissora stated that Hertz had approximately 41% more vehicles in its fleet due to the Dollar Thrifty Acquisition. Marino Cert. Ex. D at 3.

Moreover, Mr. Frissora stated on an April 30, 2013, conference call that "the industry is seasonally over-fleeted" in the months leading up to the summer.  Marino Cert. Ex. I at 7.  The statement that Hertz "had too much fleet" is not sufficient to plausibly suggest that Mr. Frissora attempted fraudulently to conceal the state of Hertz's fleet during the Class Period.  The more reasonable inference is that Mr. Frissora was aware of Hertz's overfleeting situation and believed that the issue would resolve itself during the summer months, as he said.  SAC ¶ 138.

Mr. Frissora also commented during a November 5, 2013, conference call (the "November 5 Conference Call") that the Sequester seemed to have had a greater impact on Hertz than on Hertz's competitors, and gave reasons why.  SAC ¶¶ 147-49.  These statements, however, say nothing about Defendants' knowledge or state of mind during the Class Period.[19]  At most, they represent a post-hoc, speculative explanation for the Sequester's impact.  Hindsight statements such as these are insufficient to give rise to a strong inference of scienter.  Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 158 (3d Cir. 2004).  None of the statements on which Plaintiff relies show fraudulent intent.  The Court rejects Plaintiff's claim to the contrary.

### b.  The Private Equity Group's Sale of its 12.5% Stake

Plaintiff also claims that Private Equity Group's sale of its stock supports an inference of scienter.  SAC ¶¶ 30-32, 187.  There is no logical connection between the Private Equity Group's

---

[19] In Paragraph 148, Plaintiff quotes Mr. Frissora's statements regarding the continuing weakness in the Residual Market and the future costs that Hertz would have to incur attempting to rectify its overfleeting problem.  Certainly, Mr. Frissora's statements demonstrate that he had recognized by November 5, 2013, that the weakness in the Residual Market was no longer merely a seasonal variation and that Hertz would have to accept some losses in reducing its fleet size.  His statements do not, however, help to establish anything with regard to Defendants' knowledge or states of mind during the Class Period.  Moreover, the statements do not even provide any support for the proposition that, during the Class Period, Defendants knew or recklessly disregarded that the weakness in the Residual Market (and Hertz's accompanying overfleeting problem) was actually a long-term trend.  Finally, Paragraph 149 has no probative value as it simply quotes an analyst's question and Hertz's General Counsel's response in which he declines to answer the question.

sale of its stock and the Defendants' states of mind during the Class Period.  As pled, therefore, the Private Equity Group's stock sales are irrelevant to scienter.

### c.  The Confidential Witnesses

Plaintiff uses information provided by eight CWs essentially to corroborate the allegations in the SAC regarding the condition of the Residual Market in the spring and early summer of 2013 and the losses that Simply Wheelz was experiencing on Advantage Fleet vehicle sales.  With the exception of CW5—who served as an outside accounting consultant to Simply Wheelz—the CWs were Hertz employees at various locations in the United States.  Id. ¶¶ 21-28.  Four of the seven former employees—CW1, CW2, CW3, and CW7—are each mentioned in only a single substantive paragraph in the SAC.  See id. ¶¶ 60-61, 67, 102.  The remaining three are referenced sparingly in the SAC.  See id. ¶¶ 62, 66, 68-72, 94, 104, 117, 123.  While the CWs' allegations help to establish the existence of adverse market conditions in the CWs' respective regions or locations, they establish no connection whatsoever between the CWs' personal knowledge and that of Mr. Frissora, Ms. Douglas, or any other senior executives at Hertz.  These allegations accordingly fail to support a strong inference of scienter.

