COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West-Plaza One
250 Pehle Avenue | Suite 401
Saddle Brook, NJ 07663
Telephone:  201/845-9600
201/845-9423  (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
MICHAEL G. CAPECI
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re HERTZ GLOBAL HOLDINGS, INC. SECURITIES LITIGATION | ) Master File No. 2:13-cv-07050-MCA-LDW |
| | ) |
| | ) <u>CLASS ACTION</u> |
| | ) |
| This Document Relates To: | ) <u>FOURTH CONSOLIDATED AMENDED</u> |
| | ) COMPLAINT FOR VIOLATIONS OF THE |
| ALL ACTIONS. | ) FEDERAL SECURITIES LAWS |
| | ) |
| | ) <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ........................................................................................1

JURISDICTION AND VENUE ..................................................................................4

PARTIES ....................................................................................................................5

CLASS ACTION ALLEGATIONS ............................................................................6

BASIS OF ALLEGATIONS ......................................................................................8

SUBSTANTIVE ALLEGATIONS ............................................................................9

    The Company and Its Business..........................................................................9

    Effective Internal Controls Are an Integral Component of Public Corporations ..............10

    Defendant Frissora and Hertz Senior Management Created a Culture of Fraud at Hertz............................................................................................................13

    Hertz's Financial Reporting During the Class Period  Was Materially False and Misleading.............................................................................................20

    Hertz's Admissions Associated With Its Material Understatement of Expenses.............22

    Hertz's Accounting Reserve Manipulations Defer Expenses to Later Periods ................23

    Hertz Reported Ordinary Business Expenses as Assets ....................................25

    Hertz Improperly Failed to Timely Write Down Impaired Assets  in Connection with the Advantage Divestiture ........................................................25

    The Dollar Thrifty Acquisition and Advantage Divestiture ............................25

    The Advantage Fleet Was Substantially Overvalued by June 2013 .................27

    Hertz Improperly Failed to Timely Write Down Impaired Assets ...................29

    Hertz's Admissions of Additional Financial Reporting Improprieties .............36

    Hertz's Admissions Associated with Its Material Control Deficiencies ..........37

    Hertz's Admissions that the Financial Statements and Related Financial Disclosures Were Materially Misstated ..........................................................44

**Page**

Hertz's Financial Misstatements Were the Result of Intentional Conduct ....................... 46

Defendants Issued Guidance Without Reasonable Basis .................................................... 48

Defendants Frissora, Douglas and Kapur Resign as the Fraud Is Slowly Revealed ......... 51

Hertz Restates Its Financial Results and Admits to Widespread Internal Control
Deficiencies .................................................................................................................... 56

MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL
OMISSIONS ............................................................................................................................. 57

Pre-Class Period Statements ............................................................................................. 57

Class Period Statements .................................................................................................... 62

    First Quarter 2013 Statements .................................................................................... 62

    Second Quarter 2013 Statements ............................................................................... 68

    Third Quarter 2013 Statements .................................................................................. 72

    Fourth Quarter 2013 Statements ................................................................................ 78

    First Quarter 2014 Statements .................................................................................... 85

    Second Quarter 2014 Statements ............................................................................... 90

    Third Quarter 2014 Statements .................................................................................. 93

    Fourth Quarter 2014 Statements ................................................................................ 94

    First Quarter 2015 Statements .................................................................................... 97

    Second Quarter 2015 Statements ............................................................................. 100

Summary of SEC Filings Signed by the  Individual Defendants During the Class
Period ............................................................................................................................ 102

Hertz Restates Its Financial Results for 2011-2013 ....................................................... 103

**Page**

Hertz's Class Period SEC Filings Omitted Known Trends,  Events and Uncertainties that Were Impacting, and  Would Impact, the Company's Financial Results ................................................................................................................105

Hertz's Class Period SEC Filings Omitted to Include  Significant Risk Factors Required to Be Disclosed Therein ...............................................................107

ADDITIONAL SCIENTER ALLEGATIONS .......................................................108

LOSS CAUSATION/ECONOMIC LOSS ............................................................120

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ...............................................................................................................125

APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE ...............................................................................................................126

NO SAFE HARBOR .................................................................................................127

COUNT I .....................................................................................................................127

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .................................................................127

COUNT II ...................................................................................................................130

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ...........................................................................................................130

PRAYER FOR RELIEF ............................................................................................131

JURY DEMAND ........................................................................................................132

Lead Plaintiff Sheet Metal Workers' Local No. 80 Pension Trust Fund ("Lead Plaintiff") and Westchester Teamsters Pension Fund ("Westchester," and with Lead Plaintiff, "Plaintiffs"), by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Fourth Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Complaint"), allege the following upon knowledge as to their own acts, and upon the investigation conducted by Plaintiffs' counsel, as detailed below.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of purchasers, other than Defendants (defined below), of the common stock of Hertz Global Holdings, Inc. ("Hertz" or the "Company") between February 14, 2013 and July 16, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).   Plaintiffs allege claims against defendant Hertz and several individuals who were senior executives of Hertz during the Class Period.

2.      Defendant Hertz is engaged in the automobile and equipment rental businesses worldwide.  On July 16, 2015, Hertz filed its annual report for the year ended December 31, 2014 on Form 10-K (the "2014 Form 10-K") and restated its previously reported annual financial statements for 2012 and 2013.[1]   In addition, Hertz has restated its 2013 quarterly financial

---

[1]   Lead Plaintiff previously advised the Court that Hertz had indicated its intention to restate its financial results and, as a result, Lead Plaintiff requested leave to file an amended complaint once the Restatement (defined below) was announced.  *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss, at *3 n.2 (Aug. 7, 2014) (Dkt. No. 36); Second Consolidated Amended Complaint for Violations of the Federal Securities Laws, ¶¶153-57 (Nov. 7, 2014) (Dkt. No. 45); Memorandum of Law in Opposition to Defendants' Motion to Dismiss Second Consolidated Amended Complaint, at *1-*2 & n.32 (Jan. 30, 2015).  Dkt. No. 57.

statements and has acknowledged that its financial results for periods prior to 2012 were also materially misstated.  By restating is financial statements, Hertz has now admitted that the representations it made concerning the Company's financial performance prior to, and during, the Class Period were materially inflated, and false and misleading.  Specifically, Hertz has admitted that from 2011 to 2013, its pre-tax income was overstated by $215 million and its net income was overstated by $132 million.  Hertz has also admitted that its financial statements materially understated its expenses and caused the Company's previously reported annual net income during 2011 to 2013 to be overstated between *14.64% and 32.12%* (the "Restatement").

3.      The 2014 Form 10-K, however, did not stop at simply restating historical financial information.  Rather, the 2014 Form 10-K also revealed that Defendants committed a massive and widespread fraud on investors during the Class Period.  Specifically, the Company admitted in the 2014 Form 10-K that its former Chief Executive Officer ("CEO"), defendant Mark P. Frissora ("Frissora"), and other Hertz senior management, created a pressurized operating environment whereby manipulations of Hertz's financials were made by employees in order to achieve pre-set financial targets.  Defendant Frissora and the Individual Defendants (defined below) then falsely represented to investors that Hertz's financial statements were accurate and that the Company had effective internal controls.

4.      The disclosures about the rampant fraud at Hertz were the result of two investigations directed by the audit committee (the "Audit Committee") of Hertz's board of directors (the "Board").  These investigations lasted more than 14 months, and involved newly hired audit and compliance personnel in addition to outside consultants and legal counsel (the "Internal Investigation").  The Internal Investigation revealed that prior to, and throughout, the Class Period Hertz operated with widespread internal control deficiencies.   The Internal

- 2 -

Investigation, among other things, determined that there was an "inappropriate tone at the top," that subordinates felt pressured to meet targets, and that Hertz employees violated Generally Accepted Accounting Principles ("GAAP") and Company accounting policies by manipulating expenses and Hertz's financial results.

5.    In connection with the fraud alleged herein, Defendants, among other things, issued materially false and misleading statements about the Company's historical financial results and internal controls, and provided guidance to investors without reasonable basis.  Defendants' false and misleading statements and omissions caused an artificial inflation in Hertz's stock price.

6.    The magnitude and extent of Defendants' fraud was gradually revealed to investors over time, including, without limitation, as summarized below:

(a)    On September 26, 2013, Hertz announced, among other things, that the Company was reducing its full year 2013 guidance, causing a 16% decline in Hertz's stock price.

(b)    On November 4, 2013, Hertz announced, among other things, its financial results for the third quarter of 2013, and provided details about a $40 million impairment charge, causing a 10.5% decline in Hertz's stock price.

(c)    On March 3, 2014, Hertz announced, among other things, that certain adjustments had to be made to its previously issued financial statements, causing a 2.7% decline in Hertz's stock price.

(d)    On June 6, 2014, Hertz announced, among other things, that its financial results for 2011 must be restated, that its 2012 and 2013 financial results would need to be revised, that one material weakness in Hertz's internal controls had been identified, and that a restatement will take place at some point in 2015, causing a 9.1% decline in Hertz's stock price.

(e)    On August 19, 2014, Hertz announced, among other things, that it will be well below its 2014 guidance due to operational challenges and the associated costs related to the Internal Investigation, and, as a result, it withdrew its 2014 financial guidance, causing a 3.9% decline in Hertz's stock price.

(f)    On November 14, 2014, Hertz provided, among other things, an update on the Internal Investigation and disclosed that it must restate financials for 2011, 2012 and 2013, and that the restatements will not be completed before

mid-2015.  Hertz also disclosed that in June 2014, the Company was advised by the SEC that the SEC had launched an investigation into the Company.  These disclosures caused a 4.6% decline in Hertz's stock price.

7.      Hertz ultimately provided the details of the Restatement on July 16, 2015 in the 2014 Form 10-K.  As alleged below, Hertz's financial reporting prior to and during the Class Period was in complete disarray, due in significant part to senior management who created a pressurized operating environment whereby employees engaged in manipulations of the Company's financial results in order to achieve desired amounts.  Defendants knowingly, and at a minimum recklessly, made materially false and misleading statements to investors, resulting in an artificial inflation of Hertz's stock price that repeatedly caused damage to investors as information about the fraud was disclosed over time.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

9.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

10.      Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  Hertz is headquartered in this District, and the acts and conduct complained of herein occurred in substantial part in this District.

11.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, telephonic communications, and the facilities of the national securities markets.

**PARTIES**

12.     Lead Plaintiff Sheet Metal Workers' Local No. 80 Pension Trust Fund acquired the common stock of Hertz during the Class Period as set forth in the certification previously filed with the Court and has been damaged thereby.

13.     Plaintiff Westchester Teamsters Pension Fund acquired the common stock of Hertz during the Class Period as set forth in the attached certification, which is incorporated by reference herein, and was damaged thereby.

14.     Defendant Hertz, through its subsidiaries, is engaged in the automobile and equipment rental businesses worldwide.   Headquartered in Park Ridge, New Jersey, the Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "HTZ."  As of February 26, 2013, the Company had more than 421.6 million shares issued and outstanding.

15.     Defendant Frissora served as Hertz's CEO and as Chairman of the Board beginning in July 2006.  Amidst the Internal Investigation, which concluded in the Restatement, defendant Frissora resigned as CEO and Chairman of the Board effective September 8, 2014.

16.     Defendant Elyse Douglas ("Douglas") served as Hertz's Senior Executive Vice President and Chief Financial Officer ("CFO") from prior to the beginning of the Class Period until her resignation on September 23, 2013.  Defendant Douglas is a CPA.  Defendant Douglas sold more than $4.7 million worth of Company stock during the Class Period.

17.     Defendant Jatindar S. Kapur ("Kapur") served as Hertz's Senior Vice President of Finance and Corporate Controller from prior to the beginning of the Class Period until his resignation on April 22, 2014.  Upon information and belief, defendant Kapur, as Hertz's Senior Vice President of Finance and Corporate Controller, reported first to defendant Douglas and then

to her replacements during the Class Period.  Defendant Kapur sold more than $3.9 million worth of Company stock during the Class Period.

18.     Defendant David J. Rosenberg ("Rosenberg") served as Hertz's Interim CFO from October 1, 2013 until December 9, 2013.  Defendant Rosenberg replaced defendant Douglas after her resignation.

19.     Defendant Thomas C. Kennedy ("Kennedy") presently serves as Hertz's Senior Executive Vice President and CFO, a position he has held since December 9, 2013.  Defendant Kennedy replaced defendant Rosenberg.

20.     The defendants identified in ¶¶15-19 are sometimes collectively referred to herein as the "Individual Defendants."

21.     Defendant Hertz and the Individual Defendants are sometimes collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Hertz during the Class Period (the "Class"), who were damaged thereby.

23.     Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hertz shares were actively traded on the NYSE.  As of February 26, 2013, there were approximately 421.6 million shares of Hertz common stock

outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Hertz or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

25.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all the Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

26.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection, and intends to prosecute this action vigorously.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Hertz;

(c)     whether the price of Hertz common stock was artificially inflated during the Class Period; and

(d)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BASIS OF ALLEGATIONS

29.     The allegations herein are based upon the investigation conducted by and under the supervision of Plaintiffs' counsel in order to obtain the information necessary to plead Plaintiffs' claims with particularity where necessary.  Plaintiffs' counsel's investigation included examining and analyzing information relating to the relevant time period obtained from numerous public and proprietary sources (such as LexisNexis®, Dow Jones and Bloomberg, Inc.) – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, Federal Trade Commission ("FTC") documents, court filings related to the Company, other regulatory filings and reports, publicly available annual reports, press releases, investor presentations, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and reports of securities analysts and investor advisory services.

30.     Additionally, in the course of Plaintiffs' counsel's ongoing investigation, a number of former Company employees and other individuals who possessed direct knowledge of the

wrongdoing alleged herein were interviewed.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

31.     The allegations made herein are based, in part, upon information and belief and are supported by the first-hand knowledge of two confidential witnesses ("CWs") who have direct, first-hand knowledge about the facts attributed to them as alleged herein, as follows:

32.     Confidential Witness 1 ("CW1") was employed by Robert Half Consulting ("Robert Half"), and, through Robert Half, worked at Simply Wheelz/Advantage (both defined below) from March or April 2013 until early 2014.  CW1 was responsible for performing a variety of accounting duties at Advantage, including the accounting of Advantage's rental car inventory and assisting with the preparation of financial statements on a GAAP and management reporting basis.  CW1's duties also included ensuring that Advantage was paying defendant Hertz for rental usage of the Advantage Fleet (defined below).  According to CW1, approximately six or seven people, including CW1, worked in Advantage's accounting department during 2013.

33.     Confidential Witness 2 ("CW2") worked for Hertz as a Remarketing Manager at John Wayne Airport, located in Santa Ana, California, for approximately three years, concluding in October 2013.  CW2 was responsible for selling Hertz and Advantage rental vehicles.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

34.     Hertz is in the car rental and equipment rental businesses.  Hertz's Car Rental segment includes the rental and leasing of various car models on an hourly, daily, weekend, weekly, monthly, or multi-month basis.  This segment operates both "on-airport" and "off-airport" locations worldwide, and is sometimes referred to as Hertz's Rent-A-Car ("RAC") business.  Hertz's equipment rental segment includes the rental and leasing of equipment both domestically

and internationally, and is sometimes referred to as Hertz's Equipment Rental Company ("HERC").

35.     In 2005, the Company was privately-owned by Ford Holdings LLC and was not publicly traded.  On December 21, 2005, Hertz was purchased by a conglomerate of private equity entities owned by or affiliated with Clayton, Dubilier & Rice, Inc., The Carlyle Group, and Merrill Lynch & Co., Inc. (collectively, the "Private Equity Group").

36.     Within one year after purchasing the Company, on or about November 16, 2006, the Private Equity Group took Hertz public.  Prior to going public, Hertz hired defendant Frissora as Hertz's CEO in July 2006.  Defendant Frissora became Chairman of the Board in January 2007, shortly after the initial public offering.  Defendant Douglas also joined Hertz in July 2006, and was rapidly promoted by defendant Frissora, becoming CFO by August 2007.

### Effective Internal Controls Are an Integral
### Component of Public Corporations

37.     The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") is a joint initiative of five private sector organizations, established in the United States, dedicated to providing thought leadership to executive management and governance entities on critical aspects of, among other things, internal control, fraud, and financial reporting.  COSO is supported by five supporting organizations, including the Institute of Management Accountants ("IMA"), the American Accounting Association ("AAA"), the American Institute of Certified Public Accountants ("AICPA"), the Institute of Internal Auditors ("IIA"), and the Financial Executives International ("FEI").

38.     As described in the 2014 Form 10-K, Hertz's independent auditors, PricewaterhouseCoopers LLP, audited Hertz's management's assessment of internal control over financial reporting based on the COSO Internal Control Framework (defined below).

39.     According to COSO, the "tone at the top," or the corporate culture established by an entity's board of directors and senior management within which financial reporting occurs, is of "***overriding importance*** in preventing fraudulent financial reporting" and is "***the most important factor*** contributing to the integrity of the financial reporting process."[2]

40.     COSO has developed a model for evaluating internal control (the "COSO Internal Control Framework"). This model has been adopted as the generally accepted framework for internal control and is widely recognized as the definitive standard against which organizations measure the effectiveness of their systems of internal control.

41.     The COSO Internal Control Framework is designed to provide an effective framework for public companies to use to analyze the internal control systems implemented in these organizations. The five components of the COSO Internal Control Framework are as follows:

(a)     <u>Control environment</u>: (i) the organization demonstrates a commitment to integrity and ethical values; (ii) the board of directors demonstrates independence from management and exercises oversight of the development and performance of internal control; (iii) management establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives; (iv) the organization demonstrates a commitment to attract, develop and retain competent individuals in alignment with objectives; and (v) the organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives.

---

[2]     All emphasis is added unless stated otherwise.

(b)  Risk assessment: (i) the organization specifies objectives with sufficient clarity to enable the identification and assessment of risks relating to objectives; (ii) the organization identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed; (iii) the organization considers the potential for fraud in assessing risks to the achievement of objectives; and (iv) the organization identifies and assesses changes that could significantly impact the system of internal control.

(c)  Control activities: (i) the organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels; (ii) the organization selects and develops general control activities over technology to support the achievement of objectives; and (iii) the organization deploys control activities through policies that establish what is expected and procedures that put policies into action.

(d)  Information and communication: (i) the organization obtains or generates and uses relevant, quality information to support the functioning of other components of internal control; (ii) the organization internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control; and (iii) the organization communicates with external parties regarding matters affecting the functioning of other components of internal control.

(e)  Monitoring: (i) the organization selects, develops and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning; and (ii) the organization evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate.

42.     According to COSO, in an effective internal control system, all five components of the COSO Internal Control Framework work to support the achievement of an entity's mission, strategies and related business objectives.

**Defendant Frissora and Hertz Senior Management
Created a Culture of Fraud at Hertz**

43.     Defendants committed a massive financial fraud before and during the Class Period.  Specifically, between 2011 and 2013, Hertz overstated pre-tax income by approximately $215 million and overstated net income by approximately $132 million.  At the center of the wrongdoing was Hertz's senior management, led by its CEO, defendant Frissora.  Since at least 2011, defendant Frissora, and other senior Hertz executives, created a culture of fraud which pressured employees to engage in widespread and far reaching accounting manipulations.

44.     The nature of the financial fraud and the involvement of the most senior executives at Hertz, including defendant Frissora, were revealed when Hertz filed the 2014 Form 10-K.  The 2014 Form 10-K shows that the fraud was widespread and pervasive at Hertz, and that defendant Frissora created a pressurized operating environment, which resulted in a massive overstatement of the Company's reported earnings.

45.     According to the 2014 Form 10-K, the Internal Investigation, which Hertz described as "two complimentary investigations" into the Company's financial results between 2011 and 2013, began in June 2014.  In connection with the first investigation, the Audit Committee directed the Company's management "to conduct a thorough review of [Hertz's] financial records for fiscal years 2011, 2012, and 2013" to determine whether adjustments to the Company's previously issued financial statements were necessary.  This first review by management, with the assistance of outside consultants, concluded that Hertz made "material

misstatements in the 2011, 2012, and 2013 consolidated financial statements" with respect to 15 different categories, related to the following:

- capitalization and timing of depreciation for non-fleet capital and information technology expenditures;

- accruals for un-invoiced non-fleet vendor obligations;

- accrual for salvage vehicles;

- the amortization period associated with vehicle registration and license fees;

- reserve estimates associated with allowances for uncollectible amounts receivable for renter obligations related to damaged vehicles;

- reserve estimates associated with allowances for doubtful accounts, including credit memos;

- reserve estimates associated with probable credit card charge backs;

- accruals for customer rewards programs;

- accrued unbilled revenue;

- reserve estimates associated with allowances for doubtful accounts for the Brazil operations;

- accruals for travel vouchers associated with the Brazil operations;

- Brazil operations litigation reserves;

- other assets and intercompany accounts for the Brazil operations;

- accruals for restoration obligations at the end of facility leases; and

- disclosure of gross equipment and accumulated depreciation balances associated with the capitalization of refurbishment costs.

46.     The second parallel investigation was performed by outside counsel, independent counsel for Hertz's Audit Committee, outside consultants, and recently hired senior Hertz accounting and compliance personnel.  This process "involved an internal investigation of certain matters related to the accounting during prior periods."  As a result of this second investigation,

Hertz admitted that prior to and throughout the Class Period, there were material weaknesses in four of the five categories of internal control as set forth in the COSO Internal Control Framework. Specifically, Hertz admitted material deficiencies with respect to control environment, risk assessment, information and communication, and monitoring. The 2014 Form 10-K states, in pertinent part, as follows:

> Based on the internal investigation, our review of our financial records, and other work completed by our management, the Audit Committee has concluded that there were four categories of material weaknesses in our internal control over financial reporting that contributed to the material misstatements in the 2011, 2012 and 2013 consolidated financial statements.

47.    Hertz admitted that there were widespread deficiencies with respect to the Company's control environment. Specifically, the Internal Investigation determined that, prior to and during the Class Period, senior management at Hertz created an environment which encouraged and pressured Hertz employees to violate GAAP and intentionally misrepresent Hertz's financial results. Hertz has admitted that there was an "inappropriate tone at the top" set by Hertz's senior management that resulted in employees engaging in improper accounting practices. The 2014 Form 10-K stated, in pertinent part, as follows:

> Our investigation found that inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management that did not in certain instances result in adherence to accounting principles generally accepted in the United States of America ("GAAP") and Company accounting policies and procedures.

48.    Furthermore, Hertz admitted that its most senior executive, defendant Frissora, was a key and central figure to the accounting manipulations. Defendant Frissora's management style pressured employees to manipulate financial results in order to meet expectations. Hertz's senior management set targets for financial results and based employees' performance expectations on whether they met those targets. According to Hertz, defendant Frissora placed considerable and

"inappropriate" emphasis on meeting "internal budgets, business plans, and current estimates."
Upon information and belief, "current estimates" as used by Hertz refers to earnings estimates
provided to investors, including guidance.  The 2014 Form 10-K stated, in pertinent part, as
follows:

> In particular, our former Chief Executive Officer's management style and
> temperament created a pressurized operating environment at the Company, where
> challenging targets were set and achieving those targets was a key performance
> expectation.  There was in certain instances an inappropriate emphasis on meeting
> internal budgets, business plans, and current estimates.

49.     Defendant Frissora encouraged employees to meet targets by focusing on various
types of items and accounting adjustments.  These actions created an environment which caused
employees to make "inappropriate accounting decisions" and then fail to disclose "information
critical to an effective review of transactions and accounting entries" to finance and accounting
personnel or the Board.  Thereafter, defendant Frissora signed and filed with the SEC certifications
mandated by the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the fair presentation of Hertz's
financial statements and the Company's internal control over financial reporting.  Hertz admitted
that one of the "structural and environmental factors" causing the financial misrepresentations was
"the tone set and pressures imposed by our former Chief Executive Officer [defendant Frissora],
which were inappropriate in certain instances, and may have been a factor influencing one or more
employees to record an accounting entry now determined to be improper."  The 2014 Form 10-K
stated, in pertinent part, as follows:

> Our former Chief Executive Officer further encouraged employees to focus on
> potential business risks and opportunities, and on potential financial or operating
> performance gaps, as well as ways of ameliorating potential risks or gaps, including
> through accounting reviews.  This resulted in an environment which in some
> instances may have led to inappropriate accounting decisions and the failure to
> disclose information critical to an effective review of transactions and accounting
> entries, such as certain changes in accounting methodologies, to the appropriate

finance and accounting personnel or our Board, Audit Committee, or independent registered public accounting firm.

50.     In addition to admitting that Hertz's senior management encouraged Hertz employees to manipulate Hertz's financial results, the 2014 Form 10-K acknowledged that Hertz had other material internal control deficiencies contributing to its culture of fraud.

51.     Hertz admitted that its accounting and finance personnel were not adequately qualified, or did not have enough knowledge, experience or training, to ensure compliance with GAAP.  The 2014 Form 10-K stated, in pertinent part, as follows:

> We did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and training commensurate with our financial reporting requirements to ensure proper selection and application of GAAP in certain circumstances.