In determining the amount of weight to be given to allegations based on information provided by confidential witnesses, the Court must consider several factors, including "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  Avaya, 564 F.3d at 263 (quoting Chubb, 394 F.3d at 147) (internal quotations omitted).  If the confidential witness allegations are found to be less than adequate based on these criteria, the Court "must discount them steeply."  Id.  It must be noted, however, that these criteria apply only to the question of whether a confidential witness and

his or her basis of knowledge is sufficiently identified so as to ensure compliance with the PSLRA's particularity requirements.  Id.  That is, satisfaction of these criteria does not necessarily mean that the confidential witness allegations give rise to a strong inference of scienter.  Id. at 263 n.33 (citing Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1069 n.13 (9th Cir. 2008)).

Even assuming that Plaintiff has sufficiently identified the CWs and their basis of knowledge, the CWs do not speak to Hertz's or Hertz executives' knowledge.  Nowhere in Plaintiff's scant CW allegations is there any suggestion that any of the CWs communicated in any way with Mr. Frissora, Ms. Douglas, or any person at Hertz who might have been familiar with Mr. Frissora's and Ms. Douglas's thinking.  The CW allegations focus exclusively on the CWs' views regarding the condition of the Residual Market, Hertz's alleged overfleeting, and the inability to sell Advantage Fleet vehicles at book value; these imply nothing about Defendants' views on those issues.  The CW allegations therefore fail to support a strong inference of scienter.[20] Cf. Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517, 555-56 (D.N.J. 2010) ("In sum, in over fifty paragraphs of statements made by confidential witnesses, not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants … which would sufficiently raise a strong inference of scienter that Individual Defendants knew their public statements and disclosures were false.").

> **d.  The Sequester Analysis**

---

[20] Plaintiff also relies on the certification of Simply Wheelz's CEO, Thomas P. McDonnell III, in order to corroborate its claims regarding losses on sales of Advantage Fleet vehicles.  See SAC ¶ 39.  There, Mr. McDonnell stated his belief that Hertz had materially overstated the value of the Advantage Fleet.  Even assuming that the value was indeed materially overstated, this allegation is simply not probative of whether Defendants knew or recklessly disregarded that fact during the relevant time period.

Plaintiff's allegations regarding the Sequester Analysis similarly fail to support a strong inference of scienter.  As previously discussed, Plaintiff misses a crucial step in attempting to establish knowledge or recklessness: Plaintiff fails to plead any suggestion that the results of the Sequester Analysis were either ignored or actively concealed.  Without such allegations, Plaintiff has not alleged falsity with regard to Ms. Douglas's and Hertz's reaffirmation of the 2013 Earnings Guidance, much less scienter.  The allegations surrounding the development of the Sequester Analysis fail to give rise to even a plausible inference of scienter.

### e.    Stock Sales

Plaintiff claims that stock sales by Ms. Douglas and other Hertz executives between May 8, 2013, and May 28, 2013, support an inference of scienter because they demonstrate a financial motive to misrepresent Hertz's financial status during the Class Period.  SAC ¶¶ 185-86.  In certain circumstances, stock sales by corporate executives that are "unusual in scope or timing … may support an inference of scienter."  Suprema, 438 F.3d at 277 (internal quotations and citation omitted).  A stock sale may be found to be "unusual in scope" based upon a number of factors, including "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved."  Id. (internal quotations and citation omitted).  In addition, the Court considers "whether the sales were 'normal and routine,' and whether the profits were substantial relative to the seller's ordinary compensation."  Id. (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1423 (3d Cir. 1997)).

Here, Plaintiff merely provides a table of various stock sales during May 2013 and levels the conclusory allegation that the stock sales were made at unusual times and in unusual amounts. SAC ¶ 186.  Plaintiff does not indicate why the timing of the sales were unusual.  Plaintiff fails to connect the sales to Class Period events that would suggest an ill motive for the sales.  For example,

had the stock sales been executed in proximity to the negative disclosures made on September 26, 2013, an inference that the stock sales were unusual would be far more plausible.  Additionally, Plaintiff fails to provide any indication that these stock sales were significantly different in amount and scope from previous stock sales by Ms. Douglas and the other Hertz executives.