52.     Likewise, Hertz admitted that it "did not establish clear reporting structures, reporting lines, and decisional authority responsibilities in the organization."  Hertz admitted that it did "not design effective controls over the non-fleet procurement process, which was exacerbated by the lack of training of field personnel as part of our Oracle enterprise resource planning ("ERP") system implementation during 2013."

53.     Furthermore, Hertz acknowledged that material weaknesses in the control environment caused Hertz employees to make improper accounting decisions and inappropriately change accounting methodology.  The 2014 Form 10-K states, in pertinent part, that "material weaknesses in the control environment resulted in certain instances of inappropriate accounting decisions and inappropriate changes in accounting methodology and contributed to the following additional material weaknesses":

- We did not design and maintain effective controls over certain accounting estimates.  Specifically, we did not design and maintain controls over the effective review of the models, assumptions, and data used in developing estimates or changes made to assumptions and data, related to information technology

- 17 -

expenditures; reserve estimates associated with allowances for uncollectible amounts receivable for renter obligations related to damaged vehicles; and accrued unbilled revenue.

- We did not design and maintain effective controls over the review, approval, and documentation related to journal entries.

- We did not design and maintain effective controls over changes to our policies and procedures over GAAP, as well as the review, approval, and documentation related to the application of GAAP.

54.     Furthermore, Hertz admitted that it had material weaknesses with respect to risk assessment in that it "did not effectively design controls in response to the risks of material misstatement." Hertz acknowledged that this material weakness contributed to the following additional material weaknesses:

We did not design effective controls over certain business processes including our period-end financial reporting process. This includes the identification and execution of controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments required to assess the appropriateness of certain account balances at period end.

55.     Hertz admitted that it failed to "maintain effective controls over information and communications" and that it "did not maintain personnel and systems within the internal audit function that were sufficient to ensure the adequate monitoring of control activities." This caused "misstatements in the capitalization and timing of depreciation of non-fleet capital."

56.     Hertz admitted that it "did not design and maintain effective monitoring controls related to the design and operational effectiveness of our internal controls." As a result, Hertz's internal audit function failed to identify or sufficiently follow up on the analysis of improper accounting decisions and changes in accounting methodology. The 2014 Form 10-K stated, in pertinent part, as follows:

We did not design and maintain effective monitoring controls related to the design and operational effectiveness of our internal controls. Specifically, we did not maintain personnel and systems within the internal audit function that were sufficient to ensure the adequate monitoring of control activities. This control

- 18 -

deficiency resulted in some instances of the internal audit function's failure to identify or sufficiently follow through on the analysis of certain inappropriate accounting decisions and changes in accounting methodology.

57.     Finally, Hertz admitted in the 2014 Form 10-K that the internal control deficiencies

contributed to the Restatement, stating, in pertinent part, as follows:

> One or more of the foregoing control deficiencies contributed to the restatement of our financial statements for the years 2012 and 2013 and each of the quarters of 2013, including the misstatements of direct operating expenses, accounts payable, accrued liabilities, allowance for doubtful accounts, prepaid expenses and other assets, and non-fleet property and equipment and the related accumulated depreciation.  Additionally, the foregoing control deficiencies could result in material misstatements of the consolidated financial statements that would not be prevented or detected.  Accordingly, our management has determined that these control deficiencies constitute material weaknesses.

58.     The internal control deficiencies created an environment ripe for fraud.  Indeed,

numerous compliance and audit experts were quoted in a July 28, 2015 article from

ComplianceWeek.com entitled "Hertz Restatement Drives Home Top-Level Control Issues"

describing how Hertz's 2014 Form 10-K revealed the magnitude and severity of the problems

caused by its internal control weaknesses, as set forth below:

> (a)     "'The company identified control deficiencies related to the control environment, risk assessment, information and communication, and monitoring,' Hertz says.  That represents four of the five components of effective internal control as described in the COSO internal control framework, says Bob Hirth, chairman of COSO."

> (b)     "Dale Wallis, a consultant retired from Aerospace Corp. after 11 years as CFO and treasurer and a member of [FEI], says the extensive description of internal control and accounting problems ***hits all the notes of the classic fraud triangle***.  'There was pressure, opportunity, and rationalization,' he says.  'They come right out and talk about it in their explanatory note.'  ***The former CEO created pressure to meet targets and budgets, and a weak control environment enabled it to happen***, Wallis says."

> (c)     "Gerry Zack, managing director in the global forensics group for BDO Consulting, says the directness of the disclosures is unusual.  '***They don't beat around the bush***,' he says.  '***They really very specifically call out the former CEO as the leading cause of the restatement.  You don't see that often***.'"

59.     In light of Hertz's admissions in the 2014 Form 10-K, defendant Frissora and the other Individual Defendants' knowing and/or reckless misconduct during the Class Period is beyond dispute.

## Hertz's Financial Reporting During the Class Period
## Was Materially False and Misleading

60.     Hertz has now admitted that prior to and during the Class Period the Company filed with the SEC and issued to investors financial statements that violated GAAP and SEC regulations in numerous respects.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X states that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate, despite footnote or other disclosure.  [17 C.F.R. §210.4-01(a)(1)].  Regulation S-X provides that interim financial statements must also comply with GAAP.  [17 C.F.R. §210.10-01(a)].

61.     Hertz has now advised investors not to rely on *any* of the financial statements it issued during the Class Period.  In fact, Hertz has told investors not to rely on any of its financial statements issued prior to those included in the 2014 Form 10-K, including those before the start of the Class Period.

62.     In its 2014 Form 10-K, Hertz explained how the financial statements it issued to investors prior to and during the Class Period violated numerous GAAP standards and SEC rules. As a result, the financial disclosures issued by Defendants prior to and during the Class Period that were based upon Hertz's financial statements were also, admittedly, materially false and misleading.

63.     As a result of widespread and systemic GAAP irregularities and violations of SEC rules, Hertz announced that its financial statements, and the financial information related thereto,

included in **each and every** report it filed with the SEC prior to the 2014 Form 10-K **"should no longer be relied upon."**

64.    In addition, Hertz admitted that the accounting misstatements and/or financial manipulations that riddled Hertz's financial statements materially understated Hertz's expenses and caused the Company's previously reported annual net income during 2011, 2012 and 2013 to be overstated between **14.64% and 32.12%**.

65.    Significantly, Hertz acknowledged that its former CEO, defendant Frissora, "encouraged" employees to take certain undisclosed actions to "ameliorate" shortfalls in the Company's financial and operating results and that defendant Frissora "created a pressurized operating environment" that may have resulted in "inappropriate accounting decisions and inappropriate changes in accounting methodology."  Accordingly, defendant Frissora, the Company's most senior executive officer, fostered an environment that allowed, and indeed encouraged, employees to manufacture accounting adjustments so as to enable Hertz to achieve desired financial results.

66.    As provided in detail in ¶¶73-74 below, the GAAP violations and financial reporting improprieties contained in Hertz's financial statements included, among other things, those associated with the improper:

- recording and depreciation of non-fleet capital and information technology expenditures;

- accrual of unbilled revenue, non-fleet vendor obligations, customer rewards programs, restoration obligations and salvage vehicles;

- amortization of vehicle registration and license fees;

- recording of reserves associated with allowances for uncollectible amounts receivable, allowances for doubtful accounts and probable credit card charge backs;

- disclosure of equipment and accumulated depreciation associated with refurbishment costs; and

- Brazilian allowances for doubtful accounts reserves, accruals for travel vouchers, litigation reserves; other assets and intercompany accounts.

67.    In addition, Hertz admitted that it failed to maintain an effective system of internal control over its financial reporting and that the controls and procedures designed to ensure that information required to be disclosed to investors under the Exchange Act were ineffective at all times during the Class Period.

68.    As detailed in ¶¶43-59; 119-33, Defendants caused Hertz to conduct its affairs with inadequate and deficient internal controls that permitted the misstatement of Hertz's financial results.  Among these deficiencies were: (i) an ineffective control environment caused, in part, by "an inconsistent and sometimes inappropriate 'tone at the top' under then existing senior management;" (ii) ineffective controls "in response to the risks of material misstatement;" (iii) ineffective controls over information and communication; and (iv) an internal audit function that failed to effectively monitor the effectiveness of Hertz's internal controls.

69.    Despite the lack of such key controls, and while defendant Frissora was admittedly encouraging an operating environment that enabled employees to manufacture improper accounting adjustments to allow Hertz to achieve desired financial results, defendants Frissora, Douglas, Rosenberg, and Kennedy each filed certifications with the SEC mandated by SOX attesting that they had designed, reviewed, evaluated and found Hertz's controls be "effective" in preventing the very type of misstatements Hertz has now admitted occurred during the Class Period, as explained more fully in ¶¶119-33 below.

**Hertz's Admissions Associated With Its Material Understatement of Expenses**

70.    In violation of some of the most basic and fundamental rules of accounting, the Company's reported earnings prior to and during the Class Period were repeatedly overstated due to the improper understatement of a variety of business expenses.  GAAP requires expenses to be

recorded in the period they are incurred.  *See, e.g.*, FASB's Accounting Standards Codification ("ASC") Topic 450-20, *Loss Contingencies* and Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, paragraph numbers 85 to 87.

71.     The notion that expenses be recorded in the same period in which the corresponding benefit is realized is one of, if not the, most basic tenets underlying GAAP accounting.  Hertz, however, deliberately ignored this most basic accounting precept and repeatedly allowed expense recognition to be improperly delayed over numerous years.  Indeed, defendant Hertz admitted that defendant Frissora fostered an environment which encouraged Company employees to manufacture accounting adjustments to enable Hertz to achieve desired financial results.

72.     As explained more fully below, the Company's improper and widespread manipulation of its reported expenses over numerous years occurred in at least the following ways: (i) deferring current period expense recognition via accounting reserves; (ii) recording ordinary expenses as assets and expensing them over time, rather than correctly expensing them at the time they were incurred; and (iii) failing to timely write down the value of impaired assets.

**Hertz's Accounting Reserve Manipulations Defer Expenses to Later Periods**

73.     According to the 2014 Form 10-K, prior to and during the Class Period, Hertz improperly deferred current period expenses to subsequent periods by manipulating a variety of accounting reserves.  These manipulations had the intended effect of materially understating the Company's reported direct operating, depreciation, and selling, general and administrative expenses, thereby resulting in a material overstatement of the Company's reported income.  Hertz has now admitted to the following accounting reserve manipulations:

- Reserve methodologies used to account for uncollectible customer receivables and credit memo allowances "inappropriately": (i) used inaccurate write-off rates; (ii)

aggregated, rather than segregating, receivables with significantly different credit risk profiles; (iii) utilized assumptions that were "unsupported;" (iv) utilized rates that were inconsistent with historical norms; and (v) contained formulaic errors. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Amortization periods on reserves associated with vehicle registration costs were "improperly changed." According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Reserve methodologies used to estimate recoveries from third parties responsible for vehicle damage "inappropriately" used assumptions that "lacked support" and contained formulaic errors. In addition, there were instances in which the amounts recorded for the reserves were significantly less than the amount calculated based on the methodology in place at the time and reserve methodologies were changed without reasonable basis. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Reserves for legal expenses and litigation, as well as intercompany account balances were "not properly supported" and, consequently, were written off. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Depreciation reserves failed to timely account for assets placed in service. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Reserves failed to account for global contractual restoration costs on certain of its leased facilities, including its European headquarters at Uxbridge, United Kingdom. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Reserves established to accrue for future credit card chargebacks were understated in a variety of ways, including adopting inappropriate changes in the methodology used in computing reserves and improperly excluding chargebacks received from credit card providers. According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Reserves for expenses paid utilizing credit cards did not include amounts that were incurred and/or were billed to the Company.

- Reserves associated with the Hertz Gold Plus Rewards Program were understated for a variety of reasons including: (i) utilizing improper point redemption rates; (ii) improperly calculating costs associated with customers' use of points; and (iii) failing to reconcile reserve accounts.

**Hertz Reported Ordinary Business Expenses as Assets**

74.     According to the 2014 Form 10-K, prior to and during the Class Period, Hertz improperly deferred current period expenses to subsequent periods by recording ordinary business expenses as assets.  These manipulations had the intended effect of materially misstating the Company's depreciation expense and reported income.  Hertz has now admitted to the following improper deferrals of expenses:

- Software and leasehold and property related expenditures were improperly recorded as assets rather than as expenses.  In addition, Software and leasehold and property related expenditures associated with abandoned projects and assets that were "not in service" were not timely written off.  According to Hertz, an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

- Certain assets were not "properly supported" and consequently were written off. According to Hertz an "[i]nappropriate tone at the top, among other factors, may have contributed to this restatement matter."

**Hertz Improperly Failed to Timely Write Down Impaired Assets
in Connection with the Advantage Divestiture**

**The Dollar Thrifty Acquisition and Advantage Divestiture**

75.     In 2007, Defendant Hertz introduced "Simply Wheelz by Hertz," a new company under the Hertz brand which sought to target value-seeking customers and leisure travelers with more affordable access to rental vehicles.  Simply Wheelz by Hertz was operated by Simply Wheelz LLC ("Simply Wheelz"), a subsidiary of the Company.  At the time, the value segment for rental vehicles in the United States included several competitors, including Advantage Rent-A-Car ("Advantage").  Hertz, through Simply Wheelz, purchased Advantage out of bankruptcy on or about April 1, 2009, for approximately $33 million.

76.     During 2012, amidst Hertz's fraudulent accounting, Hertz made an offer to acquire one of its competitors, Dollar Thrifty Automotive Group ("Dollar Thrifty").  The FTC examined the proposed transaction in the context of compliance with federal antitrust laws.  In order to permit

the combination of Hertz and Dollar Thrifty, the FTC required Hertz to, among other things, divest the Advantage business.  As such, on July 13, 2012, Hertz entered into a purchase agreement to divest Simply Wheelz, the owner of Hertz's Advantage business, and certain other assets to Adreca Holdings Corp., a subsidiary of Macquarie Capital (USA), Inc. (the "Advantage Divestiture").

77.    On August 26, 2012, Hertz and Dollar Thrifty announced that the parties had entered into a definitive merger agreement under which Hertz would acquire Dollar Thrifty for $2.3 billion (the "Dollar Thrifty Acquisition").  Shortly before the beginning of the Class Period, Hertz completed the Dollar Thrifty Acquisition on November 19, 2012, and the Advantage Divestiture was completed on December 12, 2012, at which time the Advantage Fleet was transferred to Simply Wheelz.

78.    As part of the Advantage Divestiture, Simply Wheelz leased approximately 24,000 vehicles from defendant Hertz, which constituted the entirety of the initial Advantage fleet (the "Advantage Fleet").  In addition, Hertz assisted Simply Wheelz with securing alternative fleet financing arrangements and entered into a senior note credit agreement, pursuant to which the Company agreed, subject to certain conditions, to loan Simply Wheelz, on a senior unsecured basis, up to $45 million over 5 years at varied interest rates up to 13% over the life of the loan.

79.    As a result of these and other arrangements, Hertz represented that it "will have significant continuing involvement in the operations of the disposed Advantage business[,]" and, as a result, the "operating results associated with the Advantage business will continue to be classified as part of our continuing operations in the consolidated statements of operations for all periods presented."

**The Advantage Fleet Was Substantially Overvalued by June 2013**

80.     Under the terms of the Advantage Divestiture, Simply Wheelz was required to dispose of the entire Advantage Fleet on or before December 31, 2014, through only a single approved disposition channel, Manheim, Inc. ("Manheim").  Manheim is an automobile auction company that provides auction services for the physical sale of automobiles as well as online tools to connect wholesale vehicle buyers and sellers.  Manheim operates one of the largest wholesale automobile auctions in the world.

81.     Simply Wheelz filed for bankruptcy protection on or about November 5, 2013. According to a declaration filed by Thomas P. McDonnell, III ("McDonnell")[3] in the Simply Wheelz bankruptcy action (the "McDonnell Declaration"), Simply Wheelz "believed that Hertz had materially overstated the [carrying] value of the vehicles included in the [Advantage] Fleet, based on an analysis of certain specimen cars representative of the vehicles included in the [Advantage] Fleet."  This is corroborated by CW1, a former contract employee in Advantage's accounting department, who also believed that the Advantage Fleet vehicles were overvalued because of the losses incurred upon the sales of the vehicles.

82.     Indeed, as soon as Simply Wheelz began selling Advantage Fleet vehicles through Manheim, it incurred losses on those vehicles.  According to the McDonnell Declaration, Simply Wheelz immediately began to experience significant losses on the sales of Advantage Fleet vehicles in June 2013 compared to the values assigned by defendant Hertz.

83.     CW1 confirmed that such losses were substantial and that Simply Wheelz was "taking losses every time we disposed" of an Advantage Fleet vehicle.  CW1 could not recall a

---

[3]     McDonnell served as CEO of Simply Wheelz and Chairman of its board of directors from May 2012 through November 5, 2013.

single week or month when Simply Wheelz made a profit on sales of Advantage Fleet vehicles. CW1 understood that the losses incurred on the sales of Advantage Fleet vehicles through Manheim were by far the single largest loss that Simply Wheelz was experiencing across its entire range of operations during 2013 and represented a "constant loss" for Simply Wheelz. As such, the losses on the sales of Advantage Fleet vehicles had a substantial and negative impact on Simply Wheelz's business and credit worthiness.

84.     Defendants knew, or recklessly disregarded, that the Advantage Fleet vehicles were consistently being sold for a loss, which negatively impacted Simply Wheelz's financial condition. Indeed, Hertz was timely notified of sales of Advantage Fleet vehicles, the amounts received for the vehicles, and any losses incurred thereon. According to CW1, Hertz was promptly notified when an Advantage Fleet vehicle was sold and Hertz received the proceeds of the sales directly from Manheim. In the event that an Advantage Fleet vehicle was sold for a loss through Manheim (*i.e.*, the amount achieved at auction was less than the value reflected in Hertz's books and records), Simply Wheelz was responsible for paying the difference to Hertz.

85.     Not only was Hertz fully informed about sales of – and losses on – Advantage Fleet vehicles as a result of their direct contact with Manheim and Simply Wheelz, Hertz was also well informed about Simply Wheelz's operations due to its ongoing and significant involvement in that business. Indeed, Hertz acknowledged that it had "significant continuing involvement in the operations of the disposed Advantage business" during the Class Period.

86.     The ongoing losses on the sales of Advantage Fleet vehicles were having a material adverse effect on Advantage's business and credit worthiness throughout the Class Period. As a result, Simply Wheelz requested a meeting with Hertz in July 2013 to discuss this matter.

87.     According to the McDonnell Declaration, beginning in July 2013, representatives of Simply Wheelz met with representatives of Hertz to request information from Hertz to determine the basis on which Hertz had calculated the net book value of the Advantage Fleet. Despite repeated requests from Simply Wheelz, Hertz did not provide Simply Wheelz with this information notwithstanding Hertz's contractual obligation to do so under the purchase agreement for the Advantage Divestiture.

**Hertz Improperly Failed to Timely Write Down Impaired Assets**

88.     During 2013, Defendants violated GAAP by knowingly or recklessly delaying the recognition and disclosure of a $40 million impairment in the value of the Advantage Fleet, thereby falsely inflating the Company's operating results during the second quarter of 2013.[4]   The Company's internal control deficiencies were a contributing factor to Hertz's failure to record this impairment charge.

89.     As explained herein, after the Advantage Divestiture, Hertz retained what it deemed to be "significant continuing involvement in the operations of the disposed Advantage business." Even though Hertz no longer owned the Advantage Fleet, since Hertz maintained a "significant continuing involvement in the operations of the disposed Advantage business," applicable accounting rules, required Hertz to continue to report Simply Wheelz's assets and operating results as part of its own in its financial statements during the Class Period.

90.     GAAP provides that the cost of equipment expected to provide a future economic benefit to an entity over a number years, such as a rental car fleet, is to be allocated to accounting periods over the asset's useful life.   This allocation process, referred to as depreciation, spreads

---

[4]   According to the 2014 Form 10-K, Hertz has not amended, and does not intend to amend, its quarterly reports on Form 10-Q for periods prior to December 31, 2014.

the cost of the asset over time periods benefiting from the asset's use.  Hertz was required to comply with this GAAP requirement.

91.     Shortly after the beginning of the Class Period, on March 4, 2013, Hertz filed the 2012 Form 10-K (defined below), which explained Hertz's method of accounting for the depreciation expense for its rental car fleet, and stated, in pertinent part, as follows:

> In the year ended December 31, 2012, our monthly per vehicle depreciation costs decreased as compared to the prior year period due to improved residual values in the U.S., a continued move towards a greater proportion of non-program vehicles, mix optimization and improved procurement and remarketing efforts.  Depreciation rates are reviewed on a quarterly basis based on management's routine review of present and estimated future market conditions and their effect on residual values at the time of disposal.  During 2012, 2011 and 2010, depreciation rates being used to compute the provision for depreciation of revenue earning equipment were adjusted on certain vehicles in our car rental operations to reflect changes in the estimated residual values to be realized when revenue earning equipment is sold.  These depreciation rate changes resulted in net decreases of $130.6 million and $13.8 million and an increase of $19.1 million in depreciation expense for the years ended December 31, 2012, 2011 and 2010, respectively.  Depreciation rate changes in certain of our equipment rental operations resulted in increase of $0.5 million and decrease of $4.4 million and an increase of $3.6 million in depreciation expense for the years ended December 31, 2012, 2011 and 2010, respectively.

> *          *          *

> Generally, when revenue earning equipment is acquired, we estimate the period that we will hold the asset, primarily based on historical measures of the amount of rental activity (e.g., automobile mileage and equipment usage) and the targeted age of equipment at the time of disposal.  We also estimate the residual value of the applicable revenue earning equipment at the expected time of disposal.  The residual values for rental vehicles are affected by many factors, including make, model and options, age, physical condition, mileage, sale location, time of the year and channel of disposition (e.g., auction, retail, dealer direct).  The residual value for rental equipment is affected by factors which include equipment age and amount of usage.

> Depreciation is recorded on a straight-line basis over the estimated holding period.  Depreciation rates are reviewed on a quarterly basis based on management's ongoing assessment of present and estimated future market conditions, their effect on residual values at the time of disposal and the estimated holding periods.

Market conditions for used vehicle and equipment sales can also be affected by external factors such as the economy, natural disasters, fuel prices and incentives offered by manufacturers of new cars. These key factors are considered when estimating future residual values and assessing depreciation rates. As a result of this ongoing assessment, we make periodic adjustments to depreciation rates of revenue earning equipment in response to changed market conditions. Upon disposal of revenue earning equipment, depreciation expense is adjusted for the difference between the net proceeds received and the remaining net book value.

92. Accordingly, Hertz's depreciation expense is generally based upon the Company's cost to acquire the vehicle, less the amount the Company expects to realize on the disposal of the vehicle (*i.e.*, the residual value), divided by the vehicle's useful life. For example, the annual depreciation expense of an automobile costing $20,000 that the Company expects to hold for three years with an estimated residual value after the third year of $14,000, is $2,000, calculated as follows: ($20,000 - $14,000)/3.

93. The cost of the vehicle in Hertz's books and records is reduced by the amount of depreciation expense. Accordingly, after year one, the $20,000 cost of the vehicle would be reduced by $2,000, to $18,000, which becomes the vehicle's new "book" or "carrying" value. Similarly, after year two, the $18,000 carrying value of the vehicle would be reduced by another $2,000, to $16,000.

94. Upon disposal of the vehicle, Hertz adjusts the depreciation expense to account for the difference between the net proceeds it receives for the vehicle and its remaining net book value. So, if in the above example, the Company sold the vehicle for $12,500 after holding and depreciating it for three years, the $1,500 loss on the disposal ($12,500 sales price/residual value minus the $14,000 carrying value) would be added to depreciation expense in the year the vehicle was disposed.

95. Thus, an overstatement in a vehicle's expected residual value will increase the loss recognized when the vehicle is sold. According to Hertz's 2012 Form 10-K, the Company makes

- 31 -

an "ongoing assessment" of the residual values of its rental car fleet and adjusts its periodic depreciation expense accordingly.

96.     In addition to the foregoing, GAAP, in ASC Topic 360, Property, Plant, and Equipment ("ASC 360"), provides that long-lived assets, such as the Advantage Fleet, must be reviewed for an impairment in value when facts and/or circumstances indicate that the carrying value, aka the book value, of the asset (or group of assets) recorded in an entity's books and records may be greater than the sum of the undiscounted cash flows expected from the asset's (or group of assets) use and disposal.

97.     When such facts and/or circumstances exist, the entity must record an impairment charge equal to the excess of the book value of the asset (or group of assets) over the asset's (group's) fair value.