Plaintiff also does not allege an unusual amount of profit relative to these executives' ordinary compensation at Hertz as a result of these stock sales.  Finally, the SAC fails to allege the proportion of Ms. Douglas's and the other executives overall stockholdings that these sales represented.  Put simply, Plaintiff does not allege sufficient facts and circumstances indicating impropriety in connection with these stock sales.  Plaintiff's allegations therefore fail to give rise to a strong inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 323-24 (2007); cf. Suprema, 438 F.3d at 277-78 (stock sale allegations sufficient to support a strong inference of scienter where the plaintiff alleged: (1) the stock sales occurred six weeks before executives' resignations; (2) the sales resulted in unusually large profits relative to annual compensation; (3) the quantity sold represented over 30% of each executive's total holdings; and (4) the executives had historically sold very little stock prior to the offering in question).

### f.  The Resignations of Ms. Douglas and Mr. Frissora

Plaintiff alleges that Ms. Douglas's resignation on September 23, 2013, and Mr. Frissora's resignation on September 8, 2014, support an inference of scienter.  SAC ¶¶ 131, 156, 188.  The sole basis for this inference is the timing of the resignation—two days before the end of the Class Period.  These allegations are plainly insufficient.  Plaintiff must allege that the resignation was in some way connected to the events described in the SAC; it fails to do so.  In the absence of such allegations, it is unreasonable to infer fraudulent intent based simply on the date of an executive's

resignation.  The fact of Ms. Douglas's resignation, without more, adds nothing to Plaintiff's scienter allegations.  Cf. In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 347-48 (D.N.J. 2007) (finding that the sole fact of officers' resignations was insufficient to support a strong inference of scienter and that "such bare allegations cannot operate even as a meaningful piece of additional evidence" of scienter); see also In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 F. App'x 465, 470 (3d Cir. 2004) (no indication that resignation of officer was related to restatement of financials and accounting irregularities).

Plaintiff similarly fails to allege any logical connection between Mr. Frissora's resignation and the facts alleged in the SAC.  Plaintiff simply embeds a paragraph regarding Mr. Frissora's September 8, 2014, resignation for "personal reasons" within its allegations regarding an internal investigation into apparent errors in Hertz's 2011, 2012, and 2013 financial statements.  See SAC ¶¶ 153-56.  These allegations fail.  First, Plaintiff makes no connection between Mr. Frissora's resignation and the internal investigation.  Second, Plaintiff fails to connect the internal investigation to the wrongdoing alleged in the SAC.  Plaintiff instead relies solely on the power of suggestion, and not on any concrete facts, in urging this Court to presume a connection between Mr. Frissora's resignation, the internal investigation, and the facts alleged in the SAC.  This the Court will not do.  Plaintiff's allegations regarding Mr. Frissora's resignation are therefore of no probative value.[21]

---

[21] Because Plaintiff fails to adequately plead either scienter or any actionable misrepresentations, Plaintiff's claims concerning the 2Q13 Form 10-Q's alleged failure to comply with Item 303 of Regulation S-K also necessarily fail.  See id. ¶¶ 124-27; Oran v. Stafford, 226 F.3d 275, 288 (3d Cir. 2000) (violation of Item 303 does not automatically give rise to Rule 10b-5 liability); see also Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 103-04 (2d Cir. 2015) (violation of Item 303 "can give rise to liability under Rule 10b-5 so long as the omission is material … and the other elements of Rule 10b-5 have been established).

## IV.   COUNT II: SECTION 20(A) CLAIM

"Section 20(a) of the Exchange Act imposes joint and several liability upon one who controls a violator of Section 10(b)."  Suprema, 438 F.3d at 284.  A valid claim under § 20(a) therefore requires the plaintiff to prove, inter alia, "that the controlled person or entity committed a primary violation of the securities laws."  Id.  Because Plaintiff has failed to state a claim for violation of § 10(b) by Hertz, Plaintiff's § 20(a) claim against Mr. Frissora and Ms. Douglas necessarily fails.  Count II is accordingly dismissed.

## V.   CONCLUSION

In light of the foregoing, Defendants' motion to dismiss is **GRANTED WITHOUT PREJUDICE**.  An appropriate order will follow.

_s/ Madeline Cox Arleo_
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**