98.     The 2012 Form 10-K, signed by defendants Frissora, Douglas and Kapur, acknowledged the applicability of these accounting standards, stating, in pertinent part, as follows:

> Intangible and Long-lived Assets
>
> Intangible assets include concession agreements, technology, customer relationships, trademarks and trade-names and other intangibles.  Intangible assets with finite lives are amortized using the straight-line method over the estimated economic lives of the assets, which range from two to fifteen years.  Long-lived assets, including intangible assets with finite lives, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable in accordance with FASB ASC Topic 360, "Property, Plant, and Equipment," or "ASC 360."  Determination of recoverability is based on an estimate of undiscounted future cash flows resulting from the use of the asset and its eventual disposition.  Measurement of an impairment loss for long-lived assets that management expects to hold and use is based on the estimated fair value of the asset.
>
> Long-lived assets to be disposed of are reported at the lower of carrying amount or estimated fair value less costs to sell.  Intangible assets determined to have indefinite useful lives are not amortized but are tested for impairment annually each October 1st and more frequently if events occur or circumstances change that indicate an asset may be impaired.

99.     During the Class Period, Hertz violated GAAP and its above-stated publicly disclosed policy of accounting for long-lived assets by failing to timely record an impairment in the value of the Advantage Fleet.

100.     Documents filed in connection with Simply Wheelz's bankruptcy, and information provided by the CWs, indicate that the carrying value of the Advantage Fleet was greater than the sum of the undiscounted cash flows Simply Wheelz expected from the Advantage Fleet's use and disposal.  These facts and circumstances required Hertz to conduct a test for impairment in the value of the Advantage Fleet for the quarter ended June 30, 2013.  Hertz, however, failed to do so, in violation of GAAP and the Company's publicly disclosed accounting policies.

101.     For example, and as noted herein, the McDonnell Declaration stated that, in June 2013, Simply Wheelz began to experience significant losses on the sale of the Advantage Fleet vehicles.  These losses were the direct result of the carrying value of the sold vehicles being greater than what was realized upon their sale.

102.     Furthermore, according to the McDonnell Declaration, in July 2013, representatives of Simply Wheelz met with representatives of Hertz to request information from the Company to determine the basis upon which Hertz had determined the carrying value of the Advantage Fleet due to the significant difference between the carrying values and the amounts Simply Wheelz realized upon the sale of the Advantage Fleet vehicles through Manheim.

103.     Pursuant to GAAP, in ASC Topic 450-20-25, an accrual for the loss must be made when information available before the issuance of financial statements indicates that: (i) it is probable that an asset had been impaired at the date of the financial statements (*i.e.*, June 30, 2013); and (ii) the amount of loss can be reasonably estimated.  In situations where both of these conditions are not satisfied, the financial statements are required to provide disclosure of the

possible asset impairment when such impairment is at least reasonably possible (*i.e.*, a greater than slight chance).  *See, e.g.*, ASC Topic 450-20-50.

104.    As noted by CW1, who was responsible for the accounting of Simply Wheelz's fleet during the Class Period, initially, the entire Simply Wheelz rental car portfolio consisted of the Advantage Fleet.  CW1 explained that beginning in the late spring and early summer of 2013, the management of Simply Wheelz sought to change the mix of its rental car portfolio by selling Advantage Fleet vehicles and purchasing, from other sources, make and model vehicles that Simply Wheelz's management believed would be more attractive to its customers.

105.    CW1 noted that Simply Wheelz was "taking losses every time" it disposed of an Advantage Fleet vehicle.  CW1 said it was implausible for Simply Wheelz to be losing as much as it was on the sale of the Advantage Fleet vehicles because Simply Wheelz purportedly acquired the vehicles from defendant Hertz at their supposed fair values just a few months prior.

106.    This was particularly the case given that Hertz's accounting policies required that it make "ongoing" assessments of and, accordingly, adjustments to the residual values of its rental car fleet.

107.    CW1 further stated that, by July 2013, it was obvious that Simply Wheelz was losing money on the disposal of the Advantage Fleet vehicles, with these losses far exceeding any expense Simply Wheelz had been experiencing across the entire range of its operations.  CW1 reiterated that the ongoing and persistent losses on the disposal of the Advantage Fleet vehicles indicated that the book values of the Advantage Fleet vehicles were overstated.  These losses on the Advantage Fleet negatively impacted the financial condition and credit worthiness of Simply Wheelz.

108.    Similarly, CW2, a former Remarketing Manager at Hertz, noted that Advantage vehicles had been overvalued in 2013 and could not be sold at prices set by the Company.

109.    As alleged herein, since senior Hertz managers were knowledgeable about significant losses then being realized on the sale of the Advantage Fleet vehicles, they knew, or recklessly disregarded, that Hertz, pursuant to GAAP and the Company's publicly disclosed accounting policies, was required to conduct a test for the impairment in the value of the Advantage Fleet as of June 30, 2013.  Hertz, however, in violation of its accounting policies and GAAP, knowingly or recklessly failed to conduct an impairment test by June 30, 2013.  Had Hertz complied with its accounting policies and GAAP, it would have recorded a $40 million impairment loss no later than the second quarter of 2013, the quarter ended June 30, 2013.

110.    Moreover, the above noted facts and circumstances also indicated to Defendants that there was a "greater than slight" chance that the Advantage Fleet was impaired, thereby requiring, pursuant to GAAP, that such reasonable possibility be disclosed in Hertz's 2013 second quarter financial statements, the quarter ended June 30, 2013.  Furthermore, since Hertz had until recently operated the business now run by Simply Wheelz, Hertz would have known that the losses on sales of the Advantage Fleet would have negatively impacted Simply Wheelz's cash flow and ability to repay its debts.  This reduced credit worthiness would have negatively impacted the likelihood that Simply Wheelz could make Hertz whole on the losses on the sale of the Advantage Fleet vehicles.  Hertz, however, in violation of GAAP, knowingly or recklessly failed to make such disclosure.

111.    At all relevant times during Hertz's failure to timely write down the impairment in the Advantage Fleet, defendant Frissora created an environment that encouraged employees to engage in "inappropriate accounting decisions."

**Hertz's Admissions of Additional Financial Reporting Improprieties**

112.    In addition to the GAAP violations described above, the 2014 Form 10-K reveals that Hertz engaged in a number of other accounting improprieties during the Class Period.  These improprieties were either corrected when Hertz restated its financial statements or were disclosed in the 2014 Form 10-K.

113.    For example, in addition to the financial misstatements detailed above, "certain other restatement matters" caused Hertz's cumulative pre-tax income to be overstated by $53 million.

114.    In addition, the Company has also restated certain notes to the financial statements – as guided by ASC Topic 235, *Notes to Financial Statements* – to correct the errors detailed therein.

115.    Further, when publicly traded companies make voluntary changes to their methods of accounting, they are required to disclose the date of and the reason for the change.  Publicly traded companies must also include as an exhibit to its SEC filings a letter from its independent accountants indicating whether or not the accounting change, in the accountant's judgment, is preferable under the circumstances.  *See*, *e.g.*, Rule 10-01(b)(6) of Regulation S-X.  [17 C.F.R. §210.10-01(b)(6)]

116.    Hertz has now disclosed that, in violation of these rules, its financial statements contained "inappropriate changes in [certain] accounting methodology," due, in part, to material weaknesses in the control environment, including an "inappropriate tone at the top."

117.    By failing to file financial statements with the SEC that complied with GAAP as discussed herein, Hertz disseminated financial statements that were presumptively misleading and inaccurate according to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)).  In addition, Defendants violated the dictates of §13 of the Exchange Act, which provides:

Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall –

       A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

       B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

       i.    transactions are executed in accordance with management's general or specific authorization;

       ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

       iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

       iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

118.    In addition, the Company's 2012 and 2013 Forms 10-K and its 2013 Forms 10-Q filed with the SEC during the Class Period were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**Hertz's Admissions Associated with Its Material Control Deficiencies**

119.    Internal control is broadly defined as a process, effected and supervised by an entity's board of directors and senior management, which was designed to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.  As a result, defendant Frissora and Hertz

senior management were responsible at all times during the Class Period for ensuring that Hertz had effective internal controls.

120.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit [the] preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Investments, Ltd.*, 567 F. Supp. 724, 746-48 (N.D. Ga. 1983).

121.    Pursuant to Regulation S-K Item 308, *Internal Control Over Financial Reporting*, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains:

(a)     a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant;

(b)     a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §13a-15 or §15d-15 under the Exchange Act;

(c)     management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective – this

discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management, and management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and

(d)     a statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

122.     As Hertz acknowledged in the 2014 Form 10-K, its management is responsible for establishing and maintaining adequate internal control over financial reporting, stating, in pertinent part, as follows:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f) and 15d-15(f).

123.     Hertz has now admitted that the internal controls over its financial reporting during the Class Period were riddled with material weaknesses.  As defined in the Public Company Accounting Oversight Board Auditing Standard No. 5 §A7, a material weakness is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

124.     The 2014 Form 10-K reveals that Hertz's financial statements, and Defendants' statements related thereto during the Class Period, were false and misleading because of material internal control weaknesses, which, among other things, included:

- "Our investigation found that an inconsistent and sometimes ***inappropriate tone at the top was present under the then existing senior*** management that did not in

certain instances result in adherence to accounting principles generally accepted in the United States of America ("GAAP") and Company accounting policies and procedures. In particular, *our former Chief Executive Officer's management style and temperament created a pressurized operating environment* at the Company, where challenging targets were set and achieving those targets was a key performance expectation. *There was* in certain instances *an inappropriate emphasis on meeting internal budgets, business plans, and current estimates*. *Our former Chief Executive Officer further encouraged employees to focus on* potential business risks and opportunities, and on potential financial or *operating performance gaps, as well as ways of ameliorating potential risks or gaps, including through accounting reviews*. *This resulted in* an environment which in some instances may have led to *inappropriate accounting decisions and the failure to disclose information critical to an effective review of transactions and accounting entries*, such as certain changes in accounting methodologies, to the appropriate finance and accounting personnel or our Board, Audit Committee, or independent registered public accounting firm."

- "We did not have a sufficient complement of personnel with an appropriate level of knowledge, experience, and training commensurate with our financial reporting requirements to ensure proper selection and application of GAAP in certain circumstances."

- "*We did not establish clear reporting structures, reporting lines, and decisional authority responsibilities in the organization*."

                        *        *        *

- "*We did not design and maintain effective controls over* certain *accounting estimates*. Specifically, *we did not* design and maintain controls over the effective *review of the models, assumptions, and data used in developing estimates or changes made to assumptions and data*, related to information technology expenditures; reserve estimates associated with allowances for uncollectible amounts receivable for renter obligations related to damaged vehicles; and accrued unbilled revenue."

- "We did not design and maintain effective controls over the review, approval, and documentation related to journal entries."

- "We did not design and maintain effective controls over changes to our policies and procedures over GAAP, as well as the review, approval, and documentation related to the application of GAAP."

- "*We did not design effective controls over* certain business processes including our *period-end financial reporting process*. This includes the identification and execution *of controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments* required to assess the appropriateness of certain account balances at period end."

- "... we did not have an adequate process for internally communicating information between the accounting department and other operating departments necessary to support the proper functioning of internal controls."

125.    Significantly, the 2014 Form 10-K notes, in pertinent part, that:

*Our incorrect accounting was caused by the foregoing control deficiencies* along with a complex mix of structural and environmental factors. *One of those factors was the tone set and pressures imposed by our former Chief Executive Officer, which were inappropriate* in certain instances, and may have been a factor *influencing one or more employees to record an accounting entry now determined to be improper*.

126.    As the 2014 Form 10-K makes clear, defendant Frissora, "encouraged" employees to take certain undisclosed actions to "ameliorate" shortfalls in the Company's financial and operating results and defendant Frissora "created a pressurized operating environment" that may have resulted in "inappropriate accounting decisions and inappropriate changes in accounting methodology."   Accordingly, prior to and during the Class Period, defendant Frissora, the Company's most senior executive officer, and other senior management of the Company, fostered an environment that allowed, and encouraged, employees to manufacture accounting adjustments to enable Hertz to achieve desired financial results.

127.    The 2014 Form 10-K also admits that the Company's material internal control weaknesses rendered its disclosure controls ineffective.

128.    Nonetheless, Hertz's 2012 and 2013 Forms 10-K and its Forms 10-Qs for each quarter during 2013, in all material respects, falsely and misleadingly represented, in pertinent part, that:

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in company reports filed or submitted under the Securities Exchange Act of 1934, or the "Exchange Act," is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. . . .

An evaluation of the effectiveness of our disclosure controls and procedures was performed under the supervision of, and with the participation of, management, including our Chief Executive Officer and Chief Financial Officer, as of the end of the period covered by this Report.  Based upon this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

**Changes in Internal Control Over Financial Reporting**

An evaluation of our internal controls over financial reporting was performed under the supervision of, and with the participation of, management, including our Chief Executive Officer and Chief Financial Officer, to determine whether any changes have occurred during the period covered by this Report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.   On November 19, 2012, the Company completed the acquisition of Dollar Thrifty.   The Company has reviewed Dollar Thrifty's operations and conducted control reviews pursuant to the Sarbanes-Oxley Act of 2002.  See Note 5, "Business Combinations and Divestitures," of the unaudited interim consolidated financial statements included in this Quarterly report on Form 10-Q for a discussion of the acquisition and related financial data.  In the third quarter of 2013, the Company implemented Oracle general ledger, accounts payable and a portion of the fixed assets, purchasing and procurement modules for most of its Hertz classic U.S. car rental and Canada equipment rental businesses. Excluding the Dollar Thrifty acquisition our Chief Executive Officer and Chief Financial Officer concluded that no changes in our internal control over financial reporting have occurred during the three months ended September 30, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

129.    These false and misleading representations were then falsely certified by defendants Frissora, Douglas, Rosenberg and Kennedy.

130.    Pursuant to §302 of the SOX, defendants Frissora, Douglas, Rosenberg and Kennedy were obligated to certify that: (i) they were responsible for establishing, maintaining and regularly evaluating the effectiveness of the Company's internal controls; (ii) they made certain disclosures to Hertz's auditors and the Audit Committee of the Board about the Company's internal controls; and (iii) that they included information in Hertz's quarterly and annual reports about their evaluation.

131.    In addition, §906 of the SOX obligated defendants Frissora, Douglas, Rosenberg and Kennedy to certify each periodic report containing financial statements filed by Hertz with the SEC pursuant to §§13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presented, in all material respects, the financial condition and results of operations of the Company.

132.    During the Class Period, defendants Frissora, Douglas, Rosenberg and Kennedy falsely attested that: (i) the financial information contained in the 2012 and 2013 Forms 10-K and the 2013 Forms 10-Q was true; (ii) the 2012 and 2013 Forms 10-K and 2013 Forms 10-Q did not omit material facts; and (iii) the Company's internal and disclosure controls were effective. Defendants Frissora, Douglas, Rosenberg and Kennedy's certifications, in all material respects, falsely represented:

I . . . . certify that:

1.    I have reviewed this [annual or] quarterly report on Form [10-K or] 10-Q . . . of Hertz Global Holdings, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15(d)-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

- 43 -

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

133.     Accordingly, defendants Frissora, Douglas, Rosenberg and Kennedy issued materially false and misleading statements during the Class Period.

**Hertz's Admissions that the Financial Statements
and Related Financial Disclosures Were Materially Misstated**

134.     As a result of its widespread and systemic accounting irregularities prior to and during the Class Period, Hertz has now restated its previously issued financial statements for the years ended December 31, 2011, 2012 and 2013, and the quarters ended March 31, 2013, June 30,

2013 and September 30, 2013.  These restatements establish that Hertz's financial statements, as well as the related financial disclosures made by Defendants prior to and during the Class Period, were materially misstated because GAAP provides that only materially misstated financial statement and measures need be corrected and re-reported on a retroactive basis.[5]

135.    The extent to which Hertz's originally reported key financial operating performance measures were inflated, including those during the Class Period, are illustrated in the chart below:

| Hertz Global Holdings, Inc. Key Financial Performance Overstatements | | | | | | |
|---|---|---|---|---|---|---|
| % Overstated | FYE 12/31/11 | FYE 12/31/12 | FYE 12/31/13 | FQE 3/31/13 | FQE 6/30/13 | FQE 9/30/13 |
| Income Before Taxes | 27.18% | 23.45% | 9.97% | 22.37% | 10.36% | 5.22% |
| Net Income | 17.19% | 32.12% | 14.64% | 200.00% | 9.37% | 6.29% |
| Net Income Attributable to Common Shareholders | 19.86% | 32.12% | 14.64% | N/A | N/A | N/A |

136.    These overstatements of Hertz's most important income-related financial measures, including the overstatement of its annual net income during 2011, 2012 and 2013 between ***14.64% and 32.12%***, are both quantitatively and qualitatively material.

137.    GAAP, as articulated in the SEC's Codification of Staff Accounting Bulletins Topic 1M ("CSAB Topic 1M"), provides that materiality in the context of a financial misstatement not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual context in which the user of financial statements would view

---

[5]    *See, e.g.*, ASC Topic 250, *Accounting Changes and Error Corrections*, SEC Staff Accounting Bulletin Topic 1-M, *Materiality*, and SEC Staff Accounting Bulletin Topic 1-N, *Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements*.

the financial misstatement (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

138.    Thus, CSAB Topic 1M provides: "the staff [of the SEC] believes that there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material."

139.    For example, CSAB Topic 1M notes that even quantitatively small financial misstatements may be material if management has intentionally made adjustments to various financial statement items in a manner inconsistent with GAAP.  Accordingly, CSAB Topic 1M cautions that SEC registrants "*should not assume that even small intentional misstatements in financial statements*" are immaterial.  Here, Hertz has admitted that its financial misstatements during the Class Period were both substantial and caused by "inappropriate" conduct by the Company's senior management, including defendant Frissora, who "encouraged" employees to "ameliorate" shortfalls in Hertz's financial results.

### Hertz's Financial Misstatements
### Were the Result of Intentional Conduct

140.    The intentionality of Hertz's financial misstatements during the Class Period is not in doubt, as the Company has admitted, among other things, as follows:

- its former CEO, defendant Frissora, and senior management (including the Individual Defendants) fostered an environment that allowed, and encouraged, employees to manufacture accounting adjustments to enable Hertz to achieve desired financial results;

- its Audit Committee hired independent legal advisors to assist it with the Internal Investigation;

- its Audit Committee determined after conducting the Internal Investigation that defendant Frissora "encouraged" employees to "ameliorat[e]" shortfalls in Hertz's financial results that may have resulted in "inappropriate" accounting actions;

- its most senior executives, including those directly responsible for the Company's financial reporting and internal and disclosure controls, "resigned" for "personal reasons;"

- it hired **over 25** new senior management level personnel to remediate the Company's material internal and disclosure controls deficiencies;

- its financial misstatements have resulted in "government investigations," including investigations by the SEC and a state securities regulator;

- the admitted GAAP violations and financial reporting improprieties were not isolated or unique, but were widespread and systemic in nature;

- the magnitude of financial misstatements caused Hertz's reported annual net income from 2011 through 2013 to be overstated between **14.6% and 32.1%**;

- the financial misconduct occurred over multiple years and reporting periods, and investors "should no longer rely upon" the financial statements and the financial information contained **in each and every periodic report filed with the SEC prior to the 2014 Form 10-K**;

- its disclosure controls and internal controls over its financial reporting were riddled with material weaknesses; and

- its most senior executive officers filed materially false and misleading SOX certifications with the SEC.

141. Taken collectively: (i) the duration, magnitude and number of Hertz's financial misstatements; (ii) the Internal Investigation and ongoing governmental investigations; (iii) the inappropriate environment fostered by defendant Frissora and his senior management team (including the Individual Defendants), which encouraged employees to ameliorate shortfalls in the Company's financial results, among other things; (iv) the "resignations" of the Company's most senior executives, including defendants Frissora, Douglas and Kapur; (v) the numerous disclosure control and internal control deficiencies; and (vi) the materially false and misleading SOX certifications issued by defendants Frissora, Douglas, Rosenberg and Kennedy, the Company's senior executive officers, are indicative of fraudulent financial reporting and not innocent record keeping mistakes.

**Defendants Issued Guidance Without Reasonable Basis**

142.    Shortly after the beginning of the Class Period, the Company provided financial guidance for fiscal year 2013 on February 25, 2013 (the "2013 Guidance"), as follows:

| Full Year 2013 Guidance | |
|---|---|
| Revenues | $10,850M - $10,950M |
| Corporate EBITDA | $2,210M - $2,270M |
| Adjusted Pre-Tax Income | $1,270M - $1,340M |
| Adjusted Net Income | $830M - $875M |
| Adjusted Diluted Earnings Per Share | $1.82 - $1.92 |

143.    Throughout the Class Period, Defendants repeatedly reaffirmed the 2013 Guidance, including, without limitation, on the following dates: (i) March 11, 2013, at a Credit Suisse Global Services Conference; (ii) March 27, 2013, at a Bank of America Merrill Lynch New York Auto Summit; (iii) April 29 and 30, 2013, as part of the Company's announcement of its financial and operational results for the first quarter of 2013; (iv) May 21, 2013, at a Barclays High Yield and Syndicated Loan Conference; and (v) July 29, 2013, as part of the Company's announcement of its financial and operational results for the second quarter of 2013.

144.    Hertz's 2013 Guidance was based, in part, on the Company presenting its financial results in conformance with GAAP.  Furthermore, the value of the Advantage Fleet as recorded on Hertz's financial statements impacted the setting of Hertz's 2013 Guidance.

145.    Defendants did not have a reasonable basis to reaffirm the 2013 Guidance because its historical financial results were misrepresented and because of widespread internal control deficiencies.  In addition, as of July 29, 2013, Defendants did not have a reasonable basis to reaffirm Hertz's 2013 Guidance because the guidance was not adjusted to reflect that Hertz failed to timely record an impairment in the value of the Advantage Fleet, or that there was more than a slight chance that those assets were impaired.

146.    Before the opening of trading on September 26, 2013, Defendants announced, among other things, that the Company was reducing the 2013 Guidance and would instead be relying upon a revised set of guidance figures for 2013 (the "2013 Revised Guidance"), as set forth in ¶243 below.  The 2013 Revised Guidance provided, in pertinent part, as follows:

|  | February 2013 Guidance ($ in Millions) | September 2013 Guidance ($ in Millions) |
|---|---|---|
| Revenues | 10,850.0 – 10,950.0 | 10,800.0 – 10,900.0 |
| Adj. Pre-Tax Income | 1,270.0 – 1,340.0 | 1,200.0 – 1,270.0 |
| Corporate EBITDA | 2,210.0 – 2,270.0 | 2,120.0 – 2,190.0 |
| Adj. Net Income | 830.0 – 875.0 | 780.0 – 830.0 |
| Adj. EPS | 1.78 – 1.88 | 1.68 – 1.78 |

147.    In response to the Company's announcements on September 26, 2013, the price of Hertz common stock declined $4.15 per share, or approximately 16%, from a close of $25.78 per share before the announcement, to close at $21.63 on September 26, 2013.

148.    In addition, during the Class Period, Defendants repeatedly reaffirmed the 2013 Revised Guidance, including, without limitation, on the following dates: (i) September 26, 2013, in the press release announcing the 2013 Revised Guidance, and that same day at a MKM Partners Entertainment and Leisure Conference; (ii) October 2, 2013, at a Deutsche Bank Leveraged Finance Conference; (iii) November 4, 2013, in the press release announcing the Company's financial results for the third quarter of 2013, the quarter ended September 30, 2013; and (iv) November 5, 2013, in an investor conference call to discuss the third quarter 2013 financial results set forth in the November 4, 2013, press release.

149.    Hertz's 2013 Revised Guidance was based, in part, on the Company presenting its financial results in conformance with GAAP.

150.    Defendants did not have a reasonable basis to reaffirm the 2013 Revised Guidance because its historical financial results were misrepresented and because of widespread internal control deficiencies.

151.    On March 18, 2014, in conjunction with announcing the Company's full year 2013 financial results, for the year ended December 31, 2013, the Company provided financial guidance for fiscal year 2014 (the "2014 Guidance"), as set forth in ¶278 below.  The 2014 Guidance provided, in pertinent part, as follows:

| Full Year 2014 Guidance | |
|---|---|
| Revenues | $11,400M - $11,700M |
| Corporate EBITDA | $2,060M - $2,420M |
| Adjusted Pre-Tax Income | $1,210M - $1,430M |
| Adjusted Net Income | $785M - $925M |
| Adjusted Diluted Earnings Per Share | $1.70 - $2.00 |

152.    Hertz's 2014 Guidance was based, in part, on the Company presenting its financial results in conformance with GAAP.

153.    Defendants did not have a reasonable basis to reaffirm the 2014 Guidance because its historical financial results were misrepresented and because of widespread internal control deficiencies.

154.    In fact, by August 19, 2014, the Company disclosed in a Form 8-K filed with the SEC that it "now expects to be well below the low end of its 2014 guidance due to operational challenges in the rental car and equipment segments as well as the associated costs related to the accounting review previously disclosed" and that "[d]ue to the foregoing, as well as potential revisions related to the ongoing accounting review, the Company has decided to withdraw its 2014 financial guidance."

155.    In response to the Company's announcements after the close of trading on August 19, 2014, the price of Hertz common stock declined $1.23 per share, or approximately 3.9%, from a close of $31.56 per share before the announcement, to close at $30.33 on August 20, 2014.

156.    Hertz did not provide any further financial guidance during the Class Period after withdrawing the 2014 Guidance on August 19, 2014.

### Defendants Frissora, Douglas and Kapur Resign as the Fraud Is Slowly Revealed

157.    The resignations of defendants Frissora, Douglas and Kapur were closely aligned with the revelations of wrongdoing at the Company.

158.    First, despite presiding over Hertz's purportedly substantial increase in earnings from 2010 through 2013, defendant Douglas mysteriously resigned from the Company on September 23, 2013, citing "personal reasons," merely days before the Company announced the 2013 Revised Guidance on September 26, 2013.

159.    In response to the Company's withdrawal of the 2013 Guidance on September 26, 2013, the price of Hertz common stock declined $4.15 per share, or approximately 16%, from a close of $25.78 per share before the announcement, to close at $21.63 on September 26, 2013.

160.    Then, shortly after defendant Douglas' resignation, Hertz continued periodically revealing information about the Restatement and its internal control deficiencies.  Specifically, on March 3, 2014, Hertz announced that the Company would be late in filing the 2013 Form 10-K (defined below) because Hertz identified certain adjustments relating to previously issued financial statements that had to be revised, but claimed that such revisions would not have a material impact on previously reported financial results.

161.    In response to the Company's announcements on March 3, 2014, the price of Hertz common stock declined $0.76 per share, or approximately 2.7%, from a close of $28.01 per share before the announcement, to close at $27.25 on March 3, 2014.

162.    Then, on April 22, 2014, defendant Kapur suddenly resigned, also for "personal reasons."

163.    Several weeks later, on May 13, 2014, Hertz continued informing investors about problems with Hertz's accounting practices.  Specifically, the Company announced that it identified certain errors relating to prior periods which may require it to restate its fiscal year 2011 financial statements.  With respect to Hertz's fiscal year 2012 and 2013 financial statements, the Company announced that those periods would not require restatement because any necessary adjustments to those periods were not expected to be material.

164.    On June 6, 2014, Hertz announced that its fiscal year 2011 financial statements "should no longer be relied upon" and that the Audit Committee was conducting the Internal Investigation.  As part of this investigation, Hertz disclosed that it may have to restate and withdraw reliance on its 2012 and 2013 financial statements.  In addition, Hertz announced that material weaknesses existed in its internal control over financial reporting and that its disclosure controls and procedures were ineffective.  Hertz did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

165.    In response to the Company's announcements before the opening of trading on June 6, 2014, the price of Hertz common stock declined over $2.75 per share, or approximately 9.1%, from a close of $30.49 before the announcement, to close at $27.73 on June 6, 2014.

166.    On August 19, 2014, Hertz announced that its financial performance for fiscal year 2014 would be well below the 2014 Guidance due to operational challenges and the associated costs related to the Internal Investigation, and, as a result, Hertz withdrew the 2014 Guidance. Hertz did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

167.    In response to the Company's announcements after the close of trading on August 19, 2014, the price of Hertz common stock declined $1.23 per share, or approximately 3.9%, from a close of $31.56 per share before the announcement, to close at $30.33 on August 20, 2014.

168.    Following the Company's revelations on June 6 and August 19, several activist investors, including Carl Icahn ("Icahn"), amassed sizeable stakes in Hertz.  Specifically, on or about August 20, 2014, Icahn announced that he had acquired an 8.48% stake in the Company, and sought to meet with Hertz's management over his concerns about, among other things, Hertz's accounting issues and Icahn's lack of confidence in Hertz's senior management.  In addition, Fir Tree Partners, which acquired over 13 million shares in Hertz also on or about August 20, 2014, pointedly called for defendant Frissora's immediate resignation because he had made "serious missteps."

169.    On September 8, 2014, defendant Frissora resigned from his positions at the Company, also purportedly for "personal reasons."  The Company had no immediate successor, and defendant Frissora's replacement was not named until November 25, 2014.

170.    On November 14, 2014, Hertz disclosed that, while the Internal Investigation was ongoing, additional proposed adjustments arising out of the review were material to the Company's fiscal year 2012 and 2013 financial statements.  As a result, Hertz announced that, in

addition to the 2011 financial statements, Hertz's 2012 and 2013 annual and quarterly financial statements must be restated and "should no longer be relied upon."

171.    Also on November 14, 2014, Hertz revealed that in June 2014, the staff of the New York Regional Office of the SEC advised Hertz that the SEC is investigating the events disclosed by the Company relating to the Restatement.

172.    In response to the Company's announcements on November 14, 2014, the price of Hertz common stock declined $1.04 per share, or approximately 4.6%, from a close of $22.73 per share before the announcement, to close at $21.69 on November 14, 2014.  Hertz did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

173.    On February 25, 2015, Hertz announced that the impact of cumulative errors identified to date on its fiscal year 2011, 2012, and 2013 annual pre-tax income was approximately $51 million, $74 million and $28 million, respectively.  The Company also announced that the Internal Investigation was on-going, and that the above-noted financial statement error totals were subject to change.  Hertz did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

174.    Shortly thereafter, on March 3, 2015, Hertz announced that it could not file a Form 10-K for the year ended December 31, 2014, due to the ongoing nature of the Internal Investigation.

175.    In response to the Company's announcements after the close of trading on March 3, 2015, the price of Hertz common stock declined $0.95 per share, or approximately 4%, from a close of $23.50 per share before the announcement, to close at $22.55 on March 4, 2015.  Hertz

did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

176.    On March 24, 2015, Hertz announced that the NYSE had notified Hertz on March 18, 2015, that the Company failed to meet a NYSE listing standard because it had not timely filed its annual report on Form 10-K for the year ended December 31, 2014.  As a result, the NYSE informed Hertz that it would be delisted if it could not cure this deficiency within six months.

177.    In response to the Company's announcements after the close of trading on March 24, 2015, the price of Hertz common stock declined $0.54 per share, or approximately 2.6%, from a close of $21.08 per share before the announcement, to close at $20.54 on March 25, 2015.

178.    On May 12, 2015, Hertz announced that it could not file a Form 10-Q for the quarter ended March 31, 2015, due to the ongoing nature of the Internal Investigation.

179.    In response to the Company's announcements on May 12, 2015, the price of Hertz common stock declined $0.78 per share, or approximately 3.8%, from a close of $20.65 per share before the announcement, to close at $19.87 on May 12, 2015.

180.    Then, shortly thereafter, on May 14, 2015, Hertz announced that it had identified an additional $30 million in financial misstatements and that, as a result, the impact of cumulative errors identified to date on its 2011, 2012, and 2013 annual pre-tax income was approximately $56 million, $85 million and $42 million, respectively.  The Company also announced that the Internal Investigation was on-going, and that the above-noted financial statement error totals were subject to change.  Hertz did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies at this time.

181.    From May 14, 2014 until the end of the Class Period, Hertz did not file any quarterly or annual financial results and did not fully restate its financial results from prior years.  It was not until after the close of trading on July 16, 2015, almost 14 months later, that Hertz finally reported financial results in the 2014 Form 10-K.

182.    Defendants did not quantify or detail the full extent of the Restatement, the roles of defendant Frissora and senior management, or the disclosure control and internal control deficiencies prior to filing the 2014 Form 10-K.  Hertz common stock closed at $30.49 on June 5, 2014, the last trading day before the first time that Hertz announced that its historical financial results required restatement.  Hertz's stock closed at $16.99 on July 16, 2015, the last trading day before the 2014 Form 10-K was filed, a decline of approximately $13.50 (or 44.3%) from Hertz's closing price on June 5, 2014.  The decline between June 5, 2014 and July 16, 2015 was due, in part, to uncertainty surrounding the Restatement and Defendants' materially false and misleading statements and omissions.

### Hertz Restates Its Financial Results and Admits to Widespread Internal Control Deficiencies

183.    After the close of trading on July 16, 2015, Hertz finally filed the 2014 Form 10-K and announced results of the Internal Investigation.  The Company admitted in the 2014 Form 10-K that its financial results as reported in Hertz's financial statements were not prepared in accordance with GAAP, and should not be relied upon by investors.  As detailed in the 2014 Form 10-K, and as discussed more fully in ¶¶60-141 above, Hertz also admitted as part of the Restatement that, contrary to Defendants' Class Period representations, Hertz's earnings were materially overstated and its expenses were materially understated at all times prior to and during the Class Period.  Hertz admitted that the Company's previously reported annual net income during 2011, 2012, and 2013 was overstated between ***14.64% and 32.12%***.

184.    The 2014 Form 10-K also admitted numerous material weaknesses in Hertz's control environment during the Class Period, with senior management, led by defendant Frissora, playing an integral role, as described more fully in ¶¶43-59; 119-33.

185.    In addition, the 2014 Form 10-K discussed that, to remediate the material weaknesses caused by the Individual Defendants and Hertz's senior management team during the Class Period, the Company had hired a new CEO, CFO, Chief Accounting Officer, General Counsel, and over twenty vice president or director level accounting employees from outside the Company.  Implicit in this disclosure is that it was necessary to replace defendants Frissora, Douglas and Kapur, and other Hertz senior management, because of their active participation and/or complicity in the conduct that led to the Restatement.

186.    Further, the 2014 Form 10-K disclosed for the first time that, in addition to the June 2014 SEC investigation, the Company was contacted in December 2014 by an unidentified state securities regulator requesting information regarding the events leading to the Restatement.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

#### Pre-Class Period Statements

187.    On February 22, 2012, the Company announced its financial and operational results for the fourth quarter 2011, for the period ended December 31, 2011 ("4Q11"), and for the full year 2011 for the year ended December 31, 2011 ("FY11") in a press release (the "2/22/12 Press Release"), which it filed with the SEC on Form 8-K.  The 2/22/12 Press Release emphasized the Company's "record" results and reported that net income on a GAAP basis was $47.1 million for 4Q11 and $176.2 million for FY11, compared to a loss of $28.1 million for the fourth quarter of 2010 and a net loss of $48.7 million for full year 2010.  Defendant Frissora was quoted in the 2/22/12 Press Release describing how Hertz was able to increase net income in FY11 on

significantly lower revenues due to defendant Frissora's "emphasis on efficiency," and stated, in pertinent part, as follows:

> Our record results for the fourth quarter and full year 2011 are attributable to an equal emphasis on efficiency and revenue growth, which were achieved despite deteriorating macro conditions in Europe.  Hertz generated over $450 million of efficiency savings last year, bringing the cumulative five-year total to over $2.1 billion, representing 25% of our total cost base. . . .  ***These achievements capped a year where Hertz almost doubled 2010 adjusted pre-tax income and beat the previous, pre-recession record in 2007, on $387.2 million lower revenues****. . . .*  A continued emphasis on technology-driven efficiencies and customer service initiatives, the advancement of an asset-light business model, and a rich mixture of car and equipment rental growth initiatives, are the recipe for sustained financial improvement in 2012 and beyond.

188.    On February 23, 2012, the Company held a conference call for analysts and investors (the "2/23/12 Conf Call") to discuss the financial results and other information set forth in the 2/22/12 Press Release.  During the 2/23/12 Conf Call, defendant Frissora stated, in pertinent part, as follows: "On the earnings front, on both a GAAP and adjusted basis, worldwide Rent-a-Car reported record pre-tax income and margin for the fourth quarter and full year."

189.    On February 27, 2012, Hertz filed its annual report on Form 10-K with the SEC for FY11 (the "2011 Form 10-K"), which was signed by, among others, defendants Frissora, Douglas and Kapur.  The 2011 Form 10-K reiterated the Company's FY11 financial results reported in the 2/22/12 Press Release, including the reporting of net income of $176.2 million in FY11.  The 2011 Form 10-K represented that Hertz's "consolidated financial statements . . . have been prepared in accordance with accounting principles generally accepted in the United States of America, or 'GAAP.'"  The 2011 Form 10-K included the representations about Hertz's internal and disclosure controls, as noted above in ¶¶43-59; 119-33.  The 2011 Form 10-K was certified by defendants Frissora and Douglas, as noted above in ¶¶129-33.

- 58 -

190.    On May 2, 2012, the Company announced its financial and operational results for the first quarter 2012, for the period ended March 31, 2012 ("1Q12") in a press release (the "5/2/12 Press Release"), which it filed with the SEC on Form 8-K.  The 5/2/12 Press Release emphasized the Company's "strong" results and reported a net loss on a GAAP basis of $56.3 million for 1Q12, compared to a loss of ($136.2) million for the first quarter of 2011.  The 5/2/12 Press Release also reported that Hertz's pre-tax loss (loss before income taxes) for 1Q12 was $36.8 million, compared to a loss of $158.9 million for the first quarter of 2011.

191.    On May 3, 2012, the Company held a conference call for analysts and investors (the "5/3/12 Conf Call") to discuss the financial results and other information set forth in the 5/2/12 Press Release.  During the 5/3/12 Conf Call, defendant Douglas stated, in pertinent part, as follows: "As [defendant Frissora] mentioned in the first quarter we generated cost savings of $100 million. ***Approximately half of those savings came from direct operating expenses***, in particular fleet-related costs primarily lower vehicle damage."

192.    On May 4, 2012, Hertz filed its quarterly report on Form 10-Q with the SEC for 1Q12 (the "1Q12 Form 10-Q"), which was signed by defendant Douglas.  The 1Q12 Form 10-Q reiterated the Company's 1Q12 financial results reported in the 5/2/12 Press Release.  The 1Q12 Form 10-Q was certified by defendants Frissora and Douglas, as noted above in ¶¶129-33.

193.    On July 30, 2012, the Company announced its financial and operational results for the second quarter 2012, for the period ended June 30, 2012 ("2Q12") in a press release (the "7/30/12 Press Release"), which it filed with the SEC on Form 8-K.  The 7/30/12 Press Release emphasized the Company's "strong" earnings growth and reported that net income on a GAAP basis was $92.9 million for 2Q12, compared to net income of $55.0 million for the second quarter of 2011.  The 7/30/12 Press Release also reported that Hertz's pre-tax income (income before

income taxes) for 2Q12 was $158.7 million, compared to $94.6 million for the second quarter of 2011. Defendant Frissora was quoted in the 7/30/12 Press Release stating, in pertinent part, as follows:

> Our second quarter 2012 results are a testament to fostering a culture of continuous improvement *as we delivered a 390 basis point improvement in direct operating expenses* and $107 million in incremental efficiency savings for the quarter.

194.    On July 31, 2012, the Company held a conference call for analysts and investors (the "7/31/12 Conf Call") to discuss the financial results and other information set forth in the 7/30/12 Press Release. During the 7/31/12 Conf Call, defendant Douglas stated, in pertinent part, as follows:

> The record earnings performance was driven by strong topline growth, lower US fleet costs, and $107 million of incremental cost savings. Moving to Slide 17, *approximately 48% of the savings came from direct operating expenses*, which as a percent of revenue declined 390 basis points from the prior-year period, benefiting from favorable trends in vehicle damage collection in Europe, reductions in vehicle licensing expense, and Donlen's low operating cost structure relative to its revenue.

195.    On August 3, 2012, Hertz filed its quarterly report on Form 10-Q with the SEC for 2Q12 (the "2Q12 Form 10-Q"), which was signed by defendant Douglas. The 2Q12 Form 10-Q reiterated the Company's 2Q12 financial results reported in the 7/30/12 Press Release. The 2Q12 Form 10-Q was falsely certified by defendant Frissora and Douglas, as noted above in ¶¶129-33.

196.    On October 31, 2012, the Company announced its financial and operational results for the third quarter 2012, for the period ended September 30, 2012 ("3Q12") in a press release (the "10/31/12 Press Release"), which it filed with the SEC on Form 8-K. The 10/31/12 Press Release emphasized the Company's "record" growth and reported that net income on a GAAP basis was $242.9 million for 3Q12, compared to net income of $206.7 million for the third quarter of 2011. The 10/31/12 Press Release also reported that Hertz's pre-tax income (income before income taxes) for 3Q12 was $368.9 million, an increase of 24.8% over the third quarter of 2011.

197.    On November 1, 2012, the Company held a conference call for analysts and investors (the "11/1/12 Conf Call") to discuss the financial results and other information set forth in the 10/31/12 Press Release.  During the 11/1/12 Conf Call, defendant Douglas stated, in pertinent part, as follows:

> As Mark mentioned, our strong earnings performance continues to be driven by incremental topline growth and disciplined cost controls.  If you move to the next slide, ***you'll see a $190 [sic] basis point improvement in direct operating expenses as a percent of revenue***.  The direct operating expenses benefited from favorable trends in fleet-related expenses, primarily vehicle damage in the US and Europe, as well as improved operating performance in equipment rental, Donlen's low-operating cost structure and the efficient execution of our cost-saving programs.

198.    On November 2, 2012, Hertz filed its quarterly report on Form 10-Q with the SEC for 3Q12 (the "3Q12 Form 10-Q"), which was signed by defendant Douglas.  The 3Q12 Form 10-Q reiterated the Company's 3Q12 financial results reported in the 11/1/12 Press Release.  The 3Q12 Form 10-Q was certified by defendants Frissora and Douglas, as noted above in ¶¶129-33.

199.    The statements referenced above in ¶¶187-98 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants:

(a)    Hertz's financial results were presented in violation of GAAP and the Company's publicly disclosed accounting policies, as described in ¶¶60-74; 112-41;

(b)    Hertz's financial results were materially overstated and should not have been relied upon due, in part, to Hertz's understatement of expenses, as described in ¶¶60-74; 112-41;

(c)    Hertz's disclosure controls and internal controls were materially deficient and not operating effectively, as described in ¶¶43-59; 119-33;

(d)     there was an inconsistent and sometimes inappropriate tone at the top at Hertz that resulted in Hertz violating GAAP and Company accounting policies; and

(e)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

### Class Period Statements

**First Quarter 2013 Statements**

200.    The Class Period commences on February 14, 2013.

201.    On February 25, 2013, the Company announced its financial and operational results for the fourth quarter 2012, for the period ended December 31, 2012 ("4Q12"), and for the full year 2012 for the period ended December 31, 2012 ("FY12"), in a press release (the "2/25/13 Press Release"), which it filed with the SEC on Form 8-K.  The 2/25/13 Press Release emphasized the Company's "record" results and reported that net loss on a GAAP basis was $36.4 million for 4Q12 and net income on a GAAP basis was $243.1 million for FY12, compared to $47.1 million for 4Q11 and $176.2 million for FY11.  Defendant Frissora was quoted in the 2/25/13 Press Release stating, in pertinent part, as follows:

> I'm pleased that Hertz once again delivered record fourth quarter and full year financial performance *due to sustained operational excellence*, improving pricing during the fourth quarter and the positive impact of strategic investments, including the acquisition of Dollar Thrifty Automotive Group. . . .  Finally, 2012 marked our third consecutive year of significant double-digit percentage improvements in adjusted pre-tax income, EBITDA, and adjusted earnings per share, as well as margin expansion[.]

202.    The statements referenced above in ¶201 were materially false and misleading when made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants:

(a)     Hertz's financial results were presented in violation of GAAP and the Company's publicly disclosed accounting policies, as described in ¶¶60-74; 112-41;

- 62 -

(b)     Hertz's financial results were materially overstated and should not have been relied upon due, in part, to Hertz's understatement of expenses, as described in ¶¶60-74; 112-41;

(c)     Hertz's disclosure controls and internal controls were materially deficient and not operating effectively, as described in ¶¶43-59; 119-33;

(d)     there was an inconsistent and sometimes inappropriate tone at the top at Hertz that resulted in Hertz violating GAAP and Company accounting policies; and

(e)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's finances.

203.    Additionally, the statement referenced above in ¶201, that "Hertz once again delivered record fourth quarter and full year financial performance due to sustained operational excellence," was materially false and misleading when made because Hertz's disclosure controls and internal controls were materially deficient and not operating effectively.

204.    The 2/25/13 Press Release also provided the 2013 Guidance, and stated, in pertinent part, as follows:

| Full Year 2013 Guidance | |
| --- | --- |
| Revenues | $10,850M - $10,950M |
| Corporate EBITDA | $2,210M - $2,270M |
| Adjusted Pre-Tax Income | $1,270M - $1,340M |
| Adjusted Net Income | $830M - $875M |
| Adjusted Diluted Earnings Per Share | $1.82 - $1.92 |

205.    The statements referenced above in ¶204 were materially false and misleading when made because they misrepresented or failed to disclose that the guidance was made without reasonable basis because of the following facts which were known by Defendants:

- 63 -

(a)     Hertz's historical financial results, upon which the guidance was based, were presented in violation of GAAP and the Company's publicly disclosed accounting policies, as described in ¶¶60-74; 112-39;

(b)     Hertz's disclosure controls and internal controls were materially deficient and not operating effectively, as described in ¶¶43-59; 119-33;

(c)     there was an inconsistent and sometimes inappropriate tone at the top at Hertz that pressured employees to misrepresent Hertz's financial condition to meet targets, violating GAAP and Company accounting policies; and

(d)     based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's guidance.

206.    Also on February 25, 2013, the Company held a conference call with analysts and investors (the "2/25/13 Conf Call") to discuss the financial results and other information set forth in the 2/25/13 Press Release.  During the 2/25/13 Conf Call, defendants Frissora and Douglas reiterated Hertz's financial results as detailed in the 2/25/13 Press Release.  In addition, defendant Frissora reiterated the 2013 Guidance during the 2/25/13 Conf Call.  Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.  During the 2/25/13 Conf Call, defendant Frissora stated, in pertinent part, as follows:

> In fact, in 2012 we had our best year ever across all profit measures.  For the consolidated company, adjusted pretax income was up 32.5% on an 8.7% revenue gain driving 180 basis point expansion in adjusted pretax margin.  Corporate EBITDA increased approximately 18% driving a 140 basis point improvement in margin.  Adjusted earnings per share was up $1.33, up 37% over 2011.
>
> *       *       *
>
> Now, let me walk you through the rest of the guidance and talk about some of our other assumptions. . . .  In terms of adjusted pretax income, we expect growth of between 40% and 48% and Corporate EBITDA improvement of 35% to 38% versus last year.

207.    The statements referenced above in ¶206 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶206 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

208.    During the 2/25/13 Conf Call, defendant Douglas stated, in pertinent part, as follows:

> Adjusting for these costs and other non-cash and one-time items, we delivered record adjusted pretax income of $213.5 million, an increase of 29.3% over the similar 2011 quarter.  In addition to the benefit from revenue growth, we improved depreciation expense as a percent of revenue by 230 basis points as monthly depreciation per unit for Worldwide RAC was 14.5% lower than the fourth quarter of 2011.  Direct operating expense increased slightly as a percent of revenue reflecting the addition of Dollar Thrifty.  We also had a difficult comp in the 2012 fourth quarter due to a large property sale gain in the prior year.  Adjusted net income was up 35.5%, resulting in adjusted earnings per share of $0.33 a share, an increase of $0.09 or 37.5% over the 2011 fourth quarter.

209.    The statements referenced above in ¶208 were materially false and misleading when made for the reasons set forth in ¶202 above.

210.    On February 26, 2013, defendants Frissora and Douglas participated at the J.P. Morgan High Yield and Leveraged Finance Conference (the "2/26/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 2/26/13 Conference, defendant Frissora reiterated Hertz's financial results and the 2013 Guidance, as detailed in the 2/25/13 Press Release.  Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.  During the 2/26/13 Conference, defendant Frissora stated, in pertinent part, as follows:

> Pretax income was up 32.5%.  And by the way, a couple years before that, it was up 95% and then 75%.  ***So we have a very consistent track record post-recession of improving both margins, as well as all financial metrics***.

*      *      *

In terms of our guidance, you can see here on this slide that we guided significantly up year-over-year, 44.9% up on EPS. Adjusted net income, up 47%; free cash flow of $500 million to $600 million, significantly up. Then if you look at adjusted pretax, you can see our track record. 4.6% margin to 12.2% margin in 2013. Look at the EBITDA growth on the lower right-hand corner; you can see EBITDA going from 13.8% to 20.7% margin in 2013. $2.3 billion of EBITDA, corporate EBITDA. And then on revenues, you can see we are forecasting $11 billion, nice, significant revenue growth, everything after the recession. So we think we've got a great track record, and we feel that '14 and '15, we'll talk about that on Investor Day, but we're pretty excited to show you those numbers as well.

211.    The statements referenced above in ¶210 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above. The statements referenced above in ¶210 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above. Additionally, the statement "very consistent track record . . . [of] improving both margins, as well as all financial metrics" was materially false and misleading because margins and financial metrics were misstated and presented in violation of GAAP.

212.    On March 4, 2013, Hertz filed its annual report on Form 10-K with the SEC for FY12 (the "2012 Form 10-K"), which was signed by, among others, defendants Frissora, Douglas and Kapur. The 2012 Form 10-K reiterated the Company's FY12 financial results reported in the 2/25/13 Press Release, as set forth in ¶201, including the reporting of net income of $243.1 million in FY12. The 2012 Form 10-K represented that Hertz's "consolidated financial statements . . . have been prepared in accordance with accounting principles generally accepted in the United States of America, or 'GAAP.'" The 2012 Form 10-K included the representations about Hertz's internal and disclosure controls, as noted in ¶¶43-59; 119-33. The 2012 Form 10-K was certified by defendants Frissora and Douglas, as noted in ¶¶129-33.

213.    The statements referenced above in ¶212 were materially false and misleading when made for the reasons set forth in ¶202 above. Furthermore, the statements referenced above

concerning the certifications by defendants Frissora and Douglas were materially false and misleading when made because the SOX certifications issued by defendants Frissora and Douglas associated with the Company's internal and disclosure controls were materially false and misleading, as set forth in ¶¶129-33 above.

214.  On March 11, 2013, defendant Douglas participated at the Credit Suisse Global Services Conference (the "3/11/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 3/11/13 Conference, defendant Douglas reiterated Hertz's financial results and the 2013 Guidance, as detailed in the 2/25/13 Press Release. Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's 2013 Guidance.  During the 3/11/13 Conference, defendant Douglas stated, in pertinent part, as follows:

> Here's our guidance in the upper left-hand column.  You can see revenue growth of 21.4%; pretax growth of 48.6%; EPS growth of 44.9%; and cash flow was a $500 million to $600 million.  And the trajectory here for revenue pretax and corporate EBITDA are shown graphically.
>
> *        *        *
>
> So given our strategies and all the work that we've done to put these strategies in place, we believe that we're going to see significant growth in profits and margins continue into 2015.

215.  The statements referenced above in ¶214 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

216.  On March 27, 2013, defendant Douglas participated at the Bank of America Merrill Lynch New York Auto Summit (the "3/27/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  In connection with the 3/27/13 Conference, defendant Douglas reiterated Hertz's financial results and the 2013 Guidance, as detailed in the 2/25/13 Press Release.  Hertz also provided investors with a PowerPoint presentation that

reiterated Hertz's financial results and the 2013 Guidance.  During the 3/27/13 Conference, defendant Douglas stated, in pertinent part, as follows:

> Let me finish by highlighting our guidance for 2013.  You can see that we are expecting revenue growth of 21.4%, pretax growth of 48.6%, earnings per share growth of 44.9%, and, again, you see here that corporate cash flow.  And you can see the trajectory here on the bar charts for revenues and profits.
>
> This next slide really just shows the numbers behind those bar charts.  And there is only a couple things I want to point out here.  One is if you look at the pretax growth here, you can see that our margins have gone from 2.8% to 12.2% in 2013.  As I said, we saw 32% growth in pretax in 2012.  That is off of a 96% growth rate in 2011, and a 75% growth rate in 2010.

217.    The statements referenced above in ¶216 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶216 related to Hertz's guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

**Second Quarter 2013 Statements**

218.    On April 29, 2013, the Company announced its financial and operational results for the first quarter of 2013, for the period ended March 31, 2013 ("1Q13") in a press release (the "4/29/13 Press Release"), which it filed with the SEC on Form 8-K.  The 4/29/13 Press Release emphasized the Company's "record" results and reported, among other things, that net income on a GAAP basis was $18.0 million for 1Q13, compared to a net loss of $56.3 million for 1Q12.  The 4/29/13 Press Release also reported that Hertz's pre-tax income for 1Q13 was $72.2 million, compared to a net loss of $36.8 million for 1Q12.  The 4/29/13 Press Release also reaffirmed the 2013 Guidance.

219.    The statements referenced above in ¶218 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202

above.  The statements referenced above in ¶218 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

220.    On April 30, 2013, the Company held a conference call with analysts and investors (the "4/30/13 Conf Call") to discuss the financial results and other information set forth in the 4/29/13 Press Release.  During the 4/30/13 Conf Call, defendants Frissora and Douglas reiterated Hertz's financial results as detailed in the 4/29/13 Press Release.  In addition, defendant Frissora reaffirmed the 2013 Guidance during the 4/30/13 Conf Call.  Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.  During the 4/30/13 Conf Call, defendant Frissora stated, in pertinent part, as follows:

> Corporate EBITDA was up 74.2% year-over-year, representing a 440 basis point margin improvement.  Profits were driven by strong revenue growth, a 200 basis point decline in total consolidated fleet depreciation expense as a percent of sales – this is on slide 6 – and a 180 basis point decline in direct operating and SG&A expenses as a percent of sales, which resulted in 5.4% higher revenue for employee.
>
> On the next slide adjusted pre-tax income was $144.5 million, significantly eclipsing the $29 million generated last year and adjusted pre-tax margin was 4 times higher year-over-year.  We reported adjusted earnings per share of $0.21 in the latest period compared with a $0.05 profit last year.
>
> *       *       *
>
> For the full year, keeping our original volume assumptions intact, we continue to be comfortable with a 2013 guidance we announced in February, which is reaffirmed on slides 31 and 32.

221.    The statements referenced above in ¶220 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶220 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

222.    During the 4/30/13 Conf Call, defendant Douglas stated, in pertinent part, as follows:

> For the first time since going public in 2006, we recorded a positive first-quarter GAAP earnings per share of $0.04, an improvement of $0.17 verses the first quarter of 2012.

223.    The statements referenced above in ¶222 were materially false and misleading when made for the reasons set forth in ¶202 above.

224.    On May 2, 2013, Hertz filed its quarterly report on Form 10-Q with the SEC for 1Q13 (the "1Q13 Form 10-Q"), which was signed by defendant Douglas.  The 1Q13 Form 10-Q reiterated the Company's 1Q13 financial results reported in the 4/29/13 Press Release, as set forth in ¶218 above.  The 1Q13 Form 10-Q was certified by defendants Frissora and Douglas, as noted in ¶¶129-33 above.

225.    The statements referenced above in ¶224 were materially false and misleading when made for the reasons set forth in ¶202 above.  Furthermore, the statements referenced above concerning the certifications by defendants Frissora and Douglas were materially false and misleading when made because the SOX certifications issued by defendants Frissora and Douglas associated with the Company's internal and disclosure controls were materially false and misleading, as set forth in ¶¶129-33 above.

226.    On May 8, 2013, defendant Frissora participated at the Wells Fargo Industrial and Construction Conference (the "5/8/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 5/8/13 Conference, defendant Frissora reiterated Hertz's financial results and the 2013 Guidance, as detailed in the 4/29/13 Press Release.  Defendant Frissora also provided investors with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.  During the 5/8/13 Conference, defendant Frissora stated, in pertinent part, as follows:

> And '11 and '12 we beat our pre-recession numbers on pre-tax.  So '11 and '12, we had two years in a row of beating our historical pre-tax number, ***showing and***

***demonstrating the strategies have been working***; balance sheet is much stronger. And then our '13 estimate midpoint of guidance shows just dramatic growth again in both earnings as well as pre-tax and revenue and our three-year plan that we laid out, which we've done now -- this is the third year in a row we've done it, and we've upped the ante every single year and we've overdelivered on every installment that we've shown you.

227.    The statements referenced above in ¶226 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶226 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.  Further, the statement "showing and demonstrating the strategies have been working" was materially false and misleading because Hertz's financial results were misstated and presented in violation of GAAP and not the result of strategies working.

228.    On May 21, 2013, defendant Douglas participated in the Barclays High Yield and Syndicated Loan Conference (the "5/21/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 5/21/13 Conference, defendant Douglas reiterated the 2013 Guidance.   Hertz also provided investors with a PowerPoint presentation that reiterated the 2013 Guidance.  During the 5/21/13 Conference, defendant Douglas stated, in pertinent part, as follows:

So this slide really highlights our guidance that we've provided.  You can see that revenues are expected to grow by 21.4% this year.  You can see the revenue chart on the upper right-hand side.  That's really a combination of HERC, where we've got pricing up 2% to 3%, volume up 10% to 12%; and rent-a-car, which pricing is relatively flat and a lot of the growth, we've got a 21% to 23%.  A lot of that's driven by Dollar Thrifty.  That top line growth is going to expand the margins in '13 as well, so we're expecting 120-basis point expansion of pre-tax margins and 260 of corporate EBITDA margins.   And our earnings per share this year is expected to grow just under 45%.

229.    The statements referenced above in ¶228 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

**Third Quarter 2013 Statements**

230.    On July 29, 2013, the Company announced its financial and operational results for the second quarter of 2013 ("2Q13"), for the period ended June 30, 2013 in a press release (the "7/29/13 Press Release"), which it filed with the SEC on Form 8-K.  The 7/29/13 Press Release emphasized the Company's "record" results and reported, among other things, that net income on a GAAP basis was $121.4 million for 2Q13, compared to $92.9 million for 2Q12.  The 7/29/13 Press Release also reported that Hertz's pre-tax income (income before income taxes) for 2Q13 was $211.9 million, compared to $158.7 million for 2Q12.  The 7/29/13 Press Release also reaffirmed the 2013 Guidance.

231.    The statements referenced above in ¶230 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶230 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.  Additionally, Hertz's historical financial information was materially false and misleading when made because Hertz failed to timely record and disclose a $40 million impairment in the value of the Advantage Fleet as set forth in ¶¶88-111 above, thereby falsely inflating the Company's operating results and guidance.

232.    Also on July 29, 2013, the Company held a conference call for analysts and investors (the "7/29/13 Conf Call") to discuss the financial results and other information set forth in the 7/29/13 Press Release.  During the 7/29/13 Conf Call, defendants Frissora and Douglas reiterated Hertz's financial results as detailed in the 7/29/13 Press Release.  In addition, defendant Frissora reaffirmed the 2013 Guidance during the 7/29/13 Conf Call.  Hertz also provided investors

with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.

During the 7/29/13 Conf Call, defendant Frissora stated, in pertinent part, as follows:

> Hertz once again delivered record quarterly results across the board. As you can see on slide 5, consolidated adjusted pre-tax income and margin were the highest of any second quarter in our history, increasing 35% and 110 basis points year-over-year respectively, on a 22% revenue gain.
>
> *       *       *
>
> [O]ur full-year guidance as outlined on slide 26 stands.

233.   The statements referenced above in ¶232 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above. The statements referenced above in ¶232 related to Hertz's 2013 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above. Additionally, Hertz's historical financial information was materially false and misleading when made because Hertz failed to timely record and disclose a $40 million impairment in the value of the Advantage Fleet as set forth in ¶¶88-111 above, thereby falsely inflating the Company's operating results and guidance.

234.   During the 7/29/13 Conf Call, defendant Douglas stated, in pertinent part, as follows:

> For the second quarter of 2013, we achieved record second-quarter earnings per share on both a GAAP and adjusted basis. GAAP earnings were $0.27 per share, an improvement of $0.06 versus the 2012 second quarter.

235.   The statements referenced above in ¶234 were materially false and misleading when made for the reasons set forth in ¶202 above. Additionally, Hertz's historical financial information was materially false and misleading when made because Hertz failed to timely record and disclose a $40 million impairment in the value of the Advantage Fleet as set forth in ¶¶88-111, thereby falsely inflating the Company's operating results.

- 73 -

236.    On August 2, 2013, Hertz filed its quarterly report on Form 10-Q with the SEC for 2Q13 (the "2Q13 Form 10-Q"), which was signed by defendant Douglas.  The 2Q13 Form 10-Q reiterated the Company's 2Q13 financial results reported in the 7/29/13 Press Release, as set forth in ¶230.  The 2Q13 Form 10-Q was certified by defendants Frissora and Douglas, as noted in ¶¶129-33.

237.    The statements referenced above in ¶236 were materially false and misleading when made for the reasons set forth in ¶202 above.  Furthermore, the statements referenced above concerning the certifications by defendants Frissora and Douglas were materially false and misleading when made because the SOX certifications issued by defendants Frissora and Douglas associated with the Company's internal and disclosure controls were materially false and misleading, as set forth in ¶¶129-33 above.

238.    The 2Q13 Form 10-Q discussed the Advantage divestiture, that Hertz agreed to sublease vehicles to Simply Wheelz, and that the operating results associated with the Advantage business will continue to be classified as part of Hertz's continuing operations, stating, in pertinent part, as follows:

> On December 12, 2012, Hertz completed the sale of Simply Wheelz LLC, or the "Advantage divestiture," a wholly owned subsidiary of Hertz that operated our Advantage Rent A Car business, or "Advantage."  As part of the sale agreement, Hertz agreed to sublease vehicles to the buyer of Advantage for use in continuing the operations of Advantage, for a period no longer than two years from the closing date.  As such, Hertz will have significant continuing involvement in the operations of the disposed Advantage business.  Therefore, the operating results associated with the Advantage business will continue to be classified as part of our continuing operations in the consolidated statements of operations for all periods presented.

239.    The 2Q13 Form 10-Q disclosed facts concerning the Advantage Fleet, as set forth in ¶238 above, because facts concerning the Advantage Fleet were material to investors.

240.    On September 18, 2013, defendant Frissora participated at the Citi Global Industrials Conference (the "9/18/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.   Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results.   During the 9/18/13 Conference, defendant Frissora stated, in pertinent part, as follows:

> When we take a look at adjusted pretax and adjusted pretax margin and **_we see the trajectory_**, the total Company's adjusted pretax income CAGR of 53% **_since 2009 has been done primarily through both a combination of revenue growth and cost reduction programs_**.   Which, -- some of which I have already talked about. So we believe that the last 12 months total profit up 66% over 2007 (peak leave) level demonstrate **_this Company is a much better Company than it was in 2007_**.   It is a company that has a lower cost of operation, a better growth rate and a much better balance sheet.

241.    The statements referenced above in ¶240 were materially false and misleading when made for the reasons set forth in ¶202 above.   Furthermore, the statement that "we see the trajectory . . . since 2009 has been done primarily through both a combination of revenue growth and cost reduction programs" was materially false and misleading because the "trajectory" was due, in large part, to accounting manipulations.   Additionally, the statement "this Company is a much better Company than it was in 2007" was materially false and misleading because of widespread internal control deficiencies and accounting manipulations.

242.    On September 23, 2013, Hertz abruptly announced that defendant Douglas had resigned from her position as Senior Executive Vice President and CFO effective October 1, 2013. Defendant Douglas' resignation was announced in a press release issued by Hertz on September 23, 2013, that was later included in a Form 8-K filed by Hertz with the SEC on September 27, 2013 (the "9/27/13 Form 8-K").   According to the 9/27/13 Form 8-K, defendant Rosenberg was announced as defendant Douglas' successor as CFO on an interim basis.

243.    After continuously reaffirming the 2013 Guidance throughout the Class Period, on September 26, 2013, before the open of trading, Hertz shocked the market by issuing a press release entitled "Hertz Revises Full Year 2013 Guidance" (the "9/26/13 Press Release").   The 9/26/13 Press Release made substantial revisions to the Company's 2013 Guidance, announced the 2013 Revised Guidance, and stated, in pertinent part, as follows:

|  | February 2013 Guidance ($ in Millions) | September 2013 Guidance ($ in Millions) |
|---|---|---|
| Revenues | 10,850.0 – 10,950.0 | 10,800.0 – 10,900.0 |
| Adj. Pre-Tax Income | 1,270.0 – 1,340.0 | 1,200.0 – 1,270.0 |
| Corporate EBITDA | 2,210.0 – 2,270.0 | 2,120.0 – 2,190.0 |
| Adj. Net Income | 830.0 – 875.0 | 780.0 – 830.0 |
| Adj. EPS | 1.78 – 1.88 | 1.68 – 1.78 |

244.    Hertz reduced the 2013 Guidance due to several factors, including the $40 million impairment charge related to the Advantage Fleet.  As such, Defendants' reduction of the 2013 Guidance served as a vehicle by which the misrepresentations and omissions alleged herein, including those concerning the $40 million impairment charge related to the Advantage Divestiture, began to enter the market.

245.    The statements referenced above in ¶243 concerning the 2013 Revised Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

246.    Defendant Frissora communicated to investors about the 2013 Revised Guidance in the 9/26/13 Press Release, and stated, in pertinent part, as follows:

We are revising full year 2013 guidance primarily because of weaker than anticipated volume generated by the Hertz brand in the U.S. airport car rental market, our largest business.  Weaker volume impacts not only revenues, but also generates related fleet issues, including lower utilization and the inability of the used car market to absorb our excess vehicles at current market prices.  Fortunately, stronger pricing in the U.S. airport car rental market is helping to partially offset softer volume.  ***Despite these challenges, we anticipate Hertz will nevertheless generate record earnings for the full year, with adjusted pre-tax income up more than 30% year-over-year.***

247.   The statement that "we anticipate Hertz will nevertheless generate record earnings for the full year, with adjusted pre-tax income up more than 30% year-over-year" was materially false and misleading when made because of the reasons set forth in ¶202 above.

248.   In response to Hertz's announcements on September 26, 2013, including the 2013 Revised Guidance, the price of Hertz common stock plummeted from $25.78 per share on September 25, 2013 to close at $21.63 per share on September 26, 2013 – a one day decline of more than $4 per share, or approximately 16%, on extremely heavy trading volume of more than 74 million shares traded (more than 11 times the average daily trading volume over the preceding 10 trading days).  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

249.   Also on September 26, 2013, defendant Frissora participated at the MKM Partners Entertainment & Leisure Conference (the "9/26/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 9/26/13 Conference, defendant Frissora reiterated the 2013 Revised Guidance, as detailed in the 9/26/13 Press Release. Hertz also provided investors with a PowerPoint presentation that reiterated the 2013 Revised Guidance.  During the 9/26/13 Conference, defendant Frissora stated, in pertinent part, as follows:

> In terms of the guidance discussion, I have a couple slides on that just to frame this. The February 2013 guidance numbers versus the September guidance numbers -- really, this is a US Rent-A-Car Hertz issue.  It has driven -- all the repercussions of the volume being softer than we would have anticipated has created a draft, if you will, a $74 million kind of earnings revision of guidance.  When you look at the growth, even on the revised guidance we're looking at a 41% improvement in pretax income, a 40% improvement in adjusted net income.  And that's on a 21% revenue growth.

> So it's not like we are revising guidance into a bunch of pathetic numbers.  These are really, really strong numbers.  It doesn't change the story.  We feel very confident the story is intact.

250.    The statements referenced above in ¶249 concerning the 2013 Revised Guidance were materially false or misleading when made because of the reasons set forth in ¶205 above.

**Fourth Quarter 2013 Statements**

251.    On October 2, 2013, one day after defendant Douglas reportedly resigned as CFO, she nonetheless appeared on behalf of Hertz at the Deutsche Bank Leveraged Finance Conference (the "10/2/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.   During the 10/2/13 Conference, defendant Douglas reiterated the 2013 Revised Guidance, as detailed in the 9/26/13 Press Release, and stated, in pertinent part, as follows:

> [W]e are still looking at close to a 34% increase in EPS for 2013.  And so this really highlights the trends in our business from 2009 through 2012, and then it shows our updated forecast for 2013.
>
> Other things to highlight here is that revenue growth at 20.8%.  We are looking at 190 basis point improvement in EBITDA margin this year and 160 in adjusted pretax.  So solid performance.

252.    The statements referenced above in ¶251 concerning the 2013 Revised Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

253.    On November 4, 2013, the Company announced its financial and operational results for the third quarter of 2013, for the period ended September 30, 2013 ("3Q13") in a press release (the "11/4/13 Press Release"), which it filed with the SEC on Form 8-K.  The 11/4/13 Press Release emphasized the Company's "record" results and reported that net income on a GAAP basis was $214.7 million for 3Q13, compared to $242.9 million for 3Q12.  The 11/4/13 Press Release also reported that Hertz's pre-tax income (income before income taxes) for 3Q13 was $328.3 million, compared to $368.9 million for 3Q12.

254.    The statements referenced above in ¶253 were materially false and misleading when made for the reasons set forth in ¶202 above.

255.   The 11/4/13 Press Release also discussed, among other things, the problems that plagued Simply Wheelz, and stated, in pertinent part, as follows:

> As of September 30, 2013, Simply Wheelz, LLC, or "Simply Wheelz," the owner and operator of Hertz's divested Advantage brand, had not made payments due under concession and joint use agreements due to Hertz.  Simply Wheelz also did not make the sublease payments due to Hertz on October 1, 2013 or November 1, 2013.  Simply Wheelz's parent Franchise Services of North America, Inc., or "FSNA," called us in early October to inform us that they were having liquidity issues and requested that Hertz delay seeking collection of all outstanding amounts owed to Hertz and agree to renegotiate certain aspects of existing commercial arrangements between the parties, including the financial terms on which Hertz is subleasing vehicles to them.
>
> We evaluated their request and suggested a number of changes that would be acceptable to Hertz.  However, after extensive discussions with respect to a potential restructuring of those commercial arrangements, we determined that it was not in Hertz's best interests to make the requested changes and were unable to agree on a suitable alternative.  On November 2, 2013, we terminated the applicable sublease contracts, and we continue evaluating our alternatives in light of the sublease termination.
>
> We currently estimate our total exposure to FSNA's liquidity issues to be between $50 and $70 million.  We recorded a reserve in the third quarter of $4 million covering those amounts due but not paid as of September 30, 2013 and an aggregate impairment charge of $40 million to cover our expected loss on the sale, including transportation and auction fees, of the vehicles subleased to Simply Wheelz.  The remaining $6-$26 million of exposure relates to professional fees, non-payment by FSNA of interest, sublease and other payments due Hertz which may fluctuate depending on when the vehicles are returned and sold.

256.   The 11/4/13 Press Release also reaffirmed the 2013 Revised Guidance.

257.   The statements referenced above in ¶256 concerning the 2013 Revised Guidance were materially false and misleading when made because of the reasons set forth in ¶205 above.

258.   Also on November 4, 2013, Simply Wheelz announced that it was filing for protection under the federal bankruptcy statutes.

259.   On November 5, 2013, the Company held a conference call with analysts and investors (the "11/5/13 Conf Call") to discuss the financial results and other information set forth

in the 11/4/13 Press Release.   During the 11/5/13 Conf Call, defendant Rosenberg reiterated

Hertz's financial results as detailed in the 11/4/13 Press Release.   In addition, defendant Frissora

reaffirmed the 2013 Revised Guidance during the 11/5/13 Conf Call.   Hertz also provided investors

with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Guidance.

During the 11/5/13 Conf Call, defendant Frissora responded to an analyst's question about the

2013 Revised Guidance and stated, in pertinent part, as follows:

**John Healy - Northcoast Research – Analyst**

Mark, I wanted to try to get a little bit more clarification on the guidance for fiscal
2013.  And I'm looking at slide 29.  It looks like the guidance is the same as on the
26th of September, when you updated things.  So with car costs going higher than
you originally thought at that time frame, as well as the impact of the government
in October, is it likely that we're tracking at the low end of guidance?  Is there
something that maybe we haven't talked about on the call that maybe upside to
where you thought and I'm just trying to understand how all the numbers fit
together given those two moving parts.

**Defendant Frissora**

Yes, we gave you a balanced message, and every comment was weighted.  So best
thing I can tell you is it is what it is.  What I gave you is, there's no conservatism.
There's no aggression.  It's where we see the lay of the land right now.

260.    The statements referenced above in ¶259 related to Hertz's historical financial

information were materially false and misleading when made for the reasons set forth in ¶202

above.  The statements referenced above in ¶259 related to Hertz's 2013 Revised Guidance were

materially false and misleading when made for the reasons set forth in ¶205 above.

261.    Also on the 11/5/13 Conf Call, defendant Rosenberg stated, in pertinent part, as

follows:

For the third quarter of 2013 GAAP earnings of $0.47 per share were lower year-
over-year impacted by a $39 million charge associated with exchanging 82% of the
convertible senior notes to shares, expenses associated with the Dollar Thrifty
integration including the corporate relocation to Florida, ***and a charge of $44***

*million primarily associated with the expected losses on the sale of vehicle subleased as part of our divestiture of the Advantage brand*.

\*      \*      \*

Now let's get back to our results for the quarter.  When you adjust for the one time charges we achieved record earnings per diluted share of $0.73 for the 2013 third quarter, a 16% increase from a year ago.  This was driven by double digit revenue growth and the fact we held consolidated adjusted direct operating and SG&A expenses as a percentage revenue essentially flat year-over-year, which led to a 22.3% improvement in adjusted pre tax income for the Company.

262.   The statements referenced above in ¶261 related to the Company's earnings were materially false and misleading when made for the reasons set forth in ¶202 above.  The statement that "record earnings" were driven, in part, by Hertz holding "adjusted direct operating and SG&A expenses as a percentage revenue essentially flat" was materially false and misleading because the Company's earnings were achieved, in part, by accounting manipulations.

263.   Even though Defendants provided additional details of the impairment charge related to the Advantage Fleet on November 4 and 5, 2013, the Company maintained the 2013 Revised Guidance issued on September 26, 2013, which had already been reduced, in part, as a result of this impairment charge.

264.   On the 11/5/13 Conf Call, an analyst raised the possibility of whether the book values of the Advantage Fleet vehicles were overvalued from the start, but Defendants refused to answer that question.  The exchange with the analyst stated, in pertinent part, as follows:

**Fred Lowrance – Analyst – Avondale Partners**:

Thank you.  Good morning, guys.  I wonder if you could explain the accounting thought process, the methodology used when you decided to count the Advantage fleet as a onetime impairment rather than flowing that through your P&L over the next couple of quarters as you sell those cars.  *And along those lines, if I do the math, impairment divided by the number of cars that you're stuck with, the unit losses on those cars are very similar to the level of losses that Advantage is alleging they're taking on each of their cars that they're selling.  So does that not lend support to some of those allegations that maybe the book values you had on*

*your cars were too high to begin with?*  I'm just wondering if you could address those couple of things.

**Jeff Zimmerman – Hertz SVP, General Counsel, Secretary**:

Hi, this is Jeff Zimmerman.  As we said in David's scripted remarks, this is a matter that we've been working very carefully with Advantage on for now going on close to a month.   And in their public announcement this morning regarding their bankruptcy, they signaled that they intend to commence litigation.  ***And given that, I have instructed our team to take no questions today on the Advantage proposed bankruptcy or along the lines that you're asking.  So unfortunately, we can't go there on this call***.

265.     On November 5, 2013, defendant Douglas – more than one month after tendering her resignation – participated on behalf of Hertz at the Citi North American Credit Conference (the "11/5/13 Conference") and answered questions about Hertz's business, financial performance and future prospects.  During the 11/5/13 Conference, defendant Douglas reiterated Hertz's financial results and the 2013 Revised Guidance, as detailed in the 11/4/13 Press Release.  Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results and the 2013 Revised Guidance.  During the 11/5/13 Conference, defendant Douglas stated, in pertinent part, as follows:

So you can see on this chart then that we have -- you really see our progress from 2009, and you can see what our guidance is for 2013.  So we are for this year expecting to see revenue growth of 21%.  We're expecting to see 41% growth in pre-tax and a 34% increase in adjusted pre-tax.  And more importantly, we're looking at cash flow to be $500 million to $600 million this year.  What you see on our chart for '13 is the high end of our guidance.

I guess the other two things I want to point out here before I complete my prepared remarks is to really look at the margin expansion just between 2012 and 2013.  We're looking at a 190-basis-point improvement in corporate EBITDA margin and 160 basis points in adjusted pre-tax margin.  And given the strategies that we've talked about today, we expect to see this type of continuous profit improvement continue into the foreseeable future.

266.     The statements referenced above in ¶265 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202

above.  The statements referenced above in ¶265 related to Hertz's 2013 Revised Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.  Furthermore, the statements referenced above that "you really see our progress from 2009," "[w]e're looking at a 190-basis-point improvement in corporate EBITDA margin and 160 basis points in adjusted pre-tax margin" and "we expect to see this type of continuous profit improvement continue into the foreseeable future" were materially false and misleading when made because Hertz's margins and earnings were overstated as a result of improper accounting in violation of GAAP and the Company's internal policies, for the reasons set forth in ¶202 above.

267.    In response to Hertz's announcements on November 4 and 5, 2013, the price of Hertz common stock declined from $23.80 per share on November 4, 2013 to close at $21.30 per share on November 5, 2013 – a decline of approximately $2.50 per share, or approximately 10.5%, on extremely heavy trading volume of more than 74 million shares traded (more than 4 times the average daily trading volume over the preceding 10 trading days).  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

268.    On November 7, 2013, Hertz filed its quarterly report on Form 10-Q with the SEC for 3Q13 (the "3Q13 Form 10-Q"), which was signed by defendant Rosenberg.  The 3Q13 Form 10-Q reiterated the Company's 3Q13 financial results reported in the 11/4/13 Press Release, as set forth in ¶253.  The 3Q13 Form 10-Q was certified by defendants Frissora and Rosenberg, as noted in ¶¶129-33.

269.    The statements referenced above in ¶268 were materially false and misleading when made for the reasons set forth in ¶202 above.  Furthermore, the statements referenced above concerning the certifications by defendants Frissora and Rosenberg were materially false and

- 83 -

misleading when made because the SOX certifications issued by defendants Frissora and Rosenberg associated with the Company's internal and disclosure controls were materially false and misleading, as set forth in ¶¶129-33 above.

270.    On December 2, 2013, Hertz announced in a Form 8-K filing with the SEC (the "12/2/13 Form 8-K") that the Company appointed defendant Kennedy as Senior Vice President and CFO of Hertz effective December 9, 2013.  According to the 12/2/13 Form 8-K, the Company also announced that defendant Rosenberg would be relieved of his duties as Interim CFO on December 9, 2013.

271.    On December 3, 2013, defendant Frissora participated at the Bank of America Merrill Lynch Leveraged Finance Conference (the "12/3/13 Conference) and answered questions about Hertz's business, financial performance and future prospects.    During the 12/3/13 Conference, defendant Frissora reiterated Hertz's historical financial results, including for the years ended 2011 and 2012.  Hertz also provided investors with a PowerPoint presentation that reiterated Hertz's financial results.  During the 12/3/13 Conference, defendant Frissora stated, in pertinent part, as follows:

> Our profitability trend has been fairly significant, if you look at the consolidated Hertz.  Again, this shows what our adjusted pretax margin was in 2009 and 2010, 2011, 2012.  As you look at this, LTM adjusted pretax is up 80% over 2007 prerecession levels.  And worldwide Hertz still profit is below -- 23% below our peak in 2007.  So in spite of HERC, not exactly at its peak yet and not recovered, we are still up 80% in pretax.

272.    The statements referenced above in ¶271 were materially false and misleading when made for the reasons set forth in ¶202 above.  Additionally, the statements that Hertz's "profitability trend has been fairly significant," "this shows what our adjusted pretax margin was in . . . 2011, 2012," "LTM adjusted pretax is up 80% over 2007 prerecession levels," and "we are still up 80% in pretax," were materially false and misleading when made because Hertz's earnings

were materially overstated during 2011 and 2012, and the figures were not as represented by defendant Frissora, for the reasons set forth in ¶202 above.

**First Quarter 2014 Statements**

273.    On March 3, 2014, Hertz announced in a Form NT-10K filed with the SEC (the "3/3/13 Form NT-10K") that the Company would be late in filing its Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K"), and stated, in pertinent part, as follows:

> Hertz Global Holdings, Inc. (the "Company") is unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 by the prescribed March 3, 2014 due date without undue effort and expense. The Company expects to file the Form 10-K within the 15-day extension period, on or before March 18, 2014. As a result of the Company's recent implementation of an enterprise resource planning (ERP) system, the Company encountered significant issues during the preparation of its annual financial statements which impacted its resources and overall system of financial reporting.
>
> During the course of the preparation of the Company's 2013 financial statements it identified certain adjustments relating to prior periods which will require the Company to revise certain of its previously issued financial statements. ***The Company does not expect that these revisions to its financial statements will have a material impact on the Company's previously reported results of operations, financial condition, or liquidity.***

274.    The statement referenced above in ¶273 that "[t]he Company does not expect that these revisions to its financial statements will have a material impact on the Company's previously reported results of operations, financial condition, or liquidity" was materially false and misleading when made because it minimized the severity of the revisions needed for prior periods. In fact, Defendants knew, or recklessly disregarded, that revisions to the financial statements were needed that would have a material impact on the Company's previously reported results of operations, for the reasons set forth in ¶202 above. Finally, contrary to the statement that the delay of the reporting of Hertz's financial statements was due, in large part, to the "recent implementation of an

enterprise resource planning (ERP) system," the delay was due to the fact that Hertz had widespread internal and disclosure control deficiencies, for the reasons set forth in ¶202 above.

275.    In response to Hertz's announcements on March 3, 2014, the price of Hertz common stock declined from $28.01 per share on March 2, 2014 to close at $27.25 per share on March 3, 2014 – a decline of approximately $0.76 per share, or approximately 2.7%.  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

276.    On March 18, 2014, the Company announced its financial and operational results for the fourth quarter of 2013, for the period ended December 31, 2013 ("4Q13"), and for the full year ended December 31, 2013 ("FY13") in a press release (the "3/18/14 Press Release"), which it filed with the SEC on Form 8-K.  The 3/18/14 Press Release emphasized the Company's "record" results and reported, among other things, a net loss on a GAAP basis of $0.6 million for 4Q13 and net income on a GAAP basis of $346.2 million for FY13, compared to a loss of $36.8 million for 4Q12 and a gain of $238.6 million for FY12.  Defendant Frissora was quoted in the 3/18/14 Press Release and stated, in pertinent part, as follows:

> 2013 was another record setting year for Hertz on both revenues and profits.  We achieved a fourth consecutive year of 20%+ adjusted pre-tax income and EPS growth in 2013, on revenues which increased 19.4%.

277.    The statements referenced above in ¶276 were materially false and misleading when made for the reasons set forth in ¶202 above.  Additionally, contrary to defendant Frissora's statement that Hertz "achieved a fourth consecutive year of 20%+ adjusted pre-tax income and EPS growth in 2013," Hertz only achieved those financial results as a result of undisclosed accounting manipulations in violation of GAAP, as set forth in ¶202 above.

278.    The 3/18/14 Press Release also provided the 2014 Guidance, and stated, in pertinent part, as follows:

| Full Year 2014 Guidance | |
| --- | --- |
| Revenues | $11,400M - $11,700M |
| Corporate EBITDA | $2,060M - $2,420M |
| Adjusted Pre-Tax Income | $1,210M - $1,430M |
| Adjusted Net Income | $785M - $925M |
| Adjusted Diluted Earnings Per Share | $1.70 - $2.00 |

279.    The statements referenced above in ¶278 concerning the 2014 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

280.    Also on March 18, 2014, the Company held a conference call for analysts and investors (the "3/18/14 Conf Call") to discuss the financial results and other information set forth in the 3/18/14 Press Release.  During the 3/18/14 Conf Call, defendant Kennedy reiterated Hertz's financial results as detailed in the 3/18/14 Press Release.  In addition, defendant Frissora discussed the 2014 Guidance during the 3/18/14 Conf Call.  Hertz also provided investors with a PowerPoint presentation that discussed Hertz's financial results and the 2014 Guidance.

281.    The statements referenced above in ¶280 related to Hertz's historical financial information were materially false and misleading when made for the reasons set forth in ¶202 above.  The statements referenced above in ¶280 related to Hertz's 2014 Guidance were materially false and misleading when made for the reasons set forth in ¶205 above.

282.    During the 3/18/14 Conf Call, defendant Kennedy commented on the delay in the filing of the Company's 2013 Form 10-K.  Defendant Kennedy downplayed the seriousness of Hertz's accounting issues, and stated, in pertinent part, as follows:

> I want to provide you some additional background of the delay in our 10K filing. As we indicated, during our second half of 2013 we implemented a new enterprise resource system to enhance the financial control environment and improve the efficiency of our back office operations which support the North American rental car and equipment rental businesses.

As you are likely aware ERP system implementations are complicated.  There are numerous examples of challenges companies have had during their systems of limitations in integration.   Hertz unfortunately was not the exception, we encountered complications related to the ERP system installation that required us to put in place enhanced year end review controls and more substantive testing.

Further we identified certain adjustments related to prior periods that reported [*sic*] us to revise certain of our previously issued financials.  ***These adjustments did not have a material impact on the previously reported results of operations, financial conditions, or liquidity.***

So I feel very good about where we are today.  We are through a North American financial system implementation for Hertz, most of the issues around the ERP have been resolved ahead of the Dollar Thrifty systems migration, we have obviously learned quite a bit from our experience and will move forward better equipped to manage the next stage which I am confident will go smoothly.

283.    The statement referenced above in ¶282 that "[t]hese adjustments did not have a material impact on the previously reported results of operations, financial conditions, or liquidity" was materially false and misleading when made because it minimized the severity of the revisions needed for prior periods.  In fact, Defendants knew, or recklessly disregarded, that revisions to the financial statements were needed that would have a material impact of the Company's previously reported results of operations, as set forth in ¶202 above.  Finally, contrary to the statement that the delay of the filing of Hertz's 2013 10-K was due, in large part, to Hertz encountering "complications related to the ERP system installation," the delay was due to the fact that Hertz had widespread internal and disclosure control deficiencies, set forth in ¶202 above.

284.    On March 19, 2014, Hertz filed its annual report for fiscal year 2013, for the period ended December 31, 2013 (the "2013 Form 10-K"), which was signed by, among others, defendants Frissora, Kennedy and Kapur.  The 2013 Form 10-K reiterated the Company's FY13 financial results reported in the 3/18/14 Press Release, as set forth in ¶276, including the reporting of net income of $346.2 million for FY13.   The 2013 Form 10-K represented that Hertz's "consolidated financial statements . . . have been prepared in accordance with accounting

principles generally accepted in the United States of America, or 'GAAP.'"  The 2013 Form 10-K included the representations about Hertz's internal and disclosure controls, as set forth in ¶¶43-59; 119-33.  The 2013 Form 10-K was falsely certified by defendants Frissora and Kennedy, as set forth in ¶¶129-33.

285.   The statements referenced above in ¶284 were materially false and misleading when made for the reasons set forth in ¶202 above.  Furthermore, the statements referenced above concerning the certifications by defendants Frissora and Kennedy were materially false and misleading when made because the SOX certifications issued by defendants Frissora and Kennedy associated with the Company's internal and disclosure controls were materially false and misleading, as set forth in ¶¶129-33 above.

286.   The 2013 Form 10-K discussed Hertz's failure to timely file this report, stating, in pertinent part, as follows:

**Correction of Errors**

We have revised our consolidated statement of cash flows for the years ended December 31, 2012 and 2011 to correctly present borrowings and repayments related to its revolving lines of credits on a gross basis.  These amounts had previously been presented on a net basis within the financing section.  This revision had no impact on the Company's total operating, investing or financing cash flows.

During the fourth quarter of 2013, we identified certain out of period errors totaling $46.3 million, of which $34.7 million ($21.0 million, net of tax) related to our previously issued consolidated financial statements for the years ended December 31, 2012, 2011 and prior.  While these errors did not, individually or in the aggregate, result in a material misstatement of our previously issued consolidated financial statements, correcting these errors in the fourth quarter would have been material to the fourth quarter ended December 31, 2013.  Accordingly, management has revised in this filing and will revise in subsequent quarterly filings on Form 10-Q its previously reported consolidated balance sheets and statements of operations as noted below.  These recorded pre-tax adjustments relate to vendor incentives (reduced pre-tax income by $12.9 million in 2011 and $2.4 million in 2012) which had been accounted for as a reduction of marketing expenses instead of reducing the cost of revenue earning equipment, charges related to certain assets and allowances for doubtful accounts in Brazil (reduced pretax income by $4.4 million

in 2010, $6.2 million in 2011 and $3.6 million in 2012), as well as other immaterial errors (decreased pre-tax income by $2.4 million in 2010 and $3.2 million in 2012, and increased pre-tax income by $0.4 million in 2011).

**Second Quarter 2014 Statements**

287.    On April 25, 2014, the Company filed a Form 8-K with the SEC (the "4/25/14 Form 8-K) that announced the resignation of defendant Kapur from his position as Senior Vice President, Finance and Corporate Controller, effective April 22, 2014.  The 4/25/14 Form 8-K also announced that defendant Kapur was immediately being replaced by Robin Kramer, a former Deloitte & Touche LLP partner who was scheduled to become Senior Vice President and Chief Accounting Officer of Hertz, effective May 16, 2014.

288.    On May 13, 2014, Hertz filed a Form NT 10-Q with the SEC (the "5/13/14 Form NT 10-Q"), which announced that the Company would be late in filing its Form 10-Q for the quarter ended March 31, 2014 ("1Q14") because, in pertinent part:

> [A]dditional work is required to complete the closing procedures associated with the first quarter primarily related to evaluating the Company's conclusions regarding the capitalization and timing of depreciation for certain non-fleet expenditures in prior periods.  As a result, the Company was unable to complete the Quarterly Report by the prescribed May 12, 2014 due date without undue effort and expense.  The Company currently expects to file the Form 10- Q within the 5 day extension period, on or before May 19, 2014, however, there can be no assurance that the Company will meet that deadline.

> [Hertz] identified certain errors relating to prior periods which may require it to restate its previously issued financial statements for 2011.  ***The Company does not believe that the adjustments to the 2013 and 2012 periods are material and does not expect that these errors will require the Company to restate its previously issued financial statements for those two years***.  Management is continuing to review these matters to determine if it needs to make any changes to its internal control over financial reporting and disclosure controls and procedures.  The Company will consider the effect of these errors on its prior conclusions regarding the Company's internal control over financial reporting and disclosure controls and procedures.

289.    The statement referenced above in ¶288 that "[t]he Company does not believe that the adjustments to the 2013 and 2012 periods are material and does not expect that these errors will require the Company to restate its previously issued financial statements for those two years" was materially false and misleading when made because it minimized the severity of the revisions needed for prior periods.  In fact, Defendants knew, or recklessly disregarded, that revisions to these financial statements were needed and that they would have a material impact of the Company's previously reported results of operations, as set forth in ¶202 above.

290.    Hertz never filed its Form 10-Q for 1Q14.

291.    On June 6, 2014, prior to the opening of the market, Hertz filed a Form 8-K with the SEC (the "6/6/14 Form 8-K") and disclosed for the first time that the Audit Committee, in conjunction with management, concluded that the Company's FY11 financial statements previously provided to investors should no longer be relied upon and needed to be restated.  In addition, the Company disclosed that it needed to correct Hertz's 2012 and 2013 financial statements to reflect these errors, meaning that further material adjustments to the Company's financial statements for fiscal years 2011 through 2013 may be necessary.  The 6/6/14 Form 8-K further stated, in pertinent part, as follows:

> The Audit Committee of the Board of Directors has consulted with management and analyzed the adjustments.  The Audit Committee has concluded that the financial statements for 2011 should no longer be relied upon, and Hertz must restate them.  Hertz also needs to correct the 2012 and 2013 financial statements to reflect these errors.  However, because of the above mentioned errors, the Audit Committee has directed the Company to conduct a thorough review of the financial records for fiscal years 2011, 2012 and 2013, and this review may require Hertz to make further adjustments to the 2012 and 2013 financial statements.  If these further adjustments to the 2012 and 2013 financial statements are determined to be material adjustments individually or in the aggregate, Hertz will need to also restate and withdraw reliance on those financial statements.  Hertz will make a decision on 2012 and 2013 financial statements after the work described in Item 7.01 below is completed.

The financial statements for 2011 were most recently included in the Form 10-K for the year ended December 31, 2013 (the "10-K").  As soon as practicable, Hertz expects to amend the 10-K to correct the errors identified and related disclosures.  Hertz will file the First Quarter Form 10-Q, and issue the first quarter earnings release, at the same time it files the 10-K amendment.  Consequently, the Company will not hold the conference call scheduled for June 9, 2014.

The chairman of the Audit Committee of the Board of Directors has discussed this matter with PricewaterhouseCoopers LLP, the independent registered public accounting firm for Hertz.

In light of the above, management, in consultation with the Audit Committee, has determined that at least one material weakness existed in Hertz's internal control over financial reporting and that disclosure controls and procedures were ineffective at December 31, 2013.  Hertz intends to amend its Management's Report on Internal Control Over Financial Reporting and Disclosure Controls and Procedures and expects to receive an adverse opinion on the internal control over financial reporting as of December 31, 2013 from PricewaterhouseCoopers LLP.

Hertz is in the process of implementing new procedures and controls, and strengthening the accounting and finance departments through the addition of new personnel.  Leading this process is Thomas (Tom) C. Kennedy, who was appointed Senior Executive Vice President and Chief Financial Officer of the Company, effective December 9, 2013.  He is being assisted by the Company's new Chief Accounting Officer (CAO), Robin Kramer, who was hired in mid- May, and its new Vice President of SOX/Compliance, Randy Walford, who was hired in late April.  Ms. Kramer comes to the Company with over 25 years of experience in both public accounting and as CAO for another Fortune 500 company.  Mr. Walford comes to Hertz with over 13 years of experience in public accounting.  The Company also recently expanded its accounting and finance departments with additional key new personnel to further strengthen the technical and managerial expertise in these departments.

292.    In response to Hertz's statements in the 6/6/14 Form 8-K referenced above in ¶291, the price of Hertz common stock dropped from $30.49 per share on June 5, 2014 to close at $27.73 per share on June 6, 2014 – a one day decline of approximately $2.75 per share, or approximately 9.1%, on extremely heavy trading volume of more than 42 million shares traded (more than 8 times the average daily trading volume over the preceding 10 trading days).  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

**Third Quarter 2014 Statements**

293.    On August 12, 2014, Hertz filed a Form NT 10-Q with the SEC (the "8/12/14 Form NT 10-Q"), which announced that the Company would be late in filing its Form 10-Q for the quarter ended June 30, 2014 ("2Q14"), and stated, in pertinent part, as follows:

> Hertz Global Holdings, Inc. (the "Company") is unable to timely file its Quarterly Report on Form 10-Q for the period ended June 30, 2014 (the "Quarterly Report") because of the ongoing nature of the Company's previously announced thorough review of its internal financial records for fiscal years 2011, 2012 and 2013.  As a result of the ongoing nature of this review and its potential impact on the Company's 2014 financial results, the Company was unable to complete the Quarterly Report by the prescribed August 11, 2014 due date without undue effort and expense, and will be unable to file the Quarterly Report within the five day extension provided by Rule 12b-25(b).

294.    Hertz never filed its Form 10-Q for 2Q14.

295.    On August 19, 2014, Hertz filed a Form 8-K with the SEC (the "8/19/14 Form 8-K") and disclosed that the Company "now expects to be well below the low end of its 2014 guidance due to operational challenges in the rental car and equipment segments as well as the associated costs related to the accounting review previously disclosed" and that "[d]ue to the foregoing, as well as potential revisions related to the ongoing accounting review, ***the Company has decided to withdraw its 2014 financial guidance***."

296.    In addition, the 8/19/14 Form 8-K also disclosed that George W. Tamke, Independent Lead Director of the Board, and Scott Sider, Hertz's Group President of RAC, Hertz's largest car rental division, were leaving the Company effective immediately.  Likewise, Hertz announced that it had hired Vincent Ciccolini as Senior Vice President and Corporate Controller, and Greg Jorgensen as Vice President, Research and Policy, "to further strengthen the Accounting department."

297.    In response to Hertz's statements in the 8/19/14 Form 8-K referenced above in ¶¶295-96, which was filed after the close of trading on August 19, 2014, the price of Hertz common stock dropped from $31.56 per share on August 19, 2014 to close at $30.33 per share on August 20, 2014 – a decline of approximately $1.23 per share, or approximately 3.9%, on extremely heavy trading volume of more than 86 million shares traded (more than 9 times the average daily trading volume over the preceding 10 trading days).  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

298.    On September 8, 2014, prior to the opening of trading, Hertz filed a Form 8-K with the SEC (the "9/8/14 Form 8-K") and announced that defendant Frissora had resigned from his positions as CEO and as Chairman of the Board, effective immediately.

**Fourth Quarter 2014 Statements**

299.    On November 10, 2014, Hertz filed a Form NT 10-Q with the SEC (the "11/10/14 Form NT 10-Q"), which announced that the Company would be late filing its Form 10-Q for the quarter ended September 30, 2014 ("3Q14") and stated, in pertinent part, as follows:

> Hertz Global Holdings, Inc. (the "Company") is unable to timely file its Quarterly Report on Form 10-Q for the period ended September 30, 2014 (the "Quarterly Report") because of the ongoing nature of the Company's previously announced thorough review of its internal financial records for fiscal years 2011, 2012 and 2013.  As a result of the ongoing nature of this review and its potential impact on the Company's 2014 financial results, the Company was unable to complete the Quarterly Report by the prescribed November 10, 2014 due date without undue effort and expense, and will be unable to file the Quarterly Report within the five day extension provided by Rule 12b-25(b).

300.    Hertz never filed its Form 10-Q for 3Q14.

301.    On November 14, 2014, Hertz filed a Form 8-K with the SEC (the "11/14/14 Form 8-K") that disclosed, for the first time, that Hertz's financial statements for FY12 and FY13 needed

to be restated (in addition to Hertz's financial statements for FY11, as announced in the 6/6/14

Form 8-K). The 11/14/14 Form 8-K also provided an update on the Internal Investigation, and

partially quantified the impact of the Restatement. The 11/14/14 Form 8-K stated, in pertinent

part, as follows:

> On June 6, 2014, each of Hertz Global Holdings, Inc. ("HGH") and The Hertz Corporation ("THC" and, together with HGH, "Hertz" or the "Company") filed a Current Report on Form 8-K announcing the conclusion of the Audit Committee of the Board of Directors (the "Audit Committee") that the financial statements for 2011 should be restated and that the 2012 and 2013 financial statements needed to be revised. Because of the errors identified, the Audit Committee also directed the Company to conduct a thorough review of the financial records for fiscal years 2011, 2012 and 2013. The Company disclosed that the results of this review might require further adjustments to the 2012 and 2013 financial statements and, if material individually or in the aggregate, this could result in the restatement and withdrawal of reliance on those financial statements. Management, in consultation with the Audit Committee, also determined that at least one material weakness existed in Hertz's internal control over financial reporting and that disclosure controls and procedures were ineffective at December 31, 2013. Hertz intends to amend its Management's Report on Internal Control Over Financial Reporting and Disclosure Controls and Procedures and expects to receive an adverse opinion on the internal control over financial reporting as of December 31, 2013 from PricewaterhouseCoopers LLP.

> In light of the above, in June 2014 the Audit Committee also commenced an investigation of certain accounting errors that had been identified. The investigation is being conducted under the direction of the Audit Committee and under the direction and with the participation of its independent counsel and has been looking into the tone at the top influence and the involvement and oversight that members of the Hertz organization may have had on those\ potential errors. The review of the initial matters identified for investigation by the Audit Committee and management is substantially complete although follow up investigative work on related matters is ongoing.

> The most material errors identified to date relate primarily to the capitalization and timing of depreciation for certain non-fleet assets, allowances for doubtful accounts in Brazil, allowances for uncollectible amounts with respect to renter obligations for damaged vehicles, restoration obligations at the end of facility leases and certain other items. The review and investigation of the financial records is ongoing. The following information summarizes the impact of errors identified to date by management, on an unaudited basis, which may change as we finalize the review and investigation.

| (In millions) | Year Ended December 31, (unaudited) | | |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| **As originally filed** | | | |
| GAAP pre-tax income | $324 | $451 | $663 |
| GAAP net income attributable to Hertz | $176 | $243 | $346 |
| | | | |
| **Errors previously disclosed and included in the originally filed 10-K\*** | | | |
| GAAP pre-tax income | $(19) | $(9) | N/A |
| GAAP net income attributable to Hertz | $(12) | $(5) | N/A |
| | | | |
| **Additional errors identified to date by management** | | | |
| GAAP pre-tax income | $(30) | $(50) | $(30) |
| GAAP net income attributable to Hertz | $(20) | $(30) | $(20) |
| | | | |
| **Cumulative errors ( Errors previously revised in 10-K plus additional errors identified to date by management)** | | | |
| GAAP pre-tax income | $(49) | $(59) | $(30) |
| GAAP net income attributable to Hertz | $(32) | $(35) | $(20) |

| Cumulative errors as a % of : | | | |
|---|---|---|---|
| GAAP pre-tax income | (15)% | (13)% | (5)% |
| GAAP net income attributable to Hertz | (18)% | (14)% | (6)% |
| *Amounts recorded as a revision in the 2013 Form 10-K. In addition, $7M and $4M in errors reducing pre-tax income and net income, respectively, related to periods prior to 2011 were recorded in the 2013 Form 10-K as a revision. | | | |

Certain of the adjustments identified to date will also effect years prior to 2011.

Although the review and investigation are ongoing, the Audit Committee, in consultation with management, has concluded that the additional proposed adjustments arising out of the review are material to the Company's 2012 and 2013 financial statements. ***Therefore, in addition to the 2011 financial statements, the 2012 and 2013 annual and quarterly financial statements must be restated and should no longer be relied upon.*** The Audit Committee has discussed this matter with PricewaterhouseCoopers LLP, the independent registered public accounting firm for Hertz.

In addition to the 2011 financial statements, as previously disclosed, the further requirement to restate the 2012 and 2013 financial statements will further lengthen the period for completion of the applicable accounting and audit activities. Hertz does not currently expect to complete the process and file updated financial statements before mid-2015, and there can be no assurance that the process will be completed at that time, or that no additional adjustments will be identified.

302.    The 11/14/14 Form 8-K also disclosed, for the first time, the existence of an SEC investigation by the New York Regional Office, of which the Company was notified about in June 2014. The 11/14/14 Form 8-K states, in pertinent part, as follows:

**SEC Matters**

In June 2014 the Company was advised by the staff of the New York Regional Office of the SEC that it is investigating the events disclosed in certain of the Company's filings with the SEC.  The Company has and intends to continue to cooperate with the SEC in its investigation.

303.    In response to Hertz's statements in the 11/14/14 Form 8-K referenced above in ¶¶301-02, the price of Hertz common stock dropped from $22.73 per share on November 13, 2014 to close at $21.69 per share on November 14, 2014 – a one day decline of approximately $1.04 per share, or approximately 4.6%, on extremely heavy trading volume of more than 52 million shares traded (more than 5 times the average daily trading volume over the preceding 10 trading days). Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

304.    On November 25, 2014, Hertz filed a Form 8-K with the SEC (the "11/25/14 Form 8-K") that announced the hiring of John P. Tague ("Tague") to succeed defendant Frissora as Hertz's CEO, effective immediately.

305.    On December 5, 2014, Hertz filed a Form 8-K with the SEC (the "12/5/14 Form 8-K") that announced the resignation of J. Jeffrey Zimmerman, Executive Vice President, General Counsel and Secretary of Hertz, effective December 1, 2014.

**First Quarter 2015 Statements**

306.    On February 25, 2015, Hertz filed a Form 8-K with the SEC (the "2/25/15 Form 8-K") that provided preliminary fourth quarter and full year 2014 operational results for the Company.  The 2/25/15 Form 8-K also provided an update on the Restatement, stating, in pertinent part, as follows:

**Financial Statement Restatement**

As previously announced, the previously issued financial statements must be restated and should no longer be relied upon. The impact on GAAP pre-tax income of cumulative errors identified to date, on an unaudited basis, is approximately $28 million, $74 million and $51 million for 2013, 2012 and 2011, respectively, inclusive of $9 million in 2012 and $19 million in 2011, previously disclosed and reflected in the financials included in the Company's 2013 10-K/A. The review and investigation of its financial records are ongoing, and numbers are therefore subject to change. The financial information set forth in this release is subject to change based on the completion of the investigation and review, and such changes may be significant. In addition, Hertz continues to expect that it will not be able to file updated financial statements before mid-2015, and there can be no assurance that the process will be completed at that time, or that no additional adjustments will be identified.

307.    Notwithstanding the disclosures by Hertz in the 2/25/15 Form 8-K, Hertz common stock remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period and because the full extent of Defendants' wrongdoing had not yet been disclosed.

308.    On March 3, 2015, Hertz filed a Form NT 10-K with the SEC (the "3/3/15 Form NT 10-K"), which announced that the Company would be late in filing its Form 10-K for the year ended December 31, 2014 ("FY14") and stated, in pertinent part, as follows:

Hertz Global Holdings, Inc. (the "Company") is unable to timely file its Annual Report on Form 10-K for the period ended December 31, 2014 (the "Annual Report") because of the ongoing nature of the Company's previously announced thorough review of its internal financial records for fiscal years 2011, 2012 and 2013. As a result of the ongoing nature of this review and its potential impact on the Company's 2014 financial results, the Company was unable to complete the Annual Report by the prescribed March 2, 2015 due date without undue effort and expense, and will be unable to file the Annual Report within the fifteen day extension provided by Rule 12b-25(b).

309.    In response to Hertz's statements in the 3/3/15 Form NT 10-K referenced above in ¶308, made after the close of trading on March 3, 2015, the price of Hertz common stock dropped from $23.50 per share on March 3, 2015 to close at $22.55 per share on March 4, 2015 – a one day

- 98 -

decline of approximately $0.95 per share, or approximately 4%. Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period and because the full extent of Defendants' wrongdoing had not yet been disclosed.

310.    On March 24, 2015, Hertz filed a Form 8-K with the SEC (the "3/24/15 Form 8-K"), which announced that the Company had failed to meet a NYSE listing standard and was in danger of being delisted, and stated, in pertinent part, as follows:

> Hertz Global Holdings, Inc. (NYSE: HTZ) ("Hertz" or the "Company") today announced that on March 18, 2015 it received a notice from the New York Stock Exchange (the "NYSE") notifying the Company of its failure to meet a NYSE listing standard resulting from the Company's failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K"), as provided by Rule 802.01E of the NYSE Listed Company Manual.
>
> As previously disclosed, the Company was unable to timely file its 2014 Form 10-K with the Securities and Exchange Commission (the "SEC") because of the ongoing nature of the Company's previously announced thorough review and investigation of its internal financial records for fiscal years 2011, 2012 and 2013. As a result of the ongoing nature of this review and its potential impact on the Company's 2014 financial results, the Company was unable to file the 2014 Form 10-K by the extended due date of March 17, 2015. The financial review and investigation by the Company is ongoing. Hertz continues to expect that it will not be able to file updated financial statements, including the 2014 Form 10-K, before mid-2015, and there can be no assurance that the process will be completed by that time.
>
> The Company has until September 17, 2015 to cure the filing delinquency associated with its failure to file the 2014 Form 10-K. The NYSE may, in its discretion, extend the initial cure period for up to six months after September 17, 2015. Subject to the NYSE's ongoing oversight and review, the Company can regain compliance during the cure period by filing its 2014 Form 10-K and subsequent Form 10-Qs (the "SEC Filings") with the SEC. If the Company fails to file its SEC Filings by the expiration of any applicable cure period, the NYSE may commence proceedings to delist the Company's common stock. The Company believes that it will continue to be listed on the NYSE, but there can be no assurance that the Company will be able to file the SEC Filings within the initial cure period or any extended cure period. In addition, the NYSE maintains the ability to commence delisting procedures at any time during the cure period, but as of today we do not believe the NYSE will do so.

311.     In response to Hertz's statements in the 3/24/15 Form 8-K referenced above in ¶310, made after the close of trading on March 24, 2015, the price of Hertz common stock dropped from $21.08 per share on March 24, 2015 to close at $20.54 per share on March 25, 2015 – a one day decline of approximately $0.54 per share, or approximately 2.6%.   Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

**Second Quarter 2015 Statements**

312.     On May 12, 2015, Hertz filed a Form NT 10-Q with the SEC (the "5/12/15 Form NT 10-Q"), which announced that the Company would be late in filing its Form 10-Q for the quarter ended March 31, 2015 ("1Q15") and stated, in pertinent part, as follows:

> Hertz Global Holdings, Inc. (the "Company") is unable to timely file its Quarterly Report on Form 10-Q for the period ended March 31, 2015 (the "Quarterly Report") because of the ongoing nature of the Company's previously announced thorough review of its internal financial records for fiscal years 2011, 2012 and 2013.  As a result of the ongoing nature of this review and its potential impact on the Company's 2014 and 2015 financial results, the Company was unable to complete the Quarterly Report by the prescribed May 11, 2015 due date without undue effort and expense, and will be unable to file the Quarterly Report within the five day extension provided by Rule 12b-25(b).

313.     In response to Hertz's statements in the 5/12/15 Form NT 10-Q referenced above in ¶312, the price of Hertz common stock dropped from $20.65 per share on May 11, 2015 to close at $19.87 per share on May 12, 2015 – a one day decline of approximately $0.78 per share, or approximately 3.8%, on extremely heavy trading volume of more than 15 million shares traded (more than 3 times the average daily trading volume over the preceding 10 trading days).  Hertz common stock, however, remained artificially inflated as a result of false and misleading statements and material omissions made by Defendants during the Class Period.

314.    On May 14, 2015, Hertz filed a Form 8-K with the SEC (the "5/14/15 Form 8-K")

that provided preliminary first quarter 2015 operational results for the Company.  The 5/14/15

Form 8-K also provided an update on the Restatement, stating, in pertinent part, as follows:

**FINANCIAL STATEMENT RESTATEMENT**

As previously announced, the previously issued financial statements must be
restated and should no longer be relied upon.  As a result of the completion of
Management's examination of additional accounts in connection with our
accounting review and investigation, the Company has identified an additional $30
million in errors above that which had been previously identified.  As a result, the
impact on GAAP pre-tax income of cumulative errors identified to date, on an
unaudited basis, is approximately $42 million, $85 million and $56 million for
2013, 2012 and 2011, respectively, inclusive of $9 million in 2012 and $19 million
in 2011, previously disclosed and reflected in the financials included in the
Company's 2013 Form 10-K/A.  The review and investigation of the Company's
financial records are ongoing, and amounts are therefore subject to change.  The
financial information set forth in this release is subject to change based on the
completion of the investigation and review, and such changes may be significant.

The Company anticipates filing a Form 10-K for 2014 that will contain audited
restated financial statements for 2012 and 2013 and audited financial statements for
2014, as well as selected restated financial information for 2011.  This 2014 Form
10-K will also contain quarterly information for the quarters in 2014 and we intend
to seek waivers from certain of our lenders in connection with using this format.
Hertz continues to expect that it will not be able to file this 2014 Form 10-K, as
well as its first quarter 2015 Form 10-Q, before mid-2015, and there can be no
assurance that the process will be completed at that time, or that no additional
adjustments will be identified.

315.    Notwithstanding the disclosures by Hertz in the 5/14/15 Form 8-K, Hertz common

stock remained artificially inflated as a result of false and misleading statements and material

omissions made by Defendants during the Class Period and because the full extent of Defendants'

wrongdoing had not yet been disclosed.

316.    On July 7, 2015, Hertz filed a Form 8-K with the SEC that announced the

resignation of Richard D. Broome as Hertz's Executive Vice President, Corporate Affairs and

Communications, effective July 1, 2015.

317.     On July 15, 2015, just one day before the announcement of the Restatement, Deutsche Bank, in a research report discussing "Risks" to Hertz, stated in pertinent part, as follows:

> ***We view the most significant risk at this point to be the fact that HTZ is still in the process of restating its 2011, 2012, and 2013 financials and has not yet filed an audited 10-K or 2014 or a 10-Q for the first quarter of 2015.*** While the company has made several disclosures relating to the anticipated annual and cumulative impact of the restatements, there cannot be any certainty as to when the final restatements will be filed, or any certainty that the preliminary restatement amounts will not increase materially.

318.     In response to Hertz's various disclosures between June 5, 2014 and July 16, 2015, which only partially quantified the Restatement and continuously stated that the Internal Investigation was ongoing, the price of Hertz common stock declined from $30.49 per share on June 5, 2014, to close at $16.99 per share on July 16, 2015 – a decline of approximately $13.50 per share, or approximately 44.3%.

### Summary of SEC Filings Signed by the Individual Defendants During the Class Period

319.     As set forth above, the Individual Defendants signed the following annual and quarterly SEC filings made by Hertz during the Class Period, and are therefore deemed to have made the statements therein:

| Individual Defendant | SEC Filing Signed or Certified |
|---|---|
| Defendant Frissora | Signed 2012 Form 10-K<br>SOX Certification for the 2012 Form 10-K<br>SOX Certification for the 1Q13 Form 10-Q<br>SOX Certification for the 2Q13 Form 10-Q<br>SOX Certification for the 3Q13 Form 10-Q<br>Signed 2013 Form 10-K<br>SOX Certification for the 2013 Form 10-K |

| Individual Defendant | SEC Filing Signed or Certified |
|---|---|
| Defendant Douglas | Signed 2012 Form 10-K<br>SOX Certification for the 2012 Form 10-K<br>Signed 1Q13 Form 10-Q<br>SOX Certification for the 1Q13 Form 10-Q<br>Signed 2Q13 Form 10-Q<br>SOX Certification for the 2Q13 Form 10-Q |
| Defendant Kapur | Signed 2012 Form 10-K<br>Signed 2013 Form 10-K |
| Defendant Rosenberg | Signed 3Q13 Form 10-Q<br>SOX Certification for the 3Q13 Form 10-Q |
| Defendant Kennedy | Signed 2013 Form 10-K<br>SOX Certification for the 2013 Form 10-K |

320.   The statements made in each filing are deemed to be statements made by each Individual Defendant who signed that filing.  The Individual Defendants are responsible and liable for all of the misstatements and omissions contained in each filing that they signed.

**Hertz Restates Its Financial Results for 2011-2013**

321.   After the close of trading on July 16, 2015, Hertz filed the 2014 Form 10-K and restated its financial results and revealed material internal control deficiencies, as set forth above.

322.   On July 17, 2015, the Company held a conference for analysts and investors (the "7/17/15 Conf Call") to discuss the Restatement and other information set forth in the 2014 Form 10-K.  During the 7/17/15 Conf Call, Tague admitted, in pertinent part, as follows:

> Importantly, we believe the processes that support the work are sustainable.  While *the number of material weaknesses are significant*, remediation work is well underway, with considerable progress expected still this year.  In addition to completing the restatement, we are fixing the foundation and completing the work we committed to.  *We have substantially rebuilt the senior leadership team* with best-in-class talent across the Company.

323.   In addition, during the 7/17/15 Conf Call, defendant Kennedy admitted, in pertinent part, as follows:

- 103 -

*The material weaknesses are grouped broadly in four categories: Control environment, including tone at the top, risk assessment, information and communications, and monitoring.* The Form 10-K adds additional detail on these matters, and I encourage you to review it carefully. The highest standards of financial reporting, rigorous internal controls, and appropriate oversight, are all priorities in areas in which Hertz will not compromise. We have taken and continue to take action to remediate the identified material weaknesses. For example, *over the last 18 months, Hertz has hired new senior management team and numerous key employees from outside the Company, as well as a new Chief Accounting Officer, General Counsel, and more than 20 highly qualified Vice President and Director level accounting employees*, including the senior accounting team highlighted on slide 6.

324.    The market for Hertz common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Hertz common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Hertz common stock relying upon the integrity of the market price of Hertz common stock and market information relating to Hertz, and have been damaged thereby.

325.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hertz common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

326.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Hertz's business, prospects and operations. These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of Hertz and its business, prospects and operations, thus causing the price of Hertz common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Hertz common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of Hertz stock was removed and the price of Hertz stock declined dramatically, causing loss to Plaintiffs and the other members of the Class.

**Hertz's Class Period SEC Filings Omitted Known Trends,
Events and Uncertainties that Were Impacting, and
Would Impact, the Company's Financial Results**

327.    Pursuant to Item 7 of Form 10-K and Item 2 of Form 10-Q, Hertz's Class Period SEC filings were required to furnish the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

328.    In 1989, the SEC issued an interpretive release on Item 303 and the disclosure required under the regulation.  *See* Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), SEC Release No. 6835, 1989 WL 1092885, at *1 (May 18, 1989) (hereinafter referred to as "1989 Interpretive Release").  In the 1989 Interpretive Release, the SEC stated, in pertinent part, that:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. . . .   A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

*Id*. at *4.

329.   Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)   Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)   If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*Id*. at *6.

330.   The following were known trends, events, or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations and, therefore, were required to be disclosed by Defendants pursuant to Item 303 in the 2012 Form 10-K, 1Q13 Form 10-Q, 2Q13 Form 10-Q, 3Q13 Form 10-Q, and 2013 Form 10-K, but were not:

(a)   Hertz's financial results were presented in violation of GAAP and the Company's publicly disclosed accounting policies, as described in ¶¶60-74; 112-41;

(b)   Hertz's financial results were materially overstated and should not have been relied upon due, in part, to Hertz's understatement of expenses, as described in ¶¶60-74; 112-41;

(c)   Hertz's disclosure controls and internal controls were materially deficient and not operating effectively, as described in ¶¶43-59; 119-33; and

(d)   there was an inconsistent and sometimes inappropriate tone at the top at Hertz that resulted in Hertz violating GAAP and Company accounting policies.

331.    In addition, the following was a known trend, event, or uncertainty that was having, and was reasonably likely to have, an impact on the Company's continuing operations and, therefore, was required to be disclosed by Defendants pursuant to Item 303 in the 2Q13 Form 10-Q, but was not:

(a)     Hertz violated GAAP and its publicly disclosed policy of accounting for long-lived assets, and failed to timely record and disclose a $40 million impairment in the value of the Advantage Fleet, thereby falsely inflating the Company's operating results as of June 30, 2013, as discussed more fully in ¶¶88-111 above.  Furthermore, even if Defendants determined not to record an impairment in the value of the Advantage Fleet, pursuant to Item 303, the 2Q13 Form 10-Q should have disclosed the possible impairment of the Advantage Fleet since impairment was at least reasonably possible, as revealed by, among other things, Simply Wheelz's consistent and ongoing losses on sales of Advantage Fleet vehicles, and Simply Wheelz's raising of their concerns about the valuation of the Advantage Flee with Hertz, including meeting with Hertz in July 2013.

**Hertz's Class Period SEC Filings Omitted to Include**
**Significant Risk Factors Required to Be Disclosed Therein**

332.    Pursuant to Item 1A of Form 10-K, Hertz's 2012 and 2013 Forms 10-K were required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."  Pursuant to Item 1A of Form 10-Q, Hertz's Class Period Forms 10-Q were required to "[s]et forth any material changes from risk factors as previously disclosed" in Hertz's 2012 Form 10-K pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.503].  Defendants failed to comply with Item 503 by failing to disclose risk factors or material changes in risk factors in these SEC filings.

333.    Specifically, Defendants failed to disclose the following in Hertz's 2012 Form 10-K, 1Q13 Form 10-Q, 2Q13 Form 10-Q, 3Q13 Form 10-Q, and 2013 Form 10-K, as required under Item 503:

(a)     Hertz's financial results were presented in violation of GAAP and the Company's publicly disclosed accounting policies, as described in ¶¶60-74; 112-41;

(b)     Hertz's financial results were materially overstated and should not have been relied upon due, in part, to Hertz's understatement of expenses, as described in ¶¶60-74; 112-41;

(c)     Hertz's disclosure controls and internal controls were materially deficient and not operating effectively, as described in ¶¶43-59; 119-33;

(d)     there was an inconsistent and sometimes inappropriate tone at the top at Hertz that resulted in Hertz violating GAAP and Company accounting policies; and

(e)     Defendants lacked a reasonable basis for their positive statements about the Company's finances.

334.    Furthermore, Defendants failed to disclose in Hertz's 2Q13 Form 10-Q the following material changes from risk factors as previously disclosed in Hertz's 2012 Form 10-K, as required under Item 503:

(a)     Simply Wheelz had experienced consistent and ongoing losses on sales of Advantage Fleet vehicles and raised their concerns about the valuation of the vehicles with Hertz, and it was at least reasonably possible that the Advantage Fleet was impaired.

### ADDITIONAL SCIENTER ALLEGATIONS

335.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that

such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Hertz, their control over, and/or receipt, and/or modification of Hertz's admittedly and allegedly materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

336.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The multi-year fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

337.    The Individual Defendants were executive officers of Hertz and, at a minimum, should have been aware of key facts related to the Company's operations, including its accounting procedures and compliance with GAAP.  With respect to defendant Frissora, the 2014 Form 10-K admits that "*[t]he tone set and pressures imposed by the former Chief Executive Officer were inappropriate in certain instances* and may have been a factor influencing one or more employees to record an accounting entry now determined to be improper."  This establishes that defendant Frissora was personally involved in, and knowledgeable about, Hertz's deficient accounting practices during the Class Period, including those items covered by the Restatement.

338.    The Individual Defendants were each members of Hertz's senior management during the Class Period.  The Company has now admitted that "an inconsistent and sometimes *inappropriate tone at the top was present under the then existing senior management* that did not in certain instances result in adherence to accounting principles generally accepted in the

United States of America ("GAAP") and Company accounting policies and procedures."  Based on their roles at Hertz, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

339.     Further, the 2014 Form 10-K admitted that the control environment at Hertz, "***which is the responsibility of senior management***," contained material weaknesses which resulted in inappropriate accounting decisions and in appropriate changes in accounting methodology.  Specifically, the 2014 Form 10-K admitted that the following material weaknesses, among others, were present during the Class Period:

(a)     an inconsistent and inappropriate "tone at the top" fostered by senior management that caused failures in adhering to GAAP and the Company's accounting policies and procedures;

(b)     a pressurized operating environment created by defendant Frissora that included an inappropriate emphasis on meeting current estimates, which resulted in inappropriate accounting decisions and failures to properly report critical information;

(c)     a lack of qualified personnel with the appropriate level of knowledge, training and experience; and

(d)     a lack of clear reporting structures, reporting lines, and decisional authority.

340.     The material weaknesses present during the Class Period, as set forth above in ¶339, further support the scienter of the Individual Defendants because it was their responsibility to maintain an effective control environment during the Class Period, and they knowingly or recklessly failed to maintain an effective control environment prior to or during the Class Period.

341.     The scienter of defendants Frissora, Douglas, Rosenberg and Kennedy is further evidenced by their SOX mandated certifications on Hertz's internal controls, which acknowledged

their responsibility to investors for establishing and maintaining controls to ensure that material information about Hertz was made known to them.

342.     Likewise, the 2014 Form 10-K admits that Hertz did not design effective controls over the preparation, analysis, and review of significant account reconciliations and closing adjustments required to assess the appropriateness of certain account balances at the closing of quarterly and annual financial reporting periods during the Class Period.  Hertz's failure to maintain effective internal controls over its financial reporting over a multi-year period supports a finding of scienter.

343.     The sheer magnitude and duration of Hertz's improper financial reporting provides additional evidence that Defendants knew of the alleged fraud, or recklessly disregarded it.  Hertz has now admitted that its previously issued financial statements *for each of FY11, FY12 and FY13* were materially misstated and should no longer be relied upon and were presented in violation of GAAP and the Company's publicly stated policies on accounting.  These facts support scienter.

344.     Additionally, the resignations and/or terminations of defendants Frissora, Douglas, Kapur, and other senior executives at Hertz, support a finding of scienter.  For example, defendant Frissora "resigned" on September 8, 2014, only a few months after the Internal Investigation began and the SEC informed the Company of its investigation, both of which occurred in June 2014. Defendant Douglas resigned just a few days before the Company reduced is full year 2013 Guidance in September 2013.  Below is a summary of various Hertz executives who resigned and/or were terminated during the Class Period:

| Name | Position | Date of Resignation/Termination | Proximity to the Restatement |
|---|---|---|---|
| Defendant Douglas | Senior Vice President and CFO | September 23, 2013 | Defendant Douglas resigned just days before the Company |

| Name | Position | Date of Resignation/Termination | Proximity to the Restatement |
|------|----------|-------------------------------|------------------------------|
| | | | announced that the 2013 Guidance was unachievable, and several months before the Company began admitting its accounting problems. |
| Defendant Kapur | Senior Vice President, Finance and Corporate Controller | April 25, 2014 | Defendant Kapur resigned just before Hertz announced in June 2014 that it will have to restate its FY11 financial results. |
| Scott P. Sider | Group President, Hertz Rent A Car | August 19, 2014 | Sider resigned the same day that Hertz announced that the 2014 Guidance was unachievable, due, in part, to the Internal Investigation. |
| Defendant Frissora | CEO and Chairman of the Board | September 8, 2014 | Defendant Frissora resigned less than 2 months after the Internal Investigation began, and in response to pressure from investors concerned about the Company's accounting problems. |

| Name | Position | Date of Resignation/Termination | Proximity to the Restatement |
|---|---|---|---|
| J. Jeffrey Zimmerman | Executive Vice President, General Counsel and Secretary | December 1, 2014 | Zimmerman resigned shortly after the Company admitted in November 2014 that its FY11, FY12 and FY13 financial results all needed to be restated. |
| Richard D. Broome | Executive Vice President, Corporate Affairs and Communications | July 1, 2015 | Broome resigned just days before the 2014 Form 10-K was released, which detailed the full extent of the Restatement. |

345.    Relatedly, the 2014 Form 10-K explained that the Company has hired nine new members of senior management in an effort to remediate the material weaknesses in internal controls described above that were caused by Hertz's former senior management team, including the Individual Defendants.  In addition, the 2014 Form 10-K discloses that Hertz has hired 20 new personnel for key positions in Hertz's financial reporting and accounting departments.  In fact, during the 7/17/15 Conf Call, Tague and defendant Kennedy both acknowledged that the primary way in which Hertz has been addressing Hertz's material weaknesses in internal controls has been to substantially replace the Class Period senior management team and the accounting and financial reporting positions that report to them, as described in ¶¶322-23 above.  The need to replace defendants Frissora, Douglas and Kapur to remediate Hertz's internal control problems implicitly acknowledges that the Individual Defendants were either the cause of the deficiencies or, at a minimum, were reckless in connection with the causes and circumstances underlying the Restatement.

346.    Additionally, in June 2014, the SEC informed the Company that it was investigating the events leading to the Restatement, and Hertz acknowledged that the Company had been and intended to continue cooperating with the SEC.  Moreover, in December 2014, an unnamed state securities regulator also informed the Company that it was investigating the events leading to the Restatement, and Hertz acknowledged that the Company had been and intended to continue cooperating with this state regulator.  The existence of these investigations further support a finding of scienter.

347.    Taken collectively: (i) the size and magnitude of the restatement of Hertz's financial results; (ii) the violations of the Company's accounting policies and GAAP; (iii) the 2014 Form 10-K's damning assessment of defendant Frissora and senior managements' role in the Company's GAAP violations and improper accounting; (iv) the material weaknesses in internal controls that were caused by the Individual Defendants and occurred on their watch; (v) the material internal control deficiencies over a multi-year period; (vi) the terminations and/or resignations of defendants Frissora, Douglas and Kapur, and the terminations and/or resignations of other Hertz senior executives; (vii) the efforts undertaken by the Company to hire competent personnel to replace defendants Frissora, Douglas and Kapur, and Hertz's former senior management; (viii) the SEC and unnamed state regulator investigations; and (ix) the Individual Defendants' repeated signings of, and SOX certifications of, Hertz's annual and quarterly Class Period SEC filings, demonstrate a strong inference that Defendants acted with scienter.

348.    In addition, Defendants also possessed knowledge of facts or had access to information contradicting their public statements.  As alleged above, Defendants knew, and/or recklessly disregarded, that the Company violated GAAP and its internal accounting policies and should have recorded an impairment on the Advantage Fleet no later than the quarter ended June

30, 2013.  The Advantage Fleet vehicles were owned and operated by Hertz prior to the Advantage Divestiture and Hertz established the carrying values for the Advantage Fleet vehicles.

349.   Defendants knew, and/or recklessly disregarded, that Advantage Fleet vehicles were consistently sold for a loss throughout the Class Period.  Hertz was promptly notified about sales of – and losses on – Advantage Fleet vehicles and the losses on Advantage Fleet vehicles were so significant during June 2013 that Simply Wheelz held a meeting with Hertz to discuss these significant losses in July 2013.  Furthermore, Defendants acknowledged that Hertz had "significant continuing involvement in the operations of the disposed Advantage business."  Since Hertz had recently run the business divested to Simply Wheelz, Hertz knew, or recklessly disregarded, that sustaining such large losses on the sales of the Advantage Fleet would have negatively impacted Simply Wheelz's ability to repay money owed to Hertz.

350.   Furthermore, as alleged above, supported in part by the CWs, Simply Wheelz bankruptcy filings, and Company admissions during the Class Period, Defendants were in possession of, or had access to, facts indicating that Defendants lacked a reasonable basis to reaffirm the Company's 2013 Guidance, 2013 Revised Guidance, and 2014 Guidance throughout the Class Period, including facts showing that: (i) Hertz's financial results were presented in violation of GAAP and were materially misstated; (ii) Hertz's disclosure controls and internal controls were materially deficient and not operating effectively; and (iii) the Advantage Fleet was overvalued.

351.   Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.  Given the nature and extent of the problems at Hertz, Defendants knew and/or recklessly disregarded the extent and scope of the wrongdoing during the Class Period.

352.     In addition, defendant Douglas has an extensive financial background and is a CPA. Defendant Douglas therefore had the requisite training and experience necessary to understand the various accounting issues plaguing Hertz during the Class Period, further supporting an inference of scienter.

353.     Likewise, the Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, income taxes, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

354.     Moreover, the fraud alleged herein relates to the core business and operations of Hertz so knowledge of the fraud may be imputed to Defendants.  Given Defendants' knowledge of the truth concerning the Company's failure to comply with GAAP, material misstatements of its financial results, material deficiencies and ineffectiveness of the Company's disclosure controls and internal controls, the Company's ability to achieve its guidance, and the valuation of the Advantage Fleet, the positive statements detailed above, made contemporaneously with that knowledge, were false and/or misleading.  Furthermore, these facts were known by Hertz employees in senior positions at Hertz and their knowledge can be imputed to Hertz itself.

355.     Additionally, Defendants possessed substantial motives for misrepresenting Hertz's financial status and operations throughout the Class Period.

356.    Defendants Douglas and Kapur, and other senior Company executives, in connection with the fraudulent scheme alleged herein, sold more than *$51 million* worth of Hertz common stock during the Class Period at times and amounts that were unusual, as set forth below:

| Name | Position | Date | No. of Shares Sold | Price | Proceeds |
|------|----------|------|--------------------|-------|----------|
| Defendant Douglas | CFO | 04/15/2013 | 36,758 | $23.09 | $848,742 |
|  |  | 05/08/2013 | 52,300 | $25.01 | $1,308,023 |
|  |  | 05/15/2013 | 57,700 | $25.04 | $1,444,808 |
|  |  | 12/31/2013 | 40,000 | $28.00 | $1,120,000 |
|  |  |  | **186,758** |  | **$4,721,573** |
| Defendant Kapur | SVP, Controller | 03/11/2013 | 65,000 | $21.23 | $1,379,950 |
|  |  | 05/08/2013 | 50,000 | $25.00 | $1,250,000 |
|  |  | 05/20/2013 | 12,600 | $26.00 | $327,600 |
|  |  | 05/22/2013 | 5,200 | $26.00 | $135,200 |
|  |  | 05/28/2013 | 32,200 | $26.14 | $841,708 |
|  |  |  | **165,000** |  | **$3,934,458** |
| Leighanne Baker | Chief H.R. Officer | 05/20/2013 | 13,016 | $26.01 | $338,546 |
|  |  | 05/22/2013 | 4,400 | $26.00 | $114,400 |
|  |  | 05/28/2013 | 52,900 | $26.13 | $1,382,277 |
|  |  |  | **70,316** |  | **$1,835,223** |
| Lois I. Boyd | President of HERC | 11/19/2013 | 23,619 | $23.16 | $547,016 |
|  |  | 11/20/2013 | 2,235 | $24.00 | $53,640 |
|  |  | 11/22/2013 | 3,169 | $24.00 | $76,056 |
|  |  | 11/25/2013 | 19,922 | $24.07 | $479,523 |
|  |  |  | **48,945** |  | **$1,156,235** |
| Richard D. Broome | SVP Communications | 02/25/2013 | 55,000 | $20.05 | $1,102,750 |
|  |  | 05/10/2013 | 25,000 | $24.74 | $618,500 |
|  |  |  | **80,000** |  | **$1,721,250** |
| Joseph F. Eckroth Jr. | CTO | 03/28/2013 | 30,000 | $22.50 | $675,000 |
|  |  | 04/02/2013 | 70,000 | $23.69 | $1,658,300 |
|  |  |  | **100,000** |  | **$2,333,300** |
| Scott P. Sider | President, Hertz RAC | 04/26/2013 | 34,086 | $24.00 | $818,064 |
|  |  | 05/08/2013 | 52,347 | $25.01 | $1,309,198 |
|  |  | 05/15/2013 | 2,653 | $25.00 | $66,325 |
|  |  |  | **89,086** |  | **$2,193,587** |

| Name | Position | Date | No. of Shares Sold | Price | Proceeds |
|------|----------|------|--------------------|-------|----------|
| Robert J. Stuart | SVP, Marketing | 04/02/2013 | 90,218 | $24.00 | $2,165,232 |
| | | 12/31/2013 | 17,600 | $28.75 | $506,000 |
| | | 01/02/2014 | 35,499 | $28.86 | $1,024,501 |
| | | 01/03/2014 | 70,896 | $29.02 | $2,057,402 |
| | | 01/03/2014 | 26,901 | $29.02 | $780,667 |
| | | 01/03/2014 | 23,141 | $29.02 | $671,552 |
| | | 01/03/2014 | 49,962 | $29.02 | $1,449,897 |
| | | | **314,217** | | **$8,655,251** |
| Michel Taride | President, Hertz Int'l | 04/16/2013 | 207,237 | $23.15 | $4,797,537 |
| | | 04/26/2013 | 200,000 | $24.11 | $4,822,000 |
| | | 05/20/2013 | 12,917 | $26.00 | $335,842 |
| | | 05/22/2013 | 4,500 | $26.00 | $117,000 |
| | | 05/28/2013 | 25,700 | $26.16 | $672,312 |
| | | 01/08/2014 | 100,000 | $27.71 | $2,771,000 |
| | | 01/08/2014 | 200,000 | $27.71 | $5,542,000 |
| | | 01/08/2014 | 100,000 | $27.71 | $2,771,000 |
| | | | **850,354** | | **$21,828,690** |
| David Trimm | CTO | 12/31/2013 | 8,000 | $27.35 | $218,800 |
| | | 12/31/2013 | 8,000 | $28.03 | $224,240 |
| | | 06/02/2014 | 8,000 | $29.00 | $232,000 |
| | | | **24,000** | | **$675,040** |
| J. Jeffrey Zimmerman | General Counsel | 02/25/2013 | 97,486 | $20.07 | $1,956,544 |
| | | 05/08/2013 | 30,000 | $25.01 | $750,300 |
| | | | **127,486** | | **$2,706,844** |
| **TOTAL** | | | **2,056,162** | | **$51,761,451** |

357.    The timing of Hertz stock sales by defendants Douglas and Kapur was unusual. Defendant Douglas did not sell any stock in the three years prior to her sales during 2013, and neither did defendant Kapur (with the exception of one Hertz stock sale in December 2012). Additionally, both defendants Douglas and Kapur sold Hertz shares near Class Period highs, and before disclosure of the accounting improprieties and internal control deficiencies detailed in the 2014 Form 10-K.

358.    The amount of the stock sales also supports scienter.  During 2013, defendant Douglas received total annual compensation of approximately $3.062 million, less severance payments relating to her resignation.  Defendant Douglas' Hertz stock sales during the Class Period

netted her an additional $4.721 million, an approximately *54%* increase over her 2013 total compensation.  Defendant Douglas' net profit on her $4.721 million in Hertz stock sales was approximately $3.999 million, representing approximately 84.7% of her gross sales.  While Hertz has not disclosed defendant Kapur's total annual compensation for 2013, even if he received the same compensation as defendant Douglas – which is unlikely given that defendant Douglas was his superior – his Hertz stock sales during the Class Period would have netted him an additional $3.934 million, an approximately *29%* increase over defendant Douglas' 2013 total compensation (and in reality likely a much larger percentage in relation to his 2013 total compensation).  Defendant Kapur's net profit on his $3.934 million in Hertz stock sales was approximately $3.182 million, representing approximately 80.9% of his gross sales.  As a result, defendant Douglas' and Kapur's Hertz stock sales during the Class Period resulted in unusually large profits relative to their annual compensation.

359.   Furthermore, as reflected in the chart above in ¶356, defendant Douglas sold 186,758 shares of Hertz stock during the Class Period, representing approximately *24.7%* of her pre-Class Period Hertz stock holdings, which stood at 756,185 shares as of February 1, 2013.  In addition, as reflected in the chart above in ¶356, defendant Kapur sold 165,000 shares of Hertz stock during the Class Period, representing approximately *62.3%* of his pre-Class Period Hertz stock holdings, which stood at 264,794 shares as of March 11, 2013.  As a result, defendants Douglas and Kapur sold a significant percentage of their total Hertz stock holdings during the Class Period.

360.   Taken collectively, defendant Douglas' and Kapur's Class Period Hertz stock sales support an inference of scienter because they historically sold very little stock prior to the Class Period, these sales resulted in unusually large profits relative to their 2013 total annual

compensation, the quantity sold represented a significant percentage of their overall total holdings, and these sales took place near Class Period highs and were timed to capitalize on Hertz's inflated stock price before Defendants' fraudulent accounting and lack of internal controls were disclosed to investors.

## LOSS CAUSATION/ECONOMIC LOSS

361.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Hertz's common stock and operated as a fraud or deceit on Class Period purchasers of Hertz's common stock.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Hertz's common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Hertz's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

362.    Defendants' false and misleading statements had the intended effect and caused Hertz's common stock to trade at artificially inflated levels throughout the Class Period.

363.    As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in Hertz's common stock, the price of Hertz's common stock fell precipitously.  These drops removed the inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.

364.    Plaintiffs allege numerous corrective disclosures during the Class Period, including as set forth below:

(a)    Before the opening of trading on September 26, 2013, Defendants announced, among other things, that the Company was reducing the 2013 Guidance and would

instead be relying upon the 2013 Revised Guidance, as set forth in ¶243 above.  In response to the Company's announcement prior to the opening of trading on September 26, 2013, the price of Hertz common stock declined $4.15 per share, or 16%, from a close of $25.78 per share before the announcement, to close at $21.63 on September 26, 2013.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(b)     After the close of trading on November 4, 2013, Defendants announced, among other things, that the Company was taking a $40 million impairment charge relating to the losses experienced by Simply Wheelz in divesting the Advantage Fleet, as set forth in ¶255 above. In response to the Company's announcement after the close of trading on November 4, 2013, the price of Hertz common stock declined over $2.50 per share, or 10.5%, from a close of $23.80 before the announcement, to close at $21.30 on November 5, 2013.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(c)     Before the open of trading on March 3, 2014, Defendants announced, among other things, that Hertz could not timely file the 2013 Form 10-K due to certain adjustments that needed to be made to its previously issued financial statements, as set forth in ¶273 above.  In response to the Company's announcement before the opening of trading on March 3, 2014, the price of Hertz common stock declined over $0.76 per share, or 2.7%, from a close of $28.01 before

the announcement, to close at $27.25 on March 3, 2014.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(d)     Before the open of trading on June 6, 2014, Defendants announced, among other things, the Internal Investigation, that Hertz's FY11 financial restatements should no longer be relied upon and its FY12 and FY13 financial statements may have to be restated, and that one material weakness existed in its internal controls, as set forth in ¶291 above.  In response to the Company's announcement before the opening of trading on June 6, 2014, the price of Hertz common stock declined over $2.75 per share, or 9.1%, from a close of $30.49 before the announcement, to close at $27.73 on June 6, 2014.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(e)     After the close of trading on August 19, 2014, Defendants announced, among other things, that Hertz would be unable to meet the 2014 Guidance due, in part, to costs relating to the Internal Investigation, and that it was withdrawing the 2014 Guidance, as set forth in ¶¶295-96 above.  In response to the Company's announcement after the close of trading on August 19, 2014, the price of Hertz common stock declined over $1.23 per share, or 3.9%, from a close of $31.56 before the announcement, to close at $30.33 on August 20, 2014.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors

who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(f)     Before the open of trading on November 14, 2014, Defendants announced, among other things, that Hertz would have to restate its FY12 and FY13 financial results, in addition to its FY11 financial results, as set forth in ¶¶301-02 above.  In response to the Company's announcement before the opening of trading on November 14, 2014, the price of Hertz common stock declined over $1.04 per share, or 4.6%, from a close of $22.73 before the announcement, to close at $21.69 on November 14, 2014.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(g)     After the close of trading on March 3, 2015, Defendants announced, among other things, that Hertz could not timely file the 2014 Form 10-K due to the Internal Investigation, as set forth in ¶308 above.  In response to the Company's announcement after the close of trading on March 3, 2015, the price of Hertz common stock declined over $0.95 per share, or 4%, from a close of $23.50 before the announcement, to close at $22.55 on March 4, 2015.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(h)     After the close of trading on March 24, 2015, Defendants announced, among other things, that Hertz had been notified by the NYSE that it was in danger of being delisted because it had not timely filed the 2014 Form 10-K, as set forth in ¶310 above.  In response to the Company's announcement after the close of trading on March 24, 2015, the price of Hertz common stock declined over $0.54 per share, or 2.6%, from a close of $21.08 before the announcement, to close at $20.54 on March 25, 2015.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period;

(i)     Before the open of trading on May 12, 2015, Defendants announced, among other things, that Hertz could not timely file its Form 10-Q for 1Q15 due to the Internal Investigation, as set forth in ¶312 above.  In response to the Company's announcement before the opening of trading on May 12, 2015, the price of Hertz common stock declined over $0.78 per share, or 3.8%, from a close of $20.65 before the announcement, to close at $19.87 on May 12, 2015.  This drop removed inflation from the price of Hertz's common stock, causing real economic loss to investors who had purchased Hertz's common stock during the Class Period.  Hertz's common stock, however, remained artificially inflated as a result of false and misleading statements, and material omissions, made by Defendants during the Class Period; and

(j)     Before the open of trading on June 6, 2014, Defendants announced for the first time that, among other things, Hertz's historical financial results required restatement, as set forth in ¶291 above.  The price of Hertz common stock closed at $30.49 on June 5, 2014.  Throughout the remainder of the Class Period, Hertz made numerous disclosures and admissions

concerning the Restatement through July 16, 2015.  The price of Hertz common stock closed at $16.99 on July 16, 2015.  Shortly after the close of trading that day, Hertz filed the 2014 Form 10-K and announced the Restatement.  Between June 5, 2014 and July 16, 2015, Hertz's common stock declined over $13.50 per share, or 44.3%.  This decline was due, in part, to the revelation of, and materialization of the risk of, Defendants' materially false and misleading statements and omissions.  This decline removed inflation from the price of Hertz's common stock during the Class Period.

365.    The timing and magnitude of the price declines in Hertz's common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Hertz's common stock and the subsequent significant decline in the value of Hertz's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

366.    As a result of these revelations, and the corresponding drop in the price of Hertz's securities, Plaintiffs and the Class suffered real economic loss.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

367.    At all relevant times, the market for Hertz common stock was an efficient market for the following reasons, among others:

(a)     Hertz's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      as a regulated issuer, Hertz filed periodic public reports with the SEC and the NYSE;

(c)      Hertz regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Hertz was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

368.    As a result of the foregoing, the market for Hertz common stock promptly digested current information regarding Hertz from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Hertz's common stock during the Class Period suffered similar injury through their purchase(s) of Hertz common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* DOCTRINE

369.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because Defendants' material omissions during the Class Period caused harm to Plaintiffs and the Class. Because the Complaint alleges Defendants' failure to disclose material adverse information regarding Hertz's accounting practices and policies, business operations, financial results and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material

- 126 -

in the sense that a reasonable investor might have considered them important in making investment decisions.

370.    Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## NO SAFE HARBOR

371.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hertz who knew that those statements were false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

372.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

373.    This Count is asserted against Hertz and the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

374.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

375.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

376.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Hertz common stock during the Class Period in an effort to maintain artificially high market prices for Hertz's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

377.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or a director of the Company were privy to and participated in the creation, development and reporting of the Company's financial results and

guidance; (iii) each of the Individual Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

378.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with Hertz and supporting the artificially inflated price of Hertz's common stock.   As demonstrated by Defendants' misstatements of the Company's business and operations during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

379.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Hertz's common stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price of Hertz's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Hertz common stock

during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

380.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class, and the marketplace, known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their Hertz common stock, or, if they had purchased such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

381.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

382.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Hertz common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

383.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

384.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.

385.    The Individual Defendants acted as controlling persons of Hertz within the meaning of Section 20(a) of the Exchange Act.

386. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

387. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Hertz common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  March 1, 2016                    COHN LIFLAND PEARLMAN
                                          HERRMANN & KNOPF LLP
                                   PETER S. PEARLMAN

                                         */s/ Peter S. Pearlman*
                                   PETER S. PEARLMAN

                                 Park 80 West-Plaza One
                                 250 Pehle Avenue | Suite 401
                                 Saddle Brook, NJ  07663
                                 Telephone:  201/845-9600
                                 201/845-9423  (fax)

                                 *Liaison Counsel for Plaintiffs*

                                 ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 EVAN J. KAUFMAN
                                 MICHAEL G. CAPECI
                                 58 South Service Road, Suite 200
                                 Melville, NY  11747
                                 Telephone:  631/367-7100
                                 631/367-1173  (fax)
                                 srudman@rgrdlaw.com
                                 ekaufman@rgrdlaw.com
                                 mcapeci@rgrdlaw.com

                                 *Lead Counsel for Plaintiffs*

                                 SACHS WALDMAN P.C.
                                 JOSEPH PAWLICK
                                 1423 East Twelve Mile Road
                                 Madison Heights, MI  48071
                                 Telephone:  248/658-0800
                                 248/658-0801 (fax)

                                 *Additional Counsel for Lead Plaintiff*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

WESTCHESTER TEAMSTERS PENSION FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed the operative complaint in *In re Hertz Global Holdings, Inc. Securities Litigation*, No. 2:13-cv-7050 (D.N.J.) and authorizes being named as a plaintiff in that action.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

HERTZ

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _12_ day of December, 2015.

WESTCHESTER TEAMSTERS PENSION FUND

By: _____

Andrew B. Mackle, Administrator

- 2 -

HERTZ

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/02/2013 | 7,866 | $23.69 |
| 06/07/2013 | 7,671 | $25.67 |
| 07/26/2013 | 1,205 | $26.66 |
| 07/30/2013 | 3,243 | $25.35 |
| 08/01/2013 | 4,320 | $24.90 |
| 09/26/2013 | 4,374 | $22.85 |
| 09/27/2013 | 1,088 | $21.61 |
| 04/09/2014 | 3,997 | $27.38 |
| 04/10/2014 | 2,818 | $26.55 |
| 06/06/2014 | 4,129 | $27.62 |
| 01/13/2015 | 2,554 | $22.88 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/31/2014 | 6,675 | $26.26 |
| 02/21/2014 | 245 | $27.26 |
| 03/18/2014 | 370 | $27.61 |
| 04/25/2014 | 840 | $27.76 |
| 07/28/2014 | 655 | $28.14 |
| 08/20/2014 | 8,903 | $27.97 |
| 08/21/2014 | 5,370 | $30.15 |
| 11/20/2014 | 695 | $22.77 |
| 06/29/2015 | 19,512 | $18.63 |